# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RONALD GONZALEZ,              )
    Plaintiff,               )
                             )
VS.                          )CIVIL ACTION: 5:15-CV-986 RCL
                             )
UNITED PARCEL SERVICE,        )
    Defendant.               )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL & VIDEO DEPOSITION OF

RONALD D. GONZALEZ

MAY 24, 2017

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

      ORAL & VIDEO DEPOSITION of RONALD D.

GONZALEZ, produced as a witness at the instance of the

Defendant, and duly sworn, was taken in the above-styled

and numbered cause on the 24th of May, 2017, from

10:57 a.m. to 6:15 p.m., before JULIE VERASTEGUI, CSR in

and for the State of Texas, reported by machine

shorthand, at the Law Offices of Thomas J. Crane,

110 Broadway, Suite 420, San Antonio, Texas 78205,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record or attached hereto.

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    THOMAS J. CRANE
    LAW OFFICE OF THOMAS J. CRANE
    110 Broadway, Suite 420
    San Antonio, Texas  78205
    PHONE:  210.736.1110
    E-MAIL:  Tom@cranelawyer.net

    -and-

    SUSAN CONE KILGORE
    LAW OFFICE OF SUSAN CONE KILGORE
    P.O. Box 461313
    San Antonio, Texas  78246
    PHONE:  210.320.2749
    E-MAIL:  Susan@skilgore.com

FOR THE DEFENDANT:

    JUSTIN BARBOUR
    SCHMOYER REINHARD, LLP
    17806 IH-10 West, Suite 400
    San Antonio, Texas  78257
    PHONE:  210.447.8033, Ext. 105
    E-MAIL:  jbarbour@sr-llp.com

ALSO PRESENT:

    HARLEN SCHULZE,
    Corporate Representative for UPS;
    DAVID FLORES,
    The Videographer;

    RONALD D. GONZALEZ,
    The Witness;
    JULIE VERASTEGUI,
    The Court Reporter.

## Page 4

(Continued from previous page.)

E-X-H-I-B-I-T-S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 9 | 4/7/14 E-Mail From Mr. Hawthorne to Mr. Gonzalez | 138 |
| Exhibit 10 | UPS Accommodation Checklist | 139 |
| Exhibit 11 | 4/21/14 E-Mail From Ms. Lorio to Mr. Gonzalez | 168 |
| Exhibit 12 | Plaintiff's Original Complaint, Ronald Gonzalez vs. Aetna Life Insurance Company | 178 |
| Exhibit 13 | Aetna Appeal Request Form, 12/29/16 | 187 |
| Exhibit 14 | 12/16/16 Letter From Jeffrey Dahl to Aetna Life Insurance Company, Kelly Birchell | 188 |
| Exhibit 15 | 2/11/14 Letter From Mr. Gonzalez to Pam | 194 |
| Exhibit 16 | Diabetes & Glandular Disease Clinic Letter to Dr. Harr from Dr. Fischer | 205 |
| Exhibit 17 | Aetna Work History and Education Questionnaire, 4/7/15 | 207 |
| Exhibit 18 | North Hills Family Medicine Letter From Dr. Naron | 212 |
| Exhibit 19 | Disability Questionnaire Provider's Report Form, 12/23/16 | 213 |
| Exhibit 20 | Activities of Daily Living, Ron Gonzalez, 12/4/16 | 216 |
| Exhibit 21 | Bexar Appraisal District Physician's Statement for Disability Homestead Exemption For Tax Year 2013 | 221 |
| Exhibit 22 | Charge of Discrimination | 224 |

## Page 3

I N D E X

RONALD D. GONZALEZ          MAY 24, 2017

| | | |
|---|---|---|
| Appearances | | 3 |
| Index | | 3-5 |
| Examination by Mr. Barbour | | 7 |
| Examination by Mr. Crane | | 250 |
| Examination by Mr. Barbour | | 289 |
| Signature and Changes | | 307 |
| Reporter's Certificate | | 309 |

E-X-H-I-B-I-T-S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 2/20/15 Letter to Ms. Melendreras From Mr. Gonzalez | 59 |
| Exhibit 2 | Doctors' Notes and Letter to Ms. Elizondo From Mr. Gonzalez | 87 |
| Exhibit 3 | Aetna Capabilities and Limitations Worksheet, 10/22/13 | 102 |
| Exhibit 4 | Aetna Attending Physician Statement, 2/19/14 | 107 |
| Exhibit 5 | 2/10/14 Letter to Mr. Gonzalez from Ms. Lorio | 112 |
| Exhibit 6 | 3/26/14 Office/Outpatient Visit for Mr. Gonzalez to Dr. Martinez | 118 |
| Exhibit 7 | Function Report Adult | 123 |
| Exhibit 8 | Request for Medical Information for Mr. Gonzalez from UPS | 129 |

## Page 5

(Continued from previous page.)

E-X-H-I-B-I-T-S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 23 | Amended Charge of Discrimination | 226 |
| Exhibit 24 | E-Mail to Ms. Melendreras From Mr. Gonzalez | 227 |
| Exhibit 25 | 7/17/15 Letter to Ms. Elizondo From Mr. Gonzalez | 228 |
| Exhibit 26 | 2/11/14 Letter From Dr. Martinez Regarding Mr. Gonzalez | 254 |
| Exhibit 27 | 2/4/14 Letter From Dr. Emmett to Thomas Edison State College | 258 |
| Exhibit 28 | Exhibit 8, Essential Job Functions For UPS | 286 |

2 (Pages 2 to 5)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 6

1    THE VIDEOGRAPHER:  In the matter of
2  Ronald B. Gonzalez vs. United Parcel Service in the
3  United States District Court for the Western District of
4  Texas, San Antonio Division, Civil No. 515-CV-986 RCL,
10:56:24  5  this is the deposition of Ronald Gonzalez, taken this
6  24th day of May 2017, at the Law Offices of Thomas J.
7  Crane, 110 Broadway, San Antonio, Texas.
8    Our court reporter is Julie Verastegui.  I
9  am the court -- I am the videographer, David Flores.
10:56:46  10    Would counsels please introduce
11  themselves?
12    Counsels for the plaintiff.
13    MR. CRANE:  Tom Crane for the plaintiff.
14    MS. KILGORE:  Hi.  I'm Susan Kilgore for
10:56:54  15  the plaintiff.
16    THE VIDEOGRAPHER:  Counsels for the
17  defense.
18    MR. BARBOUR:  Justin Barbour for the
19  defendant, and I'm accompanied by Harlen Schulze,
10:57:00  20  corporate representative for UPS.
21    THE VIDEOGRAPHER:  We are on the record at
22  10:57 a.m.
23    Madam Court Reporter, please swear in our
24  witness.
10:57:19  25    -o0o-

## Page 7

1    RONALD D. GONZALEZ,
2  having been first duly sworn, testified as follows:
3    EXAMINATION
4  BY MR. BARBOUR:
10:57:45  5    Q.  Could you state and spell your name for the
6  record, please, sir?
7    **A.  Ronald Darrell Gonzalez.  Ronald, R-O-N-A-L-D.**
8  **Darrell, D-A-R-R-E-L-L..  Gonzalez, G-O-N-Z-A-L-E-Z.**
9    Q.  Mr. Gonzalez, my name's Justin Barbour, and I
10:58:01  10  represent United Parcel Service.
11    Do you understand that?
12    **A.  Yes, sir.**
13    Q.  And you understand you're here today to give a
14  deposition in conjunction with a lawsuit that you filed
10:58:11  15  against UPS?
16    **A.  Yes.**
17    Q.  Have you ever given a deposition before, sir?
18    **A.  No.**
19    Q.  Have you ever testified in court previously?
10:58:19  20    **A.  No.**
21    Q.  Since you haven't, I'll briefly walk you
22  through some of the procedures and how we'll -- we'll go
23  about this today.
24    You understand you're under oath, correct?
10:58:25  25    **A.  Correct.**

## Page 8

1    Q.  And you understand that you'll do your best to
2  try and testify truthfully and accurately in response to
3  the questions that I will be asking you today?
4    **A.  Yes.**
10:58:33  5    Q.  Our court reporter is taking down everything
6  that we say here today.  You understand that?
7    **A.  Yes, I do.**
8    Q.  To make sure we have a clean record, it's
9  important that you give verbal answers, not uh-huh,
10:58:47  10  uh-uhs or shakes of the head and things like that.  Is
11  that fair?
12    **A.  Understood.  Uh-huh.**
13    Q.  If at any point today you don't understand a
14  question that I ask you, will you please agree to let me
10:58:59  15  know you don't understand the question?
16    **A.  Yes.**
17    Q.  And if at any point you need a break, just let
18  me know.  This isn't --
19    **A.  Okay.**
10:59:07  20    Q.  -- intended to be a marathon here today.
21    **A.  All right.**
22    Q.  Okay.
23    **A.  Very well.**
24    Q.  My -- My only request would be that if there's
10:59:13  25  a question pending, that you answer that question that's

## Page 9

1  pending, and then we'll go ahead and take a break at
2  that point.  Is that fair?
3    **A.  Sounds fair.**
4    Q.  Okay.  Mr. Gonzalez, is there any way -- any
10:59:25  5  reason -- excuse me -- that you wouldn't be able to
6  testify truthfully here today?
7    **A.  I will testify truthfully.**
8    Q.  Okay.  Are you taking any medications that
9  would affect your memory?
10:59:35  10    **A.  I do take medication.**
11    Q.  Do you take any med -- Have you taken any
12  medications today that affect your memory?
13    **A.  Some of the medications I do take have**
14  **reactions.**
10:59:47  15    Q.  Okay.
16    **A.  But I'm not sure it's going to impact my**
17  **memory.**
18    Q.  Okay.  Do you feel -- And I -- You know, we'll
19  discuss your medications in more detail later on, but do
10:59:59  20  you feel as you sit here today that your memory to
21  recall events occurring three or four years ago is
22  impacted --
23    **A.  No.**
24    Q.  -- by any of the medications you've taken
11:00:07  25  today?

3  (Pages 6 to 9)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 2

A P P E A R A N C E S

1
2
3    FOR THE PLAINTIFF:
4       THOMAS J. CRANE
        LAW OFFICE OF THOMAS J. CRANE
5       110 Broadway, Suite 420
        San Antonio, Texas 78205
6       PHONE: 210.736.1110
        E-MAIL: Tom@cranelawyer.net
7
        -and-
8
        SUSAN CONE KILGORE
9       LAW OFFICE OF SUSAN CONE KILGORE
        P.O. Box 461313
10      San Antonio, Texas 78246
        PHONE: 210.320.2749
11      E-MAIL: Susan@skilgore.com
12
13   FOR THE DEFENDANT:

        JUSTIN BARBOUR
14      SCHMOYER REINHARD, LLP
        17806 IH-10 West, Suite 400
15      San Antonio, Texas 78257
        PHONE: 210.447.8033, Ext. 105
16      E-MAIL: jbarbour@sr-llp.com
17
18
     ALSO PRESENT:
19
        HARLEN SCHULZE,
20      Corporate Representative for UPS;
21      DAVID FLORES,
        The Videographer;
22
        RONALD D. GONZALEZ,
23      The Witness;
24      JULIE VERASTEGUI,
        The Court Reporter.
25

## Page 4

1    (Continued from previous page.)
2
3              E-X-H-I-B-I-T-S
4    NO.        DESCRIPTION              PAGE
5    Exhibit 9   4/7/14 E-Mail From Mr. Hawthorne    138
                 to Mr. Gonzalez
6    Exhibit 10  UPS Accommodation Checklist     139
7    Exhibit 11  4/21/14 E-Mail From Ms. Lorio    168
                 to Mr. Gonzalez
8
9    Exhibit 12  Plaintiff's Original Complaint,    178
                 Ronald Gonzalez vs. Aetna Life
10               Insurance Company
11   Exhibit 13  Aetna Appeal Request Form, 12/29/16  187
     Exhibit 14  12/16/16 Letter From Jeffrey Dahl    188
12               to Aetna Life Insurance Company,
                 Kelly Birchell
13
     Exhibit 15  2/11/14 Letter From Mr. Gonzalez    194
14               to Pam
15   Exhibit 16  Diabetes & Glandular Disease Clinic  205
                 Letter to Dr. Harr from Dr. Fischer
16
     Exhibit 17  Aetna Work History and Education    207
17               Questionnaire, 4/7/15
18   Exhibit 18  North Hills Family Medicine Letter   212
                 From Dr. Naron
19
     Exhibit 19  Disability Questionnaire Provider's  213
20               Report Form, 12/23/16
     Exhibit 20  Activities of Daily Living, Ron     216
21               Gonzalez, 12/4/16
22
     Exhibit 21  Bexar Appraisal District Physician's  221
23               Statement for Disability Homestead
                 Exemption For Tax Year 2013
24
     Exhibit 22  Charge of Discrimination          224
25

## Page 3

I N D E X

1
2
3    RONALD D. GONZALEZ        MAY 24, 2017
4
5    Appearances........................    3
6    Index.............................  3-5
7    Examination by Mr. Barbour...........    7
8    Examination by Mr. Crane.............  250
9    Examination by Mr. Barbour...........  289
10   Signature and Changes................  307
11   Reporter's Certificate...........  309
12
13   NO.        DESCRIPTION              PAGE
14   Exhibit 1   2/20/15 Letter to Ms. Melendreras   59
                 From Mr. Gonzalez
15
     Exhibit 2   Doctors' Notes and Letter to     87
16               Ms. Elizondo From Mr. Gonzalez
17   Exhibit 3   Aetna Capabilities and Limitations  102
                 Worksheet, 10/22/13
18
     Exhibit 4   Aetna Attending Physician Statement, 107
19               2/19/14
20   Exhibit 5   2/10/14 Letter to Mr. Gonzalez from  112
                 Ms. Lorio
21
     Exhibit 6   3/26/14 Office/Outpatient Visit   118
22               for Mr. Gonzalez to Dr. Martinez
23   Exhibit 7   Function Report Adult          123
24   Exhibit 8   Request for Medical Information for  129
                 Mr. Gonzalez from UPS
13   E-X-H-I-B-I-T-S
25

## Page 5

1    (Continued from previous page.)
2
3              E-X-H-I-B-I-T-S
4    NO.        DESCRIPTION              PAGE
5    Exhibit 23  Amended Charge of Discrimination    226
6    Exhibit 24  E-Mail to Ms. Melendreras From      227
                 Mr. Gonzalez
7    Exhibit 25  7/17/15 Letter to Ms. Elizondo From  228
                 Mr. Gonzalez
8
9    Exhibit 26  2/11/14 Letter From Dr. Martinez    254
                 Regarding Mr. Gonzalez
10   Exhibit 27  2/4/14 Letter From Dr. Emmett to    258
                 Thomas Edison State College
11
     Exhibit 28  Exhibit 8, Essential Job Functions  286
12               For UPS
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 10

1     A.  I don't feel I'll be im -- impacted with
2  remembering that time period.
3     Q.  Okay.  I want to ask just some general
4  background questions about you, Mr. Gonzalez.
11:00:25  5     A.  Yeah.
6     Q.  Did you go to high school, sir?
7     A.  I did.
8     Q.  Where did you go to high school?
9     A.  Holy Cross High School.
11:00:29  10     Q.  Did you graduate?
11     A.  I did.
12     Q.  What year did you graduate?
13     A.  1977.
14     Q.  Did you take any formal education after high
11:00:39  15  school?
16     A.  Yes.
17     Q.  And where was that?
18     A.  I went to St. Edward's University in Austin.
19     Q.  Did you graduate from St. Edward's?
11:00:49  20     A.  No.
21     Q.  Generally, what was your course of study at
22  St. Edward's?
23     A.  Business.  Business marketing.
24     Q.  And how long were you enrolled at St. Edward's?
11:00:59  25     A.  One year.

Page 11

1     Q.  Other than St. Edward's, do you have any other
2  formal education?
3     A.  Yes.
4     Q.  What would that --
11:01:11  5     A.  Went to San Antonio College -- or junior
6  college.
7     Q.  What years were you at SAC?
8     A.  I would say approximately '78 to '79.
9     Q.  Did you get an associate's from SAC?
11:01:25  10     A.  No, I did not.
11     Q.  What was your course of study at SAC?
12     A.  There again, it was towards my business
13  degree -- working towards my business degree.
14     Q.  Other than St. Edward's and your courses at
11:01:43  15  San Antonio College, do you have any other formal
16  education?
17     A.  Yes.
18     Q.  What would that be?
19     A.  Thomas Edison Uni -- University.
11:01:57  20     Q.  You were at Thomas Edison University relatively
21  recently, weren't you?
22     A.  Yes.
23     Q.  And what year did you begin your course of
24  study at Thomas Edison?
11:02:05  25     A.  Roughly 2012.

Page 12

1     Q.  What was it that prompted you to go back to
2  school?
3     A.  I wanted to advance my career with UPS.
4     Q.  What type of courses did you take at Thomas
11:02:17  5  Edison?
6     A.  I took some natural sciences, communications,
7  Spanish.  Those are pretty much what I recall right now.
8  There was several others.
9     Q.  Are you on -- or are you still enrolled at
11:02:39  10  Thomas Edison?
11     A.  No.
12     Q.  Did you obtain a degree from Thomas Edison?
13     A.  I did not.
14     Q.  Approximately how many courses per semester
11:02:49  15  were you taking at Thomas Edison?
16     A.  Two.
17     Q.  Were these on-campus courses or remote courses?
18     A.  Remote.
19     Q.  Were you taking them through the computer, I
11:03:01  20  suppose, the Internet and whatnot?
21     A.  Yes.
22     Q.  Were you on any particular type of degree path
23  with Thomas Edison?
24     A.  The same.
11:03:07  25     Q.  "Same," meaning?

Page 13

1     A.  Same path, meaning business.  And it -- I may
2  have changed it to liberal arts.  It was -- It was kind
3  of still up in the -- up in the air, so to speak.
4     Q.  When did you take your last course with Thomas
11:03:23  5  Edison?
6     A.  I would have to -- I'd say -- I believe it was
7  2014.  2013, 2014.
8     Q.  And was there any particular reason that you
9  discontinued taking courses with Thomas Edison --
11:03:39  10  Edison?
11     A.  That's when I was -- began to have some medical
12  issues and surgery.
13     Q.  Did you feel that you were medically incapable
14  of continuing the courses at Thomas Edison?
11:03:55  15     A.  No.
16     Q.  Okay.
17     A.  I didn't feel like I was incapable.  I just --
18  I felt I didn't have the time to take the
19  courses and also respond to treatment.
11:04:03  20     Q.  So you felt that the time demands of your
21  courses with Thomas Edison were too great to both go to
22  the class and to get --
23     A.  I didn't --
24     Q.  -- to go to your doctors' appointments?
11:04:19  25     A.  I didn't know that.  I didn't -- No.  I

4  (Pages 10 to 13)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                           RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 14

1    didn't -- I don't feel that way.  It was a choice I made
2    to stop at that time.
3        Q.  On account of the medical issues that you were
4    dealing with?
11:04:27  5        A.  Right.  Not knowing what the outcome was going
6    to be, not knowing how long rehabilitation takes.
7        Q.  And it's fair to say you haven't recommenced
8    your courses with Thomas Edison, correct?
9        A.  No, sir, not yet.
11:04:43  10        Q.  Do you plan to?
11        A.  I do.
12        Q.  And do you have any dates on which you plan to
13    begin those courses again?
14        A.  I -- I don't have any dates, no.
11:04:53  15        Q.  Okay.  Do you have a rough -- Would you say you
16    plan to be in those courses in the next year or two?
17        A.  I -- I'd say that's fair, yes.
18        Q.  Other than the three institutions of higher
19    learning that we discussed, do you have any other
11:05:11  20    professional certifications or licenses?
21        A.  No licenses.  Certifications through -- through
22    work, not UPS, but other employers.
23        Q.  And what kind of certifications would those be?
24        A.  They're training certifications.
11:05:33  25        Q.  And do you recall -- You said that these were

## Page 15

1    certifications through prior employers; is that correct?
2        A.  Yes.
3        Q.  Through which employers did you obtain these
4    certifications?
11:05:45  5        A.  Oslin Nation is one, and Industrial Systems.
6        Q.  Okay.  Through Oslin, what certifications do
7    you recall receiving during your employment there?
8        A.  They're trainings from manufacturers that we
9    represented.
11:06:13  10        Q.  Would these be companies whose products you
11    were selling or marketing during your --
12        A.  Correct.
13        Q.  -- work for Oslin?
14        A.  Yes.
11:06:21  15        Q.  So you would have taken some type of training,
16    gotten certification demonstrating that you had
17    background and knowledge of what those products were?
18        A.  Correct.
19        Q.  Okay.  Do you recall approximately how many of
11:06:35  20    those certifications you received during your employment
21    with Oslin?
22        A.  No.
23        Q.  Okay.  What about with Industrial Systems?
24    What type of certifications did you receive while
11:06:47  25    working there?

## Page 16

1        A.  Related to mechanical equipment and plumbing,
2    possibly plumbing equipment as well.
3        Q.  And would those certifications also have been
4    to provide you with background into -- excuse me -- to
11:07:05  5    demonstrate you have knowledge of the products and
6    services that you were marketing at Industrial Systems?
7        A.  Yes.
8        Q.  Do you recall approximately how many
9    certifications you received --
11:07:13  10        A.  No.
11        Q.  -- while working at Industrial Systems?
12        A.  No, sir.
13        Q.  And just to ensure that we have a clean record,
14    if you'll let me finish my question before you answer
11:07:21  15    it, even if --
16        A.  Absolutely.
17        Q.  -- you think you understand what I'm asking
18    you --
19        A.  Okay.
11:07:25  20        Q.  -- and then I'll make sure that I allow you to
21    fully answer before I ask my next question.
22        A.  Sure.
23        Q.  Do you have any other certifications other than
24    those that you received at Oslin and Industrial Systems?
11:07:37  25        A.  None that I recall.

## Page 17

1        Q.  Where do you currently live, Mr. Gonzalez?
2        A.  9903 Carolwood Drive.
3        Q.  Does anyone else live at that address with you?
4        A.  My wife and my son, currently.
11:07:51  5        Q.  What is Ms. Gonzalez's name?
6        A.  Claudia Wilson de Gonzalez.
7        Q.  And you said your son lives with you also?
8        A.  Yes.
9        Q.  Is your son over or under 18 years old?
11:08:05  10        A.  Over.
11        Q.  What is your son's name, Mr. Gonzalez?
12        A.  Grant Jacob.
13        Q.  Does Mrs. Gonzalez work?
14        A.  Yes.
11:08:13  15        Q.  Where does she work?
16        A.  She works for AACOG.
17        Q.  Is that the Alamo Co -- Counsel of Governments?
18        A.  Alamo Area Counsel of Governments.
19        Q.  Excuse me.  Alamo Area.
11:08:23  20            Approximately how long has she worked at
21    AACOG?
22        A.  Approximately a year.
23        Q.  Okay.  Is your son enrolled in school?
24        A.  Not right now.
11:08:31  25        Q.  Okay.  Is he employed?

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

## Page 18

1    A.  No.
2    Q.  Do you rent or own the house at 9903 Carolwood?
3    A.  We own.
4    Q.  As you sit here today, are you relatively up to
11:08:45  5  date on your mortgage on that property?
6    A.  Yes, sir.
7    Q.  And otherwise, are you generally up to date on
8    bills in the household?
9    A.  Yes, sir.
11:08:55 10  Q.  Are you employed as you sit here today,
11   Mr. Gonzalez?
12   A.  No, sir.
13   Q.  Is it fair to say that the last place of
14   employment for you would have been at United Parcel
11:09:05 15  Service?
16   A.  Yes.
17   Q.  Are you receiving any monthly income outside of
18   an employment relationship today?
19   A.  Outside of --
11:09:17 20  Q.  I guess I can rephrase that.
21   A.  Yeah.
22   Q.  Do you currently receive Social Security
23   disability benefits?
24   A.  Yes, I do.
11:09:25 25  Q.  Do you know approximately how much your monthly

---

## Page 19

1    Social Security benefit is?
2    A.  Yes.
3    Q.  How much is that?
4    A.  About $2,050.
11:09:33  5  Q.  Other than your Social Security disability
6    income, do you have any other regular income yourself?
7    A.  No.
8    Q.  Does your son currently receive Social Security
9    benefits --
11:09:55 10  A.  No.
11   Q.  -- on account of your disability?
12   A.  No.
13   Q.  Did your son ever receive Social Security
14   benefits on account of your disability?
11:10:01 15  A.  Yes.
16   Q.  Would that have been discontinued when he hit
17   the age of 18?
18   A.  Yes.
19   Q.  Do you remember what your son's monthly benefit
11:10:09 20  was from Social Security?
21   A.  I do.
22   Q.  How much is that?
23   A.  Approximately $1,069.
24   Q.  And he would have received that through his
11:10:21 25  18th birthday, correct?

---

## Page 20

1    A.  Up till his 18th birthday, yes.
2    Q.  When did your son turn 18, Mr. Gonzalez?
3    A.  December 30th.
4    Q.  Of 2016?
11:10:31  5  A.  Yes.
6    Q.  Do you have medical insurance as you sit here
7    today, Mr. Gonzalez?
8    A.  I do.
9    Q.  Is that through Medicare?
11:10:45 10  A.  Yes.
11   Q.  And that is provided in conjunction with your
12   Social Security disability benefits, is it not?
13   A.  Clarify your question, please.
14   Q.  Are you -- Do you -- To the best of your
11:10:59 15  knowledge, are you on Medicare because you've been
16   approved for Social Security disability benefits?
17   A.  Yes.
18   Q.  So is it fair to say that you've been on
19   Medicare since approximately April of 2013, when you
11:11:11 20  became disabled?
21   A.  Approximately, yes.
22   Q.  Now, earlier we discussed that you're here
23   today to give a deposition in relationship with a
24   lawsuit you filed against UPS.  You understand that.
11:11:27 25       In your own words, what do you understand

---

## Page 21

1    your claims against UPS to be?
2    A.  I understand that I requested a -- an
3    accommodation to return to work and I was not allowed to
4    return.
11:11:47  5  Q.  And obviously we'll discuss all of that in
6    substantially more detail.
7         Do you believe you were discriminated
8    against during your employment at UPS?
9    A.  Yes.
11:12:03 10  Q.  And do you believe that that discrimination
11   occurred on account of your disability?
12   A.  Yes.
13   Q.  Are there any other characteristics associated
14   with you that you believe you were discriminated against
11:12:17 15  on the basis of?
16   A.  I am -- I -- I'm not a lawyer, so I don't know,
17   other than my disability and that request that I --
18   that -- a process that I went through, the EEOC.
19        If there's more to your question or -- you
11:12:39 20  might -- Can you repeat your question --
21   Q.  Yes, sir.
22   A.  -- so I can --
23   Q.  I can rephrase that.
24        You believe that you were discriminated
11:12:47 25  against on account of your disability; is that correct?

---

6 (Pages 18 to 21)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 22

1      A.  Yes.
2      Q.  Do you believe you were discriminated against
3  on the basis of anything other than your disability?
4      A.  Yes.
11:12:55  5      Q.  And what would that be?
6      A.  There were other employees working there that
7  were out very often that were able to return to work.
8      Q.  I guess my question is:  You believe that other
9  folks were allowed to return to work and you were not,
11:13:11  10  and you believe that you were discriminated against on
11  that account; is that correct?
12      A.  That's fair to say.
13      Q.  What about you or -- or what characteristics of
14  you do you believe UPS discriminated against you on the
11:13:23  15  basis of, other than your disability?
16      A.  Sounds like the same question.  Can you
17  rephrase that?
18      Q.  I can.
19          Do you believe you were discriminated
11:13:35  20  against on the basis of your sex, for example?
21      A.  No.
22      Q.  Okay.  Do you believe you were discriminated
23  against on the basis of your religion?
24      A.  No.
11:13:43  25      Q.  Okay.  Is there anything other than your

---

Page 23

1  disability that you believe you were discriminated
2  against on the basis of?
3      A.  There's two white employees that work there in
4  the same group as I that were able -- that were out
11:14:01  5  because of a chronic disability that were able to return
6  to work.
7      Q.  Do you believe you were discriminated against
8  on the basis of your race?
9      A.  Yes.
11:14:15  10      Q.  And what is your race?
11      A.  I'm Mexican-American, Latino, Hispanic.
12      Q.  Do you define your race as all three of those?
13      A.  Well, I -- I -- they're described as many of
14  those, I would say.
11:14:37  15      Q.  I'm just asking in your own words what you
16  would describe your race as, for the record.
17      A.  Well, I'm Hispanic, but if I were to check a
18  box and it doesn't give me "Latino" or
19  "Mexican-American" and it says "white," I check "white."
11:14:51  20      Q.  That would be white Hispanic, I think, on most
21  of the demographic boxes.  Is that --
22      A.  If you think so --
23      Q.  -- correct?
24      A.  -- yes.
11:15:01  25      Q.  Is one of your claims that you believe UPS

---

Page 24

1  retaliated against you?
2      A.  Yes.
3      Q.  Why do you think UPS retaliated against you?
4      A.  I -- Well, my disability, one.  I wasn't able
11:15:19  5  to return to work 100 percent -- at 100 percent capacity
6  or without restrictions.
7      Q.  Is it fair to say that in terms of -- Well, let
8  me strike that.
9          The things you're complaining UPS did to
11:15:39  10  you that you think were wrong, is it primarily that you
11  weren't allowed to return to work?
12      A.  That -- I would -- Yeah.  I don't -- Yes, I
13  would say it is primary.
14      Q.  Okay.  And subsequent to that, you were
11:15:53  15  terminated from employment, correct?
16      A.  Yes.
17      Q.  Okay.  And I'm assuming you also believe that
18  that was one of the things that UPS did that wronged
19  you.  Is that correct?
11:16:01  20      A.  That is what they did that wronged me, yes.
21      Q.  Other than that, is there anything UPS did that
22  you believe was discriminatory or unfair or retaliatory
23  towards you?
24      A.  The determination impacted my -- my life by
11:16:23  25  losing my benefits as well.

---

Page 25

1      Q.  When you say "the determination," that would be
2  the refusal to return to work and your subsequent
3  separation from employment, correct?
4      A.  Yes.
11:16:35  5      Q.  I want to talk about your employment history
6  briefly, Mr. Gonzalez.
7      A.  Okay.
8      Q.  Do you know when you began working for UPS?
9      A.  It was August 5th, I believe, two thousand -- I
11:16:53  10  believe it was 2007.
11      Q.  Prior to working at UPS -- Where did you work
12  immediately prior to working at UPS?
13      A.  Immediately prior to work -- It was with -- It
14  was one of two companies.  I'm not sure.  It may have
11:17:09  15  been Popular Tools.
16      Q.  Okay.  Was -- Where was Popular Tools located?
17      A.  They're on Warfield Drive.
18      Q.  Here in San Antonio?
19      A.  Yes.
11:17:21  20      Q.  What was your position with Popular Tools?
21      A.  I was an inside sales -- inside and outside
22  sales rep.
23      Q.  What were some of your responsibilities as an
24  inside and outside sales representative at Popular
11:17:45  25  Tools?

---

7  (Pages 22 to 25)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 26

1          A.  I had a certain territory of the country to --
2     to grow the business.
3          Q.  And what kind of business was Popular Tools in?
4          A.  They were a manufacturer of circular-tipped saw
11:17:59  5     blades.
6          Q.  How many other sales reps did you work with at
7     Popular Tools?
8          A.  One other.
9          Q.  So just two of you within the entire company?
11:18:11  10         A.  Well, that worked in that role, yes.
11         Q.  One of your responsibilities was to grow your
12    sales business?
13         A.  Right.
14         Q.  Safe to say that to do that you'd need to
11:18:29  15    identify your customer needs and identify what products
16    Popular Tools had --
17         A.  Uh-huh.
18         Q.  -- to be able to market to them?
19         A.  Well, I knew what products Popular Tools had.
11:18:39  20    Yes, it was to sell to customers that were already in a
21    book of business or a business that we already had
22    contacts with and to call on -- develop new accounts,
23    new customers.
24         Q.  For the benefit of the ladies and gentlemen of
11:18:55  25    the jury, what's the difference between inside and

---

Page 27

1     outside sales?
2          A.  Inside sales primarily is on the phone in the
3     roles that I was in.  So it was receiving inbound phone
4     calls, making outbound phone calls, submitting
11:19:13  5     proposals, reviewing specifications, sometimes receiving
6     a request for quotes by fax or e-mail.
7          Q.  Uh-huh.  And outside sales?
8          A.  And the outside sales was going out to visit
9     customers, going out to job sites, calling on new and
11:19:37  10    existing customers to, there again, grow or build a
11    business.
12         Q.  When you were working for Popular Tools, were
13    you working to develop new customer relationships,
14    expand existing ones, or a little bit of both?
11:19:53  15         A.  Both.
16         Q.  Would you use the computer in your work for
17    Popular Tools?
18         A.  Yes.
19         Q.  What type of computer programs would you use in
11:20:05  20    that job?
21         A.  The company provided software.
22         Q.  Some type of sales tracking software?
23         A.  Right.  And some customer management system.
24         Q.  Do you remember the name of the customer
11:20:21  25    management system?

---

Page 28

1          A.  No.
2          Q.  Approximately how long did you work at Popular
3     Tools?
4          A.  Approximately a year.
11:20:33  5          Q.  Why did you choose to leave that job?
6          A.  There was issues with communications with
7     the -- the boss, owner.
8          Q.  What kind of issues did you have?
9          A.  They were mostly interpretation issues because
11:20:51  10    he was of Asian decent.  So his language barriers.
11         Q.  Is it your testimony that you voluntarily left
12    Popular Tools?
13         A.  There was a dispute between us, and we agreed
14    to disagree and I left.
11:21:13  15         Q.  So I guess my question is:  Is that termination
16    characterized as voluntary or involuntary on your part?
17         A.  It was involuntary.
18         Q.  To the best of your knowledge, why did the
19    company indicate that they were involuntarily
11:21:37  20    terminating your employment?
21         A.  We -- I didn't -- I don't have anything in
22    writing or he didn't -- the owner didn't tell me why he
23    let me go.  He wasn't there.  I just received notice
24    from an employee.
11:21:57  25         Q.  What employee gave you the notice that your

---

Page 29

1     employment at Popular Tools was involuntarily
2     terminated?
3          A.  I don't recall her name.
4          Q.  Do you recall the substance of that
11:22:07  5     communication?  Let me strike that.
6              Did -- It was a female employee, I take
7     it.
8          A.  Yes, it was female.
9          Q.  Did she notify you by e-mail, by phone or in
11:22:15  10    person that you were being terminated from employment?
11         A.  In person.
12         Q.  Do you recall her position at Popular Tools?
13         A.  She's office admin.  I'm not sure she had a
14    title.
11:22:27  15         Q.  Okay.  And what do you recall of the
16    conversation in which she told you that your employment
17    was involuntarily terminated?
18         A.  She stated that the owner said that he didn't
19    want -- I no longer worked there and that -- so she had
11:22:45  20    a check.
21         Q.  She just told you you no longer worked there?
22         A.  Well, she told me the own -- the owner conveyed
23    to her that I no longer worked there.
24         Q.  When she notified you that you just no longer
11:23:05  25    worked there, did that catch you by surprise, or did

---

8  (Pages 26 to 29)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 30

```
 1    you --
 2        A.  Yes.
 3        Q.  -- expect it?
 4            Okay.  Where did you work prior to Popular
      Tools?
11:23:25
 5    
 6        A.  A company called Klinger Specialties.
 7        Q.  And was Klinger Specialties also located in
 8    San Antonio?
 9        A.  Yes, sir.
11:23:33 10    Q.  What was your job title with Klinger
11    Specialties?
12        A.  Estimator.
13        Q.  And what type of industry is Klinger
14    Specialties in?
11:23:47 15    A.  Construction.
16        Q.  What would your job responsibilities have been
17    as an estimator for Klinger Specialties?
18        A.  I would review, plan and spec -- plans and
19    specifications for new construction or renovations and
11:24:09 20    provide proposals.
21        Q.  Did you have any background in work as an
22    estimator prior to working for Klinger Specialties?
23        A.  Yes.
24        Q.  Where did you work previously as an estimator?
11:24:31 25    A.  I didn't -- The title wasn't estimator
```

---

Page 31

```
 1    previously.  I was -- A more appropriate title was
 2    manufacturer's representative, and that was for a
 3    company named Oslin Nation.
 4        Q.  Did you have any sales responsibilities as an
11:24:53 5    estimator at Klinger Specialties?
 6        A.  There again, it was to review plans and
 7    specifications and provide proposals, follow up on those
 8    proposals to the bidding contractors and submit purchase
 9    orders for the equipment, to follow up on the equipment
11:25:15 10    as far as delivery and requested schedule dates on job
11    sites and any field service that may be required.
12        Q.  Why did you leave Klinger Specialties?  Why did
13    you leave employment with Klinger Specialties?
14        A.  Klinger, I didn't enjoy the work.  Working for
11:25:37 15    Klinger Specialties, though, is still in the
16    construction business.
17            The business entailed what the -- What the
18    company sold were toilet room -- or bathroom partitions,
19    and -- for men's rooms and ladies' rooms, so it meant
11:25:53 20    going into the bathrooms and actually taking
21    measurements for new urinal partitions and bathroom
22    partitions, so I didn't -- I didn't find it pleasurable.
23        Q.  You just wanted to move on to something else --
24        A.  I did.
11:26:07 25    Q.  -- at that point?  Reasonable.  Fair enough.
```

---

Page 32

```
 1    Fair enough.
 2            So that was a voluntary separation on your
 3    part then?
 4        A.  Yes.
11:26:15 5    Q.  Okay.  You --
 6        A.  As far as I recall, that was -- that was a
 7    straight commission job, and -- Yeah.
 8        Q.  So on account of the pay structure and the
 9    nature of the work, I guess --
11:26:25 10    A.  The nature of the work, right.
11        Q.  -- you decided to move on to Popular Tools
12    after that?
13        A.  After -- Yes.
14        Q.  Okay.  Prior to Klinger, you said that you had
11:26:33 15    worked at Oslin Nation; is that correct?
16        A.  Yes.
17        Q.  And you may have told me already, but I
18    apologize if I forgot.  What was your job title with
19    Oslin Nation?
11:26:45 20    A.  Manufacturer's representative.
21        Q.  You had some of the same obligations in terms
22    of estimation and providing bids and following up on
23    proposals, and things like that, at Oslin Nation?
24        A.  That's correct.
11:26:53 25    Q.  What type of industry does Oslin Nation work
```

---

Page 33

```
 1    in?
 2        A.  HVAC, plumbing, institutional, municipality,
 3    high-tech.
 4        Q.  Are they located here in San Antonio also?
11:27:09 5    A.  Yes.
 6        Q.  Did you have any sales goals or quotas with
 7    Oslin Nation?
 8        A.  Yes.
 9        Q.  And did you have the responsibility to gain any
11:27:23 10    particularized knowledge with regard to the products
11    that Oslin Nation sold?
12        A.  Please repeat the question for me, please.
13        Q.  Yeah.  In terms of doing your duty or
14    responsibilities -- performing your responsibilities for
11:27:35 15    Oslin Nation, did you have specialized knowledge as to
16    the products that they sold?
17        A.  I was -- I had previous knowledge of the
18    products and also on-the-job knowledge and training.
19        Q.  Approximately how long did you work for Oslin
11:27:49 20    Nation?
21        A.  Approximately nine to ten years.
22        Q.  Is it correct that you failed to meet your
23    sales goals for the last eight years you worked with
24    Oslin Nation?
11:28:03 25    A.  No.
```

---

                                        9  (Pages 30 to 33)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

## Page 34

1    Q.   That would be an incorrect factual statement,
2    is your testimony?
3    **A.   That is correct.**
4    Q.   Okay.  Is it accurate to say that you were
11:28:13  5    involuntarily terminated from your employment with Oslin
6    Nation?
7    **A.   Yes.**
8    Q.   And do you recall what Oslin Nation told you
9    was the reason you were being terminated?
11:28:23  10   **A.   They told me the sales goals for that**
11   **particular year were not -- I did not achieve that sales**
12   **goal for that year.**
13   Q.   As we just discussed, you disagree with them.
14   That's correct?
11:28:43  15   **A.   That's correct.**
16   Q.   Did you believe that your termination from
17   Oslin Nation was discriminatory?
18   **A.   Yes.**
19   Q.   And why do you believe that Oslin Nation
11:28:57  20   discriminated against you?
21   **A.   Because of my national heritage.**
22   Q.   To the best of your rec -- recollection, had
23   anyone at Oslin Nation made any comments to you that you
24   felt used, you know, racial slurs or slurs about your
11:29:17  25   national origin, or anything like that?

---

## Page 35

1    **A.   None that I recall.**
2    Q.   In fact, you filed a charge of discrimination
3    against Oslin Nation with the EEOC, didn't you?
4    **A.   Yes, I did.**
11:29:29  5    Q.   And then subsequent to that charge, you
6    actually filed a lawsuit against Oslin Nation, didn't
7    you?
8    **A.   I did.**
9    Q.   And that lawsuit also alleged that you had
11:29:39  10   suffered race or national origin discrimination, didn't
11   it?
12   **A.   Yes.**
13   Q.   What was the outcome of your lawsuit against
14   Oslin?
11:29:53  15   **A.   There was a settlement.**
16   Q.   Did you receive compensation as a result of
17   that settlement?
18   **A.   Yes, I did.**
19   Q.   Do you recall how much compensation you
11:30:03  20   received as a result of that?
21   **A.   Total compen -- Total compensation, including**
22   **the lawyer's share, or just my share?**
23   Q.   Well, if you recall both, I'll take both.
24       MR. CRANE:   Was that a confidential
11:30:15  25   settlement?

---

## Page 36

1        THE WITNESS:   It may have been, yes.
2        That -- That being -- I'm not so sure I
3    should -- I mean, you can get that from -- If you want
4    that information, you can get it from my attorneys,
11:30:33  5    Sylvan Lang and/or Ron Mendoza.
6    Q.   (By Mr. Barbour)  Right.  I've got you here --
7    **A.   Right.  Okay.**
8    Q.   -- under oath at your deposition.
9    **A.   Well, I -- you know, I -- I guess I -- I could**
11:30:39  10   **tell you, but I -- I feel more comfortable -- I can give**
11   **you a range.  You know, it's less than 100,000.**
12   Q.   Was it more than 50,000?
13   **A.   No.**
14   Q.   Was it more than 25,000?
11:30:49  15   **A.   Yes.**
16   Q.   Is that share to you, or is that total
17   compensation?
18   **A.   Share.**
19   Q.   Was the total amount more or less than 50,000?
11:31:03  20   **A.   Less.**
21   Q.   You weren't deposed in that lawsuit.  That's
22   correct?
23   **A.   Correct.**
24   Q.   Would you describe your jobs with Klinger and
11:31:25  25   Oslin as being somewhat sales-oriented?

---

## Page 37

1    **A.   They -- Yes, they are sales-oriented.**
2    Q.   And you began your employment with Oslin
3    sometime in the mid to late 1990s; is that correct?
4    **A.   Correct.**
11:31:39  5    Q.   So is it safe to say that you had been -- or
6    you have been in the sales industry for a couple of
7    decades, give or take, at this point?
8    **A.   Yes.**
9    Q.   You're familiar with the sales industry?
11:31:51  10   **A.   Yes, sir.**
11   Q.   You consider yourself to be a good salesperson?
12   **A.   I do.**
13   Q.   Do you enjoy sales work?
14   **A.   I do.**
11:31:59  15   Q.   In your testimony, Mr. Gonzalez, what makes
16   somebody a good salesperson?
17   **A.   Someone that can -- Someone with integrity,**
18   **someone that can build rapport, someone that can be --**
19   **can follow through and be successful with ever --**
11:32:31  20   **whatever products and services I'm -- I'm providing or**
21   **selling.**
22   Q.   Sure.  It's important to have a good
23   relationship with your customers, correct?
24   **A.   Yes.**
11:32:41  25   Q.   They need to know that they can rely on you,

---

**10  (Pages 34 to 37)**

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 38

1    right?

2        A.  Absolutely.

3        Q.  And is it important that you not just be there

4    to actually sell them the product but to help them after

11:32:51   5    that sale as well?

6        A.  Yes, it's important to -- build those

7    relationships.

8        Q.  All right.  So if they have concerns and issues

9    after the sale is consummated --

11:33:01  10        A.  Uh-huh.

11        Q.  -- would you agree that it's important that you

12    be there to at least direct them to the right person to

13    get those --

14        A.  It's -- It --

11:33:07  15        Q.  -- concerns addressed?

16        A.  It's important that I do have the support, yes,

17    that I have support -- if I can't be there, that there's

18    other people that can be there to support me, the

19    people -- employers -- employees that work with me.

11:33:21  20            It wasn't -- I wasn't a single proprietor.

21    I did work with other employees in the -- in the same

22    role.

23        Q.  Okay.  Did you find it was important to know

24    your customers' needs?

11:33:33  25        A.  Yes.

## Page 39

1        Q.  Did you think it was important, obviously,

2    to -- to know what products your company was selling to

3    your customers?

4        A.  Very, very important.

11:33:43   5        Q.  And then you've got to identify how to make a

6    marriage between those needs and the products and

7    services that we're selling, right?

8        A.  Yes.

9        Q.  Do you consider sales to be a stressful job?

11:34:01  10        A.  It has stressful moments.

11        Q.  In what ways can the sales industry be

12    stressful?

13        A.  An example would be if I had several jobs

14    bidding at the same time, just putting together the bids

11:34:23  15    in time to -- before the bid -- bidding date --

16        Q.  Right.

17        A.  -- so the contractors have enough time or

18    customers have enough time to prepare their proposals.

19        Q.  So there could be a lot going on at any one

11:34:39  20    time --

21        A.  Sure.

22        Q.  -- correct?

23            And it's difficult to predict when that

24    would be the case; is that right?

11:34:45  25        A.  Yes, in some cases it is.

## Page 40

1        Q.  I guess at some times it would be predictable.

2        A.  Yes, because there are -- there's bidding

3    schedules.

4        Q.  When were you hired at UPS, Mr. Gonzalez?

11:34:55   5        A.  You asked me earlier.

6        Q.  All right.  Was it August 2007?

7        A.  Yes, sir.

8        Q.  Do you remember your first job title with UPS?

9        A.  It was inside sales rep.

11:35:07  10        Q.  Did that position change at any point during

11    your employment with UPS?

12        A.  Yes.

13        Q.  What did it change to?

14        A.  The last job was a franchise sales consultant.

11:35:21  15        Q.  How does a franchise sales consultant differ

16    from an inside sales representative?

17        A.  It's more of a specialist role.

18        Q.  And how is it more specialized?

19        A.  It was dedicated to a group of franchisees, a

11:35:45  20    UPS Store.

21        Q.  So you were supporting individual UPS Stores?

22        A.  Yes.

23        Q.  Those UPS Stores were not themselves owned by

24    UPS; is that correct?

11:35:59  25        A.  Some were.

## Page 41

1        Q.  And some were not?

2        A.  And some were not.

3        Q.  So you would have been supporting outside

4    companies who happened to be UPS stores.  Is that a

11:36:09   5    correct statement?

6        A.  I wouldn't word it that way.

7        Q.  Okay.  How would you word it?

8        A.  There are independently owned stores, and there

9    are also corporate-owned stores.

11:36:27  10        Q.  You represented a mix of both; is that correct?

11        A.  Yes.

12        Q.  Was franchise sales consultant the position

13    that you recall holding until your separation from

14    employment?

11:36:43  15        A.  Yes.

16        Q.  Did you hold any other positions during your

17    employment with UPS other than insides sales rep and

18    franchise sales consultant?

19        A.  I worked in -- worked in the growth group.

11:36:59  20        Q.  What's the growth group?

21        A.  Growth group is a pool of new sales reps or

22    new -- new represent -- when I say "new sales reps," new

23    ISRs, inside sales reps, that have just been trained

24    that go to the growth group before they are assigned a

11:37:21  25    territory.

11 (Pages 38 to 41)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

## Page 42

1    Q.  What kind of work does the growth group do if
2   it's different than -- different than the day-to-day
3   work of an inside sales rep?
4       A.  There's different roles that they do.  Some
11:37:37  5  depends on the -- depends on the project.  There was a
6   couple of projects that I worked on.
7           One was, I would receive inbound phone
8   calls requesting information on technology, on UPS
9   services, and just que -- basic questions on the various
11:38:01 10  domestic and international services of the small package
11  division.
12      Q.  What was your job title when you were in the
13  growth group?
14      A.  I was still an ISR.
11:38:11 15     Q.  And that growth group was at the San Antonio
16  facility on Summit -- Summit Parkway?
17      A.  5315 Summit Parkway.
18      Q.  Approximately how many people do you recall
19  being in the growth group?
11:38:23 20     A.  It ranged from -- It could -- could range
21  anywhere from 20 to -- to 10, and then there may have
22  even been more.
23      Q.  Do you recall the approximate dates in which
24  you worked in the growth group?
11:38:37 25     A.  No.

---

## Page 43

1    Q.  Other than your ISR job in the growth group,
2   your beginning ISR job and your franchise sales
3   consultant job, did you hold any other positions with
4   UPS?
11:38:55  5      A.  No.  That's all I recall right now.
6      Q.  Okay.  I want to ask you some respon --
7   questions about your responsibilities as a franchise
8   sales consultant.
9           And -- And have you ever heard the term
11:39:07 10  "enterprise inside sales representative"?
11      A.  That -- Yes, I've heard of it.
12      Q.  Okay.  To the best of your recollection and
13  understanding, is an enterprise sales rep the same as a
14  franchise sales consultant?
11:39:21 15     A.  When I was working there, no.
16      Q.  When you were working there, what do you recall
17  an enterprise sales representative doing?
18      A.  Enterprise, when I first started working there,
19  was -- it may have been considered a specialist at the
11:39:37 20  time.  It was a non-commissioned position, or a non-SIP,
21  as they call it, so they were on a -- on a salary.  They
22  did not receive a commission or quarterly bonuses.
23      Q.  Did you ever -- Were you ever paid on a
24  commission basis during your work at UPS?
11:39:59 25     A.  Yes.

---

## Page 44

1    Q.  Were you paid on a commission basis during your
2   work as a franchise sales consultant?
3      A.  No.
4      Q.  That was just an hourly job, wasn't it?
11:40:09  5      A.  Yes.
6      Q.  What were your hours of -- your average and
7   standard hours of work as a franchise sales consultant?
8      A.  8:00 to 5:00.
9      Q.  Okay.  Monday through Friday?
11:40:29 10     A.  Yes.
11      Q.  And you had customer accounts assigned to you;
12  is that correct?
13      A.  Yes.
14      Q.  And would each of those accounts have been a
11:40:39 15  separate UPS Store?
16      A.  Yes.
17      Q.  Would you have any non-UPS Store customers
18  assigned to you during your employment as a franchise
19  sales consultant?
11:40:47 20     A.  Yes.
21      Q.  What types of other customers would be assigned
22  to you as a franchise sales consultant?
23      A.  There were other stores that had not been
24  completely transitioned over to a UPS Store from --
11:41:01 25     Q.  What kind -- I --

---

## Page 45

1    A.  -- from a --
2      Q.  Go ahead.
3      A.  The UPS -- UPS purchased Mail Boxes Etc., so
4   there was still some stores under that name that I
11:41:19  5  called on.
6      Q.  Those would be pla -- places of business like
7   the UPS Store but which might not have had their names
8   formally transitioned over?
9      A.  Yes.
11:41:29 10     Q.  Okay.  Did you have any private businesses or
11  non-UPS Store type businesses assigned to you as a
12  franchise sales consultant?
13      A.  No.
14      Q.  Approximately how many customers were assigned
11:41:43 15  to you during your work as a franchise sales consultant?
16      A.  I'm going to say close to a thousand.
17      Q.  Would it be fair to say that you would have had
18  somewhere between 1,200 and 1,500 customers assigned to
19  you during your work at UPS?
11:42:05 20     A.  Yeah, approximately.
21      Q.  So talk me through your average day as a
22  franchise sales consultant.
23          What type of work would you do for these
24  1,200 to 1,500 clients?
11:42:21 25     A.  My -- My work entailed making sure that each

---

12 (Pages 42 to 45)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 46

1    store was aware of all of our services, domestic and
2    international, as well as LTL freight, made sure that
3    they are not only aware but they used our technology,
4    our Internet-based technology, and made sure that they
11:42:55  5    had the contacts that they needed should they have an
6    issue.
7        Q.   You say contacts they needed if they had an
8    issue.  Would these be contacts internally within UPS?
9        A.   Yes.
11:43:09  10       Q.   Was one of your responsibilities occasionally
11   receiving complaints or concerns from one of these 1,200
12   to 1,500 customers --
13       A.   Yes.
14       Q.   -- about their work with UPS?
11:43:21  15       A.   Yes.
16       Q.   Yeah.  And would it be your job to timely and
17   responsively get back with that person and do what you
18   can to point them to the right person to get those
19   complaints addressed?
11:43:33  20       A.   Yeah.  If I couldn't do it, they had phone
21   numbers or other contacts that they could call for
22   support.
23       Q.   Did you have any goals in terms of how quickly
24   you were expected to respond to client or customer
11:43:47  25   concerns?

## Page 47

1        A.   Typically, they were the same day or next day,
2    depending on the time of the concern.
3        Q.   Was there a particular time of the day at which
4    a concern might be received --
11:43:59  5        A.   No.
6        Q.   -- in which you would be expected to respond
7    the same day?
8        A.   Not that I'm aware of.
9        Q.   Did you do your best to try and respond timely
11:44:21  10   to those customer complaints and concerns that you would
11   receive?
12       A.   Yes.
13       Q.   Were your 1,200 to 1,500 customers and accounts
14   shared with any other franchise sales consultants?
11:44:31  15       A.   On occasion, yes.
16       Q.   When you say "on occasion," what does that
17   mean?
18       A.   That means when -- if another franchise sales
19   consultant was on vacation or out on a leave or for
11:44:45  20   whatever reason, I would cover -- as an example, I would
21   cover their -- their e-mails and phone calls, voice
22   messages.
23       Q.   Right.  We wouldn't just ignore those
24   customers while --
11:44:57  25       A.   No.

## Page 48

1        Q.   -- while their consultant was out --
2        A.   No.
3        Q.   -- on vacation, I guess.
4        A.   No.
11:45:03  5        Q.   Other than covering for people who were either
6    on leave or on vacation, did anyone else ever cover your
7    accounts otherwise?
8        A.   On a full-time basis --
9        Q.   Yes.
11:45:13  10       A.   -- or a part-time or --
11       Q.   At all --
12       A.   -- at any time --
13       Q.   -- to the best of your recollection.
14       A.   -- did...
11:45:17  15            Yes.  If I was out on leave, they are
16   supposed to -- somebody is supposed to cover my phone
17   calls and e-mails.
18       Q.   Okay.  And -- And other than you were out on
19   leave, is -- is my question.
11:45:29  20       A.   Uh-huh.
21       Q.   Other than when you're out on vacation or
22   leave, are you solely responsible for those 12- or
23   1,500 customers that are assigned to you?
24            MR. CRANE:  Objection; foundation.
11:45:39  25       Q.   (By Mr. Barbour) To the best of your knowledge.

## Page 49

1        A.   Well, the -- the customers have various
2    departments that they can call besides me.  For example,
3    if an issue has to do with billing, there's a billing
4    phone number that they can call.  So instead of asking
11:46:05  5    me to handle the billing issue, they -- they know they
6    can call the billing department to get help and get
7    direct assistance there.
8            Likewise, with operations, if there's an
9    operations issue, they can either call or e-mail me.
11:46:19  10   I'll forward them the information.  If -- If I -- If I
11   can access it through my programs, I'll give them the
12   answer.  If I cannot, they should have a number that
13   they can call locally to speak to an operations
14   personnel to support them.
11:46:35  15       Q.   My question was specific to the inside sales
16   realm --
17       A.   Uh-huh.
18       Q.   -- department.
19            I understand that there are many different
11:46:45  20   departments and divisions of UPS.
21       A.   Uh-huh.
22       Q.   Within the inside sales division, would other
23   sales reps have been assigned to your accounts other
24   than when you were on leave or vacation, to the best of
11:46:55  25   your knowledge?

13 (Pages 46 to 49)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 50

1    A. No. Each -- Each franchise consultant had
2    their own what they call "book of business." They were
3    assigned a certain territory which had a certain number
4    of accounts.
11:47:11  5    Q. Did you consider it important to culture,
6    develop and maintain those customer relationships?
7    A. Yes.
8    Q. The franchise sales consultant position was a
9    full-time job, wasn't it?
11:47:27 10    A. Yes.
11    Q. Eight hours a day, is what you said, correct?
12    A. Yes.
13    Q. And is the same true for the inside sales rep
14    position? Was that also a full-time job?
11:47:37 15    A. Yes.
16    Q. Who was your supervisor as of the time you last
17    went out on leave in April 2013?
18    A. Grace Eason.
19    Q. How long had Grace Eason been your supervisor,
11:48:01 20    to the best you can remember?
21    A. Oh, I'd say one to two years.
22    Q. And who was Grace Eason's immediate supervisor
23    above her?
24    A. Kris Johnson.
11:48:17 25    Q. In your day-to-day work, how often would you

## Page 51

1    interact with Kris Johnson?
2    A. Wasn't a day-to-day.
3    Q. Most of your interactions would be with
4    Ms. Eason?
11:48:37  5    A. Yes.
6    Q. How many franchise sales consultants were
7    located in the San Antonio inside sales facility?
8    A. I believe there were six.
9    Q. You would have been one of those six?
11:48:53 10    A. Yes.
11    Q. Approximately how many inside sales
12    representatives worked in the San Antonio facility, to
13    the best of your recollection?
14    A. Over 200.
11:49:05 15    Q. And earlier you mentioned that franchise sales
16    consultants worked primarily with UPS Stores or
17    equivalents to that; is -- is that correct?
18    A. Not -- Not the way you worded it.
19    Q. Okay. How did I mis-word it?
11:49:29 20    A. Well, the -- we worked with the UPS Store
21    franchisees and their staff and then the few stores that
22    had not transitioned over to the UPS Stores.
23    Q. Okay. Was there a substantial difference in
24    terms of the day-to-day responsibilities between an
11:49:45 25    inside sales rep and a franchise sales consultant

## Page 52

1    position?
2    A. Yes.
3    Q. What would those differences be?
4    A. The inside sales rep position entailed putting
11:49:55  5    together incentive bid agreements, whether they were
6    template-type bids or custom bids. They also had a --
7    They were a commissioned-based job or a bonus-pay job.
8    They may have had more -- I believe they had more
9    accounts.
11:50:25 10    Q. The ISR had more accounts than the franchise
11    sales consultant?
12    A. Yes.
13    Q. Approximately how many accounts would an ISR
14    have, to the best of your recollection?
11:50:33 15    A. They can have, in my experience, close to
16    3,000.
17    Q. As a franchise sales -- excuse me -- franchise
18    sales consultant, what type of computer programs did you
19    use in your day-to-day work?
11:51:05 20    A. Used the customer management system called
21    TEAMS, Total Enterprise Account Management System.
22    Another system was the mainframe that had all my
23    customers, including the franchise -- franchise stores,
24    in it.
11:51:29 25    Q. Do you remember the name of that mainframe

## Page 53

1    system?
2    A. No, I don't offhand.
3    Q. Did you use a program called Customer Volume
4    Behavior Analysis Tracking System?
11:51:41  5    A. Yes, I did.
6    Q. Is that different than the mainframe system?
7    A. Yes.
8    Q. Had you used any of these programs prior to
9    your work with UPS?
11:51:49 10    A. I had used a customer management system, yes.
11    Q. That same customer management system or --
12    A. Not --
13    Q. -- something similar to it?
14    A. Not TEAMS.
11:51:59 15    Q. Did you have to receive any training on UPS
16    systems?
17    A. Yes.
18    Q. Approximately how long did that training last?
19    Do you recall?
11:52:07 20    A. They varied from beginning-the-job training,
21    which was -- could be anywhere from four to eight weeks
22    before you're assigned a territory.
23    Q. And part of that training would be covering
24    UPS' processes and --
11:52:27 25    A. Right. TEAMS --

14 (Pages 50 to 53)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 54

1    Q.  -- programs, right?
2    A.  -- CVBAT.
3         There was also several technology
4    programs.  There was bidding programs.  There was
11:52:43  5   Internet-based.  There was soft -- I'm sorry --
6    software, as well.  Worldship was another one that's
7    Internet and software-based.
8    Q.  That four to eight weeks of training, did UPS
9    also train you on the products and services that it
11:53:03 10   offered to its customers and clients?
11   A.  Yes.
12   Q.  Were you acquainted with those products and
13   services prior to working with UPS?
14   A.  Not UPS products or services.
11:53:13 15   Q.  Would it have been possible for you to perform
16   your franchise sales consultant job without using these
17   computer programs that we just discussed?
18   A.  Possible.
19   Q.  And how would you --
11:53:29 20   A.  Not likely, but --
21        MS. KILGORE:  Objection; lack of
22   foundation.
23        MR. BARBOUR:  Who's defending the
24   deposition?
11:53:35 25        MR. CRANE:  I am.

Page 55

1         MS. KILGORE:  Sorry, Tom.
2         MR. BARBOUR:  Okay.
3         MR. CRANE:  It's okay.
4         MR. BARBOUR:  Just making sure we keep it
11:53:41  5   straight forward moving forward.
6         MR. CRANE:  You can handle two, can't you?
7         MR. BARBOUR:  I don't know if I can handle
8    one.
9    Q.  (By Mr. Barbour) I apologize, Mr. Gonzalez.
11:53:45 10   What was your answer to that?
11        My question was:  Would it be possible for
12   you to perform, to the best of your knowledge, your
13   franchise sales consultant job without using these
14   computer programs?
11:53:57 15   A.  Without the use of those specific programs, I
16   would say no.  They're proprietary.
17   Q.  One of your essential job functions was to
18   enter relevant data into U -- UPS' account management
19   system, wasn't it?
11:54:23 20   A.  Yes.
21   Q.  What type of hardware would you use to enter
22   that data into these account management systems?
23   A.  I don't know what the hardware was.  It was --
24   Q.  Would you use a mouse --
11:54:35 25   A.  It was --

Page 56

1    Q.  -- and a keyboard and things like this?
2    A.  Yes.
3    Q.  And your job with UPS required pretty heavy
4    computer and phone use, didn't it?
11:54:47  5   A.  Yes.  Now you can define "heavy" for me.
6    Q.  Well, how would you define -- Let -- Let me --
7    Well, I'll ask you this way:  Approximately how many
8    hours a day would you spend on the computer during your
9    work as a franchise sales consultant?
11:55:05 10   A.  It's hard to say.  It's hard to say, because it
11   depends on how much time is spent on the phone.
12   Q.  Would it vary?
13   A.  Yes.
14   Q.  Would it vary depending upon the customer's
11:55:19 15   needs and whatever was happening on that particular day?
16   A.  Absolutely.
17   Q.  Was it unpredictable in terms of how much time
18   you would spend on the computer or phone on any given
19   day?
11:55:29 20   A.  Yes, very unpredictable.
21   Q.  Did UPS have any target metrics for you in
22   terms of how long you were supposed to spend on the
23   phone on any given day?
24   A.  Yes.
11:55:43 25   Q.  And what were those target metrics in terms of

Page 57

1    phone time?
2    A.  The most recent metric that I recall was about
3    two and a half hours a day.
4    Q.  So it would have been two and a half hours on
11:55:55  5   the phone with our customers every day; is that correct?
6    A.  That's correct.
7    Q.  And that was a baseline; sometimes you could be
8    expected to spend more time on the phone with these
9    customers, right?
11:56:07 10   A.  That was the baseline.  There's always -- I
11   mean, if you can get more, great, but it depends on the
12   type of call.  If it was a service call that's not truly
13   a valuable call, you spend a lot of time on service.
14   Q.  But your goal with these -- when you -- When
11:56:27 15   you say "a service call," was this a call where you're
16   not selling products and services but you're trying to
17   help a customer with existing services that they're
18   using?
19   A.  Right.  If there's an -- If they have an issue
11:56:41 20   that they've had to escalate because they weren't
21   getting the resolution they wanted, I -- I was an
22   escalation point.  So sometimes I would have to
23   conference in other personnel to resolve an issue.  So
24   it wasn't a direct sales call, so to speak --
11:56:59 25   Q.  Right.

Hoffman Reporting _ Video Service                    (210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 58

1      A. -- but it did take time.
2      Q. I think we kind of touched on that earlier,
3   where one of your responsibilities wasn't just selling
4   new products and services but maintaining the --
11:57:03    5      A. Right.
6      Q. -- relationships --
7      A. It's still part of the --
8      Q. -- that you already had.
9      A. -- relationship, yes.
11:57:09   10      Q. And it would be fair to say that your job as an
11   inside sales rep was to make sure that in those
12   situations the customer was put in touch with somebody
13   who could actually solve the concerns that they had; is
14   that correct?
11:57:21   15      A. Correct.
16      Q. Your job with UPS required you to -- to use
17   analytical skills, didn't it?
18      A. Yes.
19      Q. And it required you to use time-management
11:57:33   20   skills, didn't it?
21      A. Yes.
22      Q. And the computer programs that we discussed
23   were necessary for that critical analysis and to support
24   your job functions, weren't they?
11:57:43   25      A. Yes.

Page 59

1      Q. And it was an essential function of your UPS
2   position to have the cognitive ability to follow
3   directions and routines, wasn't it?
4         MR. CRANE:  Objection; calls for a legal
11:57:55    5   conclusion.
6      Q. (By Mr. Barbour) Did you consider it to be an
7   essential function of your job with UPS to have the
8   cognitive ability to follow directions and routines,
9   Mr. Gonzalez?
11:58:07   10      A. Please repeat the question.
11      Q. Yes, sir.  I'm not asking you to use any legal
12   terminology.  Just to the --
13      A. No, I know.
14      Q. -- to the best of -- to the best of however you
11:58:19   15   would use these words, did you consider it to be an
16   essential job function of your job with UPS to have the
17   cognitive ability to follow directions and routines?
18      A. I'm not a psychologist.  My understanding of my
19   essential job functions were to assess the customers'
11:58:47   20   needs and provide them the solutions that they required.
21         (Exhibit 1 marked.)
22      Q. (By Mr. Barbour) I will hand you what I'm
23   marking as Exhibit 1 to your deposition, Mr. Gonzalez.
24         MR. CRANE:  Thank you.
11:59:15   25      Q. (By Mr. Barbour) And take a second to review

Page 60

1   Exhibit 1, please, and let me know when you've had a
2   chance to do so.
3      A. (Reviewing document.) Okay.
4      Q. All right.  Do you recognize what we've marked
12:02:53    5   as Exhibit 1, Mr. Gonzalez?
6      A. Yes.
7      Q. And what is Exhibit 1?
8      A. It's a letter addressed to the EEOC.
9      Q. Is it a letter from you to the EEOC?
12:03:03   10      A. Yes, it is.
11      Q. And did you submit this letter in conjunction
12   with the charge of discrimination that you had filed
13   against UPS?
14      A. I did.
12:03:11   15      Q. If you look on the bottom right-hand corner of
16   the pages, do you see a number that begins with "D,"
17   slash, "RG," slash, then some numbers?
18      A. Yes, sir.
19      Q. Okay.  Can you turn to the page that's
12:03:25   20   D-RG-932?
21      A. Okay.
22      Q. Is that your signature --
23      A. Yes.
24      Q. -- on Page D-RG-932?
12:03:39   25         THE WITNESS:  Bless you.

Page 61

1         Yes.  Yes, sir.
2      Q. (By Mr. Barbour) When you submitted this to the
3   EEOC, were you trying to be as truthful as possible with
4   them?
12:03:47    5      A. Yes.
6      Q. And if I read this correctly, you submitted
7   this on February 20th, 2015, didn't you?
8      A. Yes.
9      Q. That was less than a year after your
12:03:55   10   termination from UPS, correct?
11      A. Correct.
12      Q. I'm looking at the first page of Exhibit 1,
13   Mr. Gonzalez.  And towards the bottom, do you write to
14   the EEOC, "My role as an inside sales representative
12:04:11   15   (ISR) for the small package division was to help for
16   approximately five years and as an enterprise account
17   representative for the UPS Stores for over one year"?
18         Do you -- Do you see where I've read that?
19      A. Yes, I do.
12:04:27   20      Q. Okay.  When you refer to the enterprise account
21   representative position, is that another way to say
22   franchise sales consultant?
23      A. Earlier I stated enterprise account
24   representative, when I first started there, was a -- a
12:04:47   25   role that was a salaried role, which I still believe to

16 (Pages 58 to 61)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 62

1    be correct.  There...
2        Q.  And you also told me that you never held an
3    enterprise sales representative position.  Is that
4    correct?
12:05:03    5    A.  Well, yes, I did say that; however, there's
6    more to it -- to the job description, because I know
7    there had been some changes to the -- the job
8    description itself.
9            My understanding was, as an ISR -- the
12:05:17   10    ISRs, many of them transition to be an enterprise
11    account representative, but that was an internal UPS
12    change of titles, if I recall correctly.
13        Q.  Okay.  But when you write and you reference
14    your role as an inside sales representative for
12:05:39   15    approximately five years, does that re -- match your
16    recollection as to how long you held the ISR job?
17        A.  Yes.
18        Q.  Okay.  When you say that you worked in a
19    position for the UPS Stores for over one year, does that
12:05:51   20    match your recollection as to how long you performed
21    what you called the franchise sales consultant job?
22        A.  Yes.
23        Q.  So when you're writing to the EEOC on
24    February 20th, 2015 and you refer to this enterprise
12:06:05   25    account representative position, are you, in fact,

---

Page 63

1    referring to that franchise sales consultant job that
2    you had?
3        A.  If I -- If I may rephrase, the first five years
4    I worked as -- as an ISR, and the last -- my last title
12:06:23    5    before I was terminated was franchise sales consultant.
6        Q.  Okay.  When you write to the EEOC, the very
7    next sentence after what I read previously said, "I
8    performed the essential job functions."
9            You see that?
12:06:39   10    A.  Yes.
11        Q.  Okay.  We'll get to that in a second.  But
12    you're describing your essential job functions for --
13    for two positions you had held with UPS, correct?
14        A.  Yes.
12:06:47   15    Q.  The ISR job, obviously.
16        A.  Uh-huh.
17        Q.  And then this other position that is this
18    enterprise account representative position.
19        A.  Yes.
12:06:55   20    Q.  My question is:  When you're describing the
21    essential job functions for the enterprise account
22    representative position, is that really the franchise
23    sales consultant job that we've spent so long talking
24    about?
12:07:05   25    A.  No.  The ISR -- I -- I wasn't aware of there

---

Page 64

1    being a job description for a franchise sales consultant
2    because it's a new position.
3        Q.  Okay.  When you say you weren't aware of there
4    being a job description, you mean a written job
12:07:21    5    description?
6        A.  For the franchise sales consultant, yes.
7        Q.  All right.  But -- But you're familiar with
8    what that job actually entails, because you did it,
9    right?
12:07:27   10    A.  Yes.
11        Q.  Okay.  And so I'm not concerned about whether
12    there's a written job description or not.  I'm just
13    asking what your understanding of those responsibilities
14    was.
12:07:37   15    A.  Okay.
16        Q.  Okay.  So you write that you worked as an ISR
17    and then in a position supporting the UPS Stores for
18    over one year, and you say, "I performed the essential
19    job functions."  Flip over to the next page.
12:07:49   20    A.  Okay.
21        Q.  And you see all of these dashes here, correct?
22        A.  Yes.
23        Q.  Okay.  I'm looking about midway down Page 929.
24    And did you tell the EEOC that one of your
12:08:01   25    responsibilities in your position supporting UPS Stores

---

Page 65

1    was to have the cognitive ability to follow directions
2    and routines?
3        A.  Yes.
4        Q.  And then you say that in your role supporting
12:08:17    5    the UPS Stores you need to have that cognitive ability.
6    Are we talking about your franchise sales
7    consultant job?
8        A.  Yes.
9        Q.  Okay.  Did you also tell the EEOC that one of
12:08:29   10    the essential functions of your franchise sales
11    consultant job was to have the cognitive ability to work
12    independently with appropriate judgment?
13        A.  Yes.
14        Q.  Did you tell the EEOC that one of the essential
12:08:43   15    functions of your franchise sales consultant job was to
16    have the cognitive ability to concentrate, memorize and
17    recall?
18        A.  Are you reading from a specific page?
19        Q.  Yes, sir.  I'm still on Page 929.
12:08:57   20    A.  Okay.
21        Q.  And I'm still under that paragraph that begins
22    with "demonstrate cognitive ability to" --
23        A.  Okay.
24        Q.  I apologize if I didn't direct you there.
12:09:07   25            And I think my question was:  Did you tell

---

17 (Pages 62 to 65)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 66

1    the EEOC that one of the essential functions of your
2    franchise sales consultant job was to have the cognitive
3    ability to concentrate, memorize and recall?
4        A.  Yes.
12:09:19  5    Q.  And did you tell the EEOC that one of the
6    essential functions of your franchise sales consultant
7    job was to have the cognitive ability to identify
8    logical connections and determine the sequence of
9    response?
12:09:33 10    A.  Yes.
11    Q.  And did you tell the EEOC that one of the
12    essential functions of your franchise sales consultant
13    job was to have the cognitive ability to process two to
14    three steps ahead?
12:09:45 15    A.  Yes, I did.
16    Q.  Did you ever have to do any research on your
17    customers in your day-to-day work as a franchise --
18    A.  Yes.
19    Q.  -- sales consultant?
12:09:57 20    A.  Yes.
21    Q.  Would this be Internet research, or what tools
22    would you use to do that research?
23    A.  I would use the UPS programs that we had.
24    Q.  These would be these computer programs?
12:10:09 25    A.  Yes.

---

Page 67

1    Q.  So UPS would provide you some type of
2    information about the size and structure of the customer
3    and how they might be able to use our products and
4    services, right?
12:10:19  5    A.  Right.  CVBAT is one.  The billing is another.
6    Q.  And you were primarily working with customers
7    whose transportation spend was between 10,000 and
8    $30,000 a year; is that correct?
9    A.  Repeat your question.
12:10:35 10    Q.  Did -- Were -- Were you assigned -- When you
11    were assigned customers, was it customers whose average
12    spend on logistics and transportation spending was
13    within a certain amount each year, to the best of your
14    knowledge?
12:10:49 15    A.  For the franchise?
16    Q.  Yes.
17    A.  No.
18    Q.  Okay.  So it would have been any UPS Stores,
19    regardless of what their average spend would be then?
12:10:57 20    A.  Correct.
21    Q.  Okay.  Did the ISR job have a range?
22    A.  Yes.  The ISR's range was, I believe, up to
23    $50,000.
24    Q.  When we got beyond $50,000 a year, do you know
12:11:11 25    where those accounts would go at that point if they were

---

Page 68

1    no longer kept by an ISR?
2        A.  They were kept by the enterprise account rep.
3    Those are the reps that, when I first started, they were
4    assigned to accounts that had a revenue greater than
5    50,000 a year.
12:11:27  6    Q.  Did you consider it to be one of your
7    responsibilities to develop sales strategy for your
8    clients, as a franchise sales consultant?
9    A.  Yes.
12:11:37 10    Q.  And how would you go about developing a sales
11    strategy for an individual client?
12    A.  Consultative conversations with them, seek out
13    what their problems are, provide solutions based on
14    that.
12:11:51 15    Q.  And that would require, you know, some
16    cognitive ability to identify --
17    A.  Yes.
18    Q.  -- problems and solutions, right?
19    A.  Yes.
12:11:59 20    Q.  Was there a certain -- We discussed there was a
21    set amount of time you needed to spend on the phone each
22    day.
23        Was there a certain number of calls you
24    needed to make each day, according to company metrics?
12:12:23 25    A.  Yes.  They like to see at least -- well,

---

Page 69

1    approximately 15, as far as I recall.
2    Q.  15 calls each day?
3    A.  Yes.
4    Q.  Were you required to enter your data for each
12:12:37  5    customer and your work that happened that day on a daily
6    basis?
7    A.  Yes.
8    Q.  Were their specific reports that you were
9    required to submit?
12:12:43 10    A.  On occasion, yes.
11    Q.  How often would those reports have to be
12    submitted?  On a daily or a less frequent basis?
13    A.  Less frequent.
14    Q.  How often would you have to submit those
12:12:57 15    reports?
16    A.  It was upon request, and it's -- depended on --
17    on projects.
18    Q.  Okay.  So not within any -- it wasn't a daily
19    or weekly thing; it was kind of on an as-needed basis?
12:13:13 20    A.  Yes.
21    Q.  Okay.  Would you have to be responsible for
22    monitoring your clients' com -- compliance with existing
23    contracts?
24    A.  Yes.
12:13:21 25    Q.  And would you be responsible for keeping and

---

18  (Pages 66 to 69)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

## Page 70

1  maintaining regular schedules of all phone discussions
2  with your customers?
3       **A.  Yes.**
4       Q.  And would that happen on a daily, weekly and
12:13:41  5  monthly basis?
6       **A.  Daily, weekly and monthly.**
7       Q.  Did you receive training on the pricing of UPS
8  services and products?
9       **A.  Yes.**
12:14:07 10      Q.  And would you have to rely on that training and
11  knowledge in your day-to-day work in selling those
12  products and services to our customers?
13      **A.  Not in the franchise consultant role.**
14      Q.  Would you have to do that in the ISR job?
12:14:21 15      **A.  Yes.**
16      Q.  How was a franchise sales consultant job
17  different that you wouldn't have to rely on that
18  training in your day-to-day work?
19      **A.  The pricing was already established.**
12:14:31 20      Q.  Because they're UPS Stores?
21      **A.  Yes.**
22      Q.  Okay.  Do you recall your last hourly wage with
23  UPS prior to your termination?
24      **A.  Approximately $23.**
12:14:57 25      Q.  If I said $22.95 is what's reflected on the

## Page 71

1  records, does that sound more or less correct to you?
2       **A.  That sounds very close.**
3          **Am I speaking loud enough?**
4       Q.  I think so.
12:15:13  5      **A.  Okay.**
6          MR. BARBOUR:  Are we speaking loud enough?
7          THE WITNESS:  Okay.
8       Q.  (By Mr. Barbour) Is now a good time to take a
9  break, Mr. Gonzalez?
12:15:19 10      **A.  I'm fine.**
11      Q.  Okay.
12         MR. CRANE:  This would be a good time to
13  stop to --
14         THE WITNESS:  Yeah.  I --
12:15:25 15         MR. CRANE:  We're going to need a --
16         THE WITNESS:  That's fine.
17         MR. CRANE:  -- break for lunch anyway.  At
18  least I'll -- I'll need a break for lunch.
19         MR. BARBOUR:  This is a good spot to stop.
12:15:31 20         MR. CRANE:  Well, it seems like it for
21  you.
22         MR. BARBOUR:  Yeah, yeah.
23         THE WITNESS:  Okay.
24         MR. BARBOUR:  We'll go off the record.
12:15:37 25         THE VIDEOGRAPHER:  The time is 12:15, and

## Page 72

1  we are off the record.
2          (Off the record.)
3          THE VIDEOGRAPHER:  The time is 1:04 p.m.,
4  and we are on the record.
13:04:05  5      Q.  (By Mr. Barbour) Mr. Gonzalez, are you ready to
6  proceed, sir?
7       **A.  Yes, I am.**
8       Q.  Do you have any answers so far that you'd like
9  to change?
13:04:11 10      **A.  Yes.  There is one regarding my employment that**
11  **I may not have been -- that I just wanted to review.  It**
12  **was with -- The employer was Klinger Specialties.**
13      Q.  Uh-huh.
14      **A.  And I don't recall exactly if I was -- it was a**
13:04:27 15  **company layoff or how the end of that job ended, because**
16  **I -- I know I was looking for another job, and I think**
17  **they -- they had a company-wide layoff.**
18      Q.  Okay.  Let me ask you this:  Did you
19  voluntarily resign from Klinger Specialties?
13:04:45 20      **A.  I recall it being a layoff, so it -- that would**
21  **have been involuntary.**
22      Q.  Do you recall how many people were laid off?
23      **A.  At the time, it -- Company-wide, no.  In my**
24  **office, it was me.**
13:04:57 25      Q.  So you were the only person laid off?

## Page 73

1       **A.  In that office, yes.**
2       Q.  In your -- In your office.
3       **A.  Uh-huh.**
4       Q.  Are you aware of whether anyone in -- Well, let
13:05:07  5  me strike that.
6          How many offices did Klinger have, to the
7  best of your recollection?
8       **A.  I -- I'm not certain.  I know they were a**
9  **nationwide company.**
13:05:15 10      Q.  Do you have any knowledge as to whether anyone
11  in other offices were laid off at the same time as you?
12      **A.  No, I do not.**
13      Q.  Did anyone at Klinger speak to you regarding
14  your layoff?
13:05:29 15      **A.  Yes.  It was the manager.**
16      Q.  And who -- what was the manager's name?
17      **A.  I think his last name was Herrera.**
18      Q.  H-E-R-R-E-R-A?
19      **A.  I -- That sounds right.**
13:05:45 20      Q.  Was it a Mr. or Ms. Herrera?
21      **A.  Mister.**
22      Q.  And you don't recall Mr. Herrera's first name?
23      **A.  It's Mike -- Michael, maybe, or Mike.  It --**
24  **I -- It was a four-letter -- like, Mike or Richard.**
13:05:59 25      Q.  Was Mr. Herrera your manager for the entire

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                           RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 74

1    time your were at Klinger?

2    **A. Yes.**

3    Q.  What do you recall Mr. Herrera telling you

4    about the reasons you were being laid off?

13:06:11  5    **A. That there was a company-wide layoff and he was**

6    **very sorry.**

7    Q.  Do you recall the approximate date on which you

8    were -- or even year you were laid off from Klinger?

9    **A. No, I do not.**

13:06:21  10   Q.  Were you laid off -- To the best of your

11   recollection, were you laid off from Klinger Specialties

12   due to substandard, poor work performance on your part?

13   **A. No.**

14   Q.  To the best of your recollection, were you laid

13:06:39  15   off from Klinger due to violation of company policies?

16   **A. No, no violations.**

17   Q.  Okay.  Any other answers to questions I've

18   already asked you that you'd like to change the answers

19   to at this point?

13:06:57  20   **A. Not at this time, no.  No.**

21   Q.  I do want to discuss in a little bit more

22   detail, kind of, the years you were employed with UPS.

23   **A. Okay.**

24   Q.  I know you went out on leave in April 2013 and

13:07:09  25   that precipitated some of the events that led to your

---

Page 75

1    termination.  We'll talk about that in more detail.

2         But do you recall requesting leave from

3    your work with UPS sometime the year before, in 2012?

4    **A. Yes.**

13:07:21  5    Q.  And specifically I'm talking about a period of

6    leave that began sometime in September of 2012.

7    **A. Yes.**

8    Q.  What was the reason that you requested leave in

9    September of 2012?

13:07:33  10   **A. It was surgery.**

11   Q.  And what kind of surgery was it, if you don't

12   mind me asking?

13   **A. It was probably so -- shoulder surgery.**

14   Q.  And what medical condition was that surgery

13:07:51  15   targeted or directed at?

16   **A. The common description is frozen shoulder, also**

17   **known as adhesive capsulitis.  And there was a couple of**

18   **other medical terms involved that they -- they fixed, so**

19   **to speak.**

13:08:11  20   Q.  And what would those medical terms be?

21   **A. Oh, those, I'm not -- I think one was**

22   **acromioplasty, A-C-R-O -- cromio --**

23   **A-C-R-M-I-O-P-L-A-S-T-Y [sic].  And I believe he also**

24   **shaved off a burr.  And I -- I don't -- There may have**

13:08:37  25   **been one other as part of the procedure, but I don't**

---

Page 76

1    recall.

2    Q.  Okay.  And I am far from a medical

3    professional, Mr. Gonzalez, so in layman's terms, can

4    you talk me through how these conditions manifested

13:08:49  5    themselves in you and kind of what -- what your physical

6    condition was at that time?

7    **A. Well, it -- the way it manifested was due to**

8    **repetitive stress or repetitive actions.**

9    Q.  And I guess my question is:  Did you have the

13:09:09  10   inability to move your shoulder at that time?

11   **A. What a frozen shoulder is, it does feel like**

12   **it -- it's frozen, like it's -- it's very rigid.**

13   Q.  Uh-huh.

14   **A. And what it is, is it's a swelling of the**

13:09:23  15   **capsule in the shoulder.  So when you have swelling in**

16   **there, it hits other nerves and makes it difficult to**

17   **move the shoulder.**

18   Q.  And you said that you had surgery on that

19   shoulder at that time; is that right?

13:09:35  20   **A. Yeah.  That sounds correct.**

21   Q.  Okay.  Who -- Do you recall who your surgeon

22   for that procedure would have been?

23   **A. Yes.  That was Dr. Scott Sledge.**

24   Q.  How long has Dr. Sledge treated you?

13:09:47  25   **A. Since two thou -- at least 2013.**

---

Page 77

1    Q.  Right here I'm referencing at least a period of

2    leave that you took in 2012.

3    **A. Okay.  And it --**

4    Q.  Would Dr. Sledge have been --

13:10:05  5    **A. I -- I have had two surgeries from him.  So one**

6    **was right shoulder; the other was left shoulder.  So the**

7    **dates, I -- offhand, I don't know --**

8    Q.  Okay.

9    **A. -- spe -- specifically.**

13:10:15  10   Q.  But to the best of your recollection, this

11   period of leave that began in September 2012 was on

12   account of that first shoulder surgery?

13   **A. Yes.**

14   Q.  All right.  Was Grace Eason your supervisor

13:10:27  15   when -- as of September 2012?

16   **A. Yes.**

17   Q.  Did you say Kris Johnson was your manager?

18   **A. He's a sales manager.**

19   Q.  Sales manager.  Was Kris Johnson your sales

13:10:39  20   manager as of 2012?

21   **A. Yes.**

22   Q.  Do you recall Grace Eason saying anything

23   negative as of 2012 about the fact that you were

24   requesting leave?

13:10:49  25   **A. No.**

---

Hoffman Reporting _ Video Service                              210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

Page 78

1      Q.  Do you recall Mr. Johnson saying anything
2  negative about the fact that you requested leave?
3      A.  No.
4      Q.  How did you go about requesting leave?  Did you
13:10:57  5  reach out to HR and ask them?
6      A.  Yes.  I went through -- I advised Grace, my
7  supervisor, about the surgery date.  I also advised
8  Carmen Elizondo about the scheduled surgery date.
9      Q.  And Carmen at that point was an HR specialist,
13:11:13  10  wasn't she?
11      A.  I believe that's her title.  I'm not certain.
12      Q.  Did Ms. Elizondo assist you in doing whatever
13  paperwork was necessary to get that leave approved?
14      A.  Yes.
13:11:27  15      Q.  Did you find her to be helpful in getting that
16  leave approved?
17      A.  Yes.
18      Q.  Did Ms. Elizondo say anything negative to you
19  about the fact that you were requesting leave at that
13:11:37  20  time?
21      A.  No.
22      Q.  As of September 2012, at least when you
23  requested that leave, did anybody at UPS say anything
24  negative about your medical condition or the fact that
13:11:47  25  you had this shoulder condition?

Page 79

1      A.  No.
2      Q.  Do you remember approximately how long you were
3  out on leave in 2012?
4      A.  Approximately six weeks.
13:12:01  5      Q.  Okay.  If I told you you came back to work
6  sometime in October 2012, more or less within the next
7  month, does that sound more or less right?
8      A.  That's -- Tell me again the -- the first date.
9      Q.  The records indicate that you went out on leave
13:12:15  10  on September 27th and came back on October 15th.
11      A.  September to October.  So give me the number of
12  weeks that you have that --
13      Q.  I would say approximately three weeks or so.
14  And --
13:12:29  15      A.  Okay.
16      Q.  -- I'm not trying to split hairs here.  Does
17  that sound --
18      A.  Yeah.  No, no.  That's -- That's fine.  Three
19  weeks.
13:12:35  20      Q.  You said you had a sol -- shoulder surgery
21  while you were out; is that right?
22      A.  Yes.
23      Q.  Okay.  Do you recall what restrictions you had
24  when you returned from leave in 2012?
13:12:45  25      A.  After being out those three weeks?

Page 80

1      Q.  Yes, sir.
2      A.  I did not have any restrictions.  I -- That was
3  the only way to get back to work, was without
4  restrictions.
13:13:03  5      Q.  So it's your testimony you didn't have any
6  restrictions when you tried to come back to work in
7  2012?
8      A.  My testimony is, UPS wouldn't let me go back to
9  work unless I had a doctor's note that said I could
13:13:17  10  return to work without restrictions.
11      Q.  We'll discuss that in a little bit more detail,
12  but my question to you right now is:  Did you have any
13  restrictions when you came back to work in October 2012,
14  to the best of your recollection?
13:13:29  15      A.  No.
16      Q.  Okay.  Now, in terms of your testimony being
17  that UPS wouldn't allow you to come back with any
18  restrictions, what is that testimony based on?
19      A.  Conversations I've had with other em --
13:13:43  20  employees of UPS.
21      Q.  And who at UPS told you that you cannot come
22  back to work if you had any restrictions?
23      A.  Carmen Elizondo.
24      Q.  Anyone else?
13:13:51  25      A.  None other -- Nobody else that I recall right

Page 81

1  now.
2      Q.  Do you remember when it was that Ms. Elizondo
3  told you that you could not come back to work if you had
4  any restrictions at all?
13:14:09  5      A.  May have been as early as 2008 or '9.
6      Q.  And did she tell you this in an e-mail or --
7      A.  No.
8      Q.  -- orally, or how did she go about telling you?
9      A.  Orally.
13:14:35  10      Q.  In 2008 or 2009, in what context did it arise
11  that Ms. Elizondo told you that you couldn't come back
12  to work if you had any restrictions at all?
13      A.  That was -- I don't recall exact verbiage, but
14  the -- what I do recall is she said, "In order to go
13:14:55  15  back to work to your team or a team, we must have a
16  doctor's note that states, 'I can return to work without
17  restrictions.'"  If I do not have that, I cannot return
18  to work.
19      Q.  You -- You said she had told you this back as
13:15:19  20  early as 2008 or 2009, correct?
21      A.  Yes.
22      Q.  Did you have some medical condition back in
23  2008 or 2009 that -- that gave you certain restrictions
24  in relationship to your work for UPS?
13:15:31  25      A.  I did not have -- That gave me certain

21 (Pages 78 to 81)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 82

1    restrictions?  Please clarify your question.

2        Q.  Yes, sir.  You're -- It's your testimony that

3    Ms. Elizondo told you sometime in 2008 or 2009 that to

4    work for UPS you had to have no restrictions at all.  Is

13:15:47    5    that correct?

6        A.  Yes.

7        Q.  Okay.  I guess my question is:  Did she just

8    say this out of the blue in 2008 or 2009, or did you

9    have some medical condition that that --

13:15:55    10        A.  I had a medical --

11        Q.  -- kind of related to?

12        A.  I had an upcoming medical condition.

13        Q.  And what condition did you have back in 2008 or

14    2009?

13:16:05    15        A.  It was carpal tunnel release surgery.

16        Q.  So you had a surgery back in 2008 or 2009; is

17    that right?

18        A.  Yes.  Approximately, yes.

19        Q.  Did you take FMLA leave or did you take a

13:16:13    20    medical leave of absence for that carpal tunnel surgery?

21        A.  For the sur -- Yes, I did.

22        Q.  Do you recall approximately how long you were

23    out as a result of that carpal tunnel surgery?

24        A.  No.

13:16:23    25        Q.  Did you return to work in your ISR position

## Page 83

1    following that surgery?

2        A.  I did.

3        Q.  And is it your testimony that when you were

4    returning from that carpal tunnel surgery Ms. Elizondo

13:16:35    5    told you you can't come back to work unless you have no

6    restrictions at all?

7        A.  Repeat your question.

8        Q.  Yes, sir.

9        A.  Because there's a timing I'm trying to get

13:16:45    10    clarified.

11        Q.  Okay.  It's your testimony that you had carpal

12    tunnel surgery back in 2008 or 2009, correct?

13        A.  Yes.

14        Q.  And is it your testimony that when you were

13:16:53    15    attempting to return from that carpal tunnel surgery it

16    was at that point that Ms. Elizondo told you you can't

17    come back to work unless you have no restrictions?

18        A.  It was prior to the surgery.  There were

19    instructions given to her -- to me saying to be sure to

13:17:11    20    get a note from your doctor stating that you can return

21    to work without restrictions, because without it you

22    cannot go back to work.

23        Q.  And you said these were instructions given to

24    you.  And these were instructions given to you orally,

13:17:29    25    correct?

## Page 84

1        A.  Orally, correct.

2        Q.  And in 2008 or 2009, this is four or five years

3    prior to the period of leave you took in April 2013,

4    correct?

13:17:39    5        A.  That math sounds right.

6        Q.  Right.  Did you ever ask Ms. Elizondo whether

7    this, quote, unquote, no restrictions policy was written

8    anywhere in company handbooks or anything?

9        A.  I did not.

13:17:55    10        Q.  Did you think it was unfair if UPS had this,

11    quote, unquote, no restrictions policy?

12        A.  I don't recall what I thought of it at the

13    time.  I just thought it was protocol.

14        Q.  Other than your carpal tunnel surgery in 2008

13:18:11    15    and 2009, did Ms. Elizondo ever tell you after that that

16    UPS wouldn't allow you to come back unless you had no

17    restrictions?

18        A.  I just recall the one time.  There may have

19    been another time, but I don't recall them.

13:18:27    20        Q.  You don't recall anyone other than Ms. --

21        A.  Well --

22        Q.  Go ahead.

23        A.  -- I take -- I'm sorry to interrupt.

24             I -- I recall sending her some

13:18:37    25    correspondence stating that I will -- And this may not

## Page 85

1    have been after that surgery, because I've had several.

2    It may have been after cubital tunnel surgery, or it may

3    have been after sol -- shoulder surgery.

4             I sent her an e-mail, which I often did,

13:18:59    5    giving her updates of my condition as far as concerning

6    my return to work --

7        Q.  Uh-huh.

8        A.  -- and how I was recovering.  And I sent her an

9    e-mail saying, "Yes, I -- and I do know I need to get a

13:19:13    10    doctor's note from my doctor that states I need to

11    return to work without restrictions."

12        Q.  And that was an e-mail you sent to Ms. Elizondo

13    at some point?  You don't --

14        A.  Yeah, at some point.

13:19:27    15        Q.  -- recall exactly?

16        A.  Yeah.

17        Q.  Okay.  But other than her telling you prior to

18    going out on leave in 2008 or 2009 for your carpal

19    tunnel surgery that you couldn't come back unless you

13:19:37    20    had no restrictions, do you recall her ever telling you

21    again that that was company policy?

22        A.  I don't recall her verbally telling me again,

23    no.

24        Q.  And you don't recall anyone other than

13:19:47    25    Ms. Elizondo telling you that company policy was that

22 (Pages 82 to 85)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 86

1   you couldn't come back unless you had no restrictions?

2     **A.  I -- I can't say for certain.  The only other**

3   **person that would have told me that may have been the HR**

4   **manager at the time.**

13:20:01 5     Q.  And who was the HR manager at that time?

6     **A.  It was Rick Montecinos.**

7     Q.  Do you recall Mr. Montecinos telling you you

8   couldn't come back to work unless you had no

9   restrictions?

13:20:13 10     **A.  I don't recall him specifically saying that,**

11   **no.**

12     Q.  Do you recall him saying anything of that sort?

13     **A.  I can't say for -- for certain that he did.**

14     Q.  Do you have any notes that you would have taken

13:20:29 15   around that period of time that would reflect your

16   conversations with Mr. Montecinos or with Ms. Elizondo?

17     **A.  With Mr. Montecinos, no.  The e-mail I -- I**

18   **mentioned to you, yes --**

19     Q.  That was an e-mail --

13:20:41 20     **A.  -- with Ms. Eli --**

21     Q.  Sorry.  I apologize.

22     **A.  No, no, no.  That's okay.  We --**

23     Q.  That was an e-mail to Ms. Elizondo, right?

24     **A.  Yes, ma'am.  I'm sorry.  Yes, sir.**

13:20:45 25     Q.  You're fine.

---

Page 87

1     **A.  Sorry about that, Justin.**

2     Q.  You're fine.

3     **A.  Thinking about Carmen.**

4     Q.  Other than Mr. -- I guess you don't remember it

13:20:53 5   with Mr. Montecinos.  So other than with Ms. Elizondo,

6   you don't remember anybody else at UPS telling you there

7   was this, quote, unquote, no restrictions policy then?

8     **A.  Correct.**

9     **(Exhibit 2 marked.)**

13:21:09 10     Q.  (By Mr. Barbour) Okay.  I'll hand you what I've

11   marked as Exhibit 2 to your deposition, Mr. Gonzalez.

12   And I'll represent to you that Exhibit 2 is three pages

13   of documents that your counsel produced to us in this

14   litigation and ask you if you're familiar with these

13:21:35 15   documents.

16     **A.  I am familiar with the documents.**

17     Q.  And earlier or just a moment ago you had

18   testified that you had provided Ms. Elizondo with some

19   doctors' notes indicating that you could return to work,

13:21:47 20   quote, unquote, with no restrictions, correct?

21     **A.  Yes.**

22     Q.  Okay.  The bottom right-hand page of these

23   documents again has some numbers on them.

24     **A.  Okay.**

13:21:57 25     Q.  And I'm looking at Page 1540 and 1541.

---

Page 88

1     Are these the doctors' notes that you

2   provided to Ms. Elizondo indicating that you could

3   return to work, quote, unquote, without restrictions?

4     **A.  Yes.  These -- These are some of them.**

13:22:13 5     Q.  You would agree with me that nothing on

6   Page 1540, 1541 is Ms. Elizondo telling you you can't

7   return unless you have no restrictions, correct?

8     **A.  That -- That's correct.  These are doctors'**

9   **script pads.**

13:22:29 10     Q.  Then, when I look at Page 1542, at that third

11   page of Exhibit 2, is this the e-mail that you're

12   referencing you had sent to Ms. Elizondo?

13     **A.  Yes.  This is the one I was referring to.**

14     Q.  Okay.

13:22:51 15     **A.  And I was thinking of the -- a different**

16   **surgery.  So the -- the year I gave you around 2009**

17   **was -- was not correct.**

18     Q.  Well, the --

19     **A.  So the -- So the date on this -- this**

13:23:05 20   **correspondence is more accurate.**

21     Q.  Okay.  Well, the doctors' notes that we have

22   that are 1540 and 1541 are dated in 2009, are they not?

23     **A.  Yes, they are.**

24     Q.  And is it your testimony that you got these

13:23:19 25   doctors' notes because Ms. Elizondo told you that you

---

Page 89

1   couldn't return to work unless you had no restrictions?

2     **A.  She -- I'm sorry.  Can you please repeat that?**

3     Q.  Yes, sir.  1540 and 1541 are three doctors'

4   notes releasing you to return to work in 2009, quote,

13:23:39 5   with no restrictions, aren't they?

6     **A.  Yes.**

7     Q.  Is it your testimony that you got these three

8   notes because Ms. Elizondo had previously told you you

9   couldn't return to work if you had restrictions?

13:23:49 10     **A.  Yes, that's correct.**

11     Q.  And so the one time that you recall her telling

12   you that that was company policy would have happened

13   sometime prior to April 14th, 2009, the first of these

14   notes, wouldn't it?

13:24:03 15     **A.  Well, she -- she never -- she never**

16   **specifically said it was company policy.  She just said**

17   **I needed to have this note from my doctor to return to**

18   **work.**

19     Q.  So she didn't say it was company policy?

13:24:17 20     **A.  No, she never said it was company policy.  She**

21   **just said I needed -- when I come back, I need to bring**

22   **a -- a note from the doctor stating I can return to work**

23   **without restrictions.**

24     Q.  I just want to make sure that I understand

13:24:35 25   here.  You only recall her telling you that once

---

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                              RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

## Page 90

1   specifically, correct?

2   A.  Correct.

3   Q.  And because the first of these doctors' notes

4   that say you can return, quote, without restrictions is

13:24:47   5   dated April 14th, 2009, she would have told you that

6   sometime prior to that date; is that correct?

7   A.  I -- As far as the dates, I cannot be certain

8   on the dates because I -- I just recall it being prior

9   to when -- what I believe was my carpal tunnel surgery,

13:25:13   10   which is the first surgery I had.

11   Q.  Back in 2009?

12   A.  Yes.

13   Q.  Okay.

14   A.  Approximately, yeah, around that -- around

13:25:21   15   2009.

16   Q.  Okay.  And I understand dates get hazy as time

17   goes on.

18   A.  Yes.

19   Q.  I understand that.

13:25:25   20        But it would be your testimony, then, that

21   she would have told you that you had to have a note with

22   no restrictions sometime back in 2009, give or take?

23   A.  Yes, sir.

24   Q.  Okay.  The last of these documents, Page 1542,

13:25:39   25   this is an e-mail to you -- from you to Ms. Gonzalez --

---

## Page 91

1   excuse me -- Ms. Elizondo --

2   A.  Yes.

3   Q.  -- dated October 8th, 2013; is that correct?

4   A.  It is.

13:25:47   5   Q.  And this would have been during that period of

6   time that ultimately culminated in your separation,

7   correct?

8   A.  Yes.

9   Q.  Okay.  When I look at the middle right here,

13:25:55   10   there's a paragraph that begins with, "My next doctor's

11   appointment."  You see where I'm at?

12   A.  Yes, sir.

13   Q.  And you tell Ms. Elizondo, "My next doctor's

14   appointment with my orthopedic surgeon is scheduled for

13:26:07   15   October 22nd.  My hope is he will release me to return

16   to work without restrictions."  Is that correct?

17   A.  That is correct.

18   Q.  Okay.  And it's your testimony that you

19   provided this because Ms. Elizondo had previously told

13:26:17   20   you you can't return to work if you have restrictions?

21   A.  Correct.

22   Q.  But you don't have any e-mail or other document

23   from Ms. Elizondo in which she told you that was a

24   requirement?

13:26:27   25   A.  Correct.

---

## Page 92

1   Q.  Other than these three pages, Pages 1540

2   through 1542, are you aware of any other documents in

3   your possession that would show that UPS wouldn't allow

4   you to return to work if you had any restrictions at

13:26:45   5   all?

6   A.  I am aware -- aware of some additional doctors'

7   notes that I submitted to UPS, to Ms. Elizondo, from --

8   from another time I was out on leave, but I --

9   Q.  Do you --

13:27:05   10   A.  -- I don't re -- I -- I don't -- I can't find

11   them.  I don't know where they are.

12   Q.  Do you -- So you don't have copies of those

13   notes anywhere --

14   A.  I don't --

13:27:13   15   Q.  -- yourself?

16   A.  I don't think so.  Not -- I have gone through

17   my files and have -- did not locate -- I submitted or

18   provided what I could find.

19   Q.  Do you recall when those notes would have been

13:27:21   20   from?

21   A.  Let's see.  Two thousand -- Let's see.  We've

22   got 2009.  4/2009.  I'm going to say two thousand -- I

23   believe there's two more.  2011 -- and 2013 is from --

24   Let's see.  So 2011, 2012.  I believe there's two more.

13:28:05   25   Q.  Okay.  So it's safe to say that you took

---

## Page 93

1   medical leave in 2009, 2011 and 2012, correct?

2   A.  That sounds correct.

3   Q.  And when you returned from each of those, you

4   didn't have any restrictions on your ability to do your

13:28:17   5   job for UPS; is that right?

6   A.  Correct.

7   Q.  And you were returned to your position with UPS

8   after each of those three periods of leave, weren't you?

9   A.  I was returned to a position of an ISR, yes.

13:28:29   10   Q.  Which was the position you held before you went

11   out on leave?

12   A.  Or I was returned to growth group.

13   Q.  And you told me earlier that in the growth

14   group, that was still an ISR position you were

13:28:41   15   performing.

16   A.  Yes.

17   Q.  Right.  Okay.

18   A.  Yes.  There's a distinction between growth

19   group and ISR --

13:28:45   20   Q.  Well, what's the distinction --

21   A.  -- as well.

22   Q.  -- between growth group and ISR?

23   A.  Growth group's a -- where new employees start

24   out or people from leave come back because they are

13:28:59   25   going to be reassigned a new territory.

---

24 (Pages 90 to 93)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 94

1      Q.  So it's not a different job title; it's just a
2   different group in which you're performing the ISR
3   position.  Is that more or --
4      A.  Yes.
13:29:11   5      Q.  -- less correct?
6      A.  Yeah.  That sounds fair, yeah.
7      Q.  Okay.
8      A.  Correct.
9      Q.  In 2009 or 2011 or 2012, when you returned to
13:29:17  10   work, you didn't have any limitations on your ability to
11   make decisions, did you?
12      A.  No.
13      Q.  When you returned to work in 2009, 2011, 2012,
14   you didn't have any restrictions on your cognitive
13:29:31  15   memory --
16      A.  Correct.
17      Q.  -- did you?
18         Okay.  And similarly, when you returned to
19   work after each of those three periods of leave, you
13:29:39  20   didn't have any cognitive restrictions whatsoever --
21      A.  No.
22      Q.  -- did you?
23         Okay.  Now, you did request leave from UPS
24   in April of 2013, didn't you?
13:29:55  25      A.  Yes, sir.

---

Page 95

1      Q.  What was the medical condition that led you to
2   request some leave at that time?
3      A.  It was a shoulder surgery.
4      Q.  And what shoulder surgery -- that shoulder
13:30:07   5   surgery was treating what medical condition?
6      A.  Adhesive capsulitis.
7      Q.  The same as -- same condition we discussed
8   earlier?
9      A.  Yes, sir.
13:30:15  10      Q.  Had that medical condition restricted your
11   ability to perform the job you were performing for UPS
12   at that time?
13      A.  I was -- No.  I was doing my job up until the
14   time I had my surgery.
13:30:37  15      Q.  When you requested leave -- At the time you had
16   requested leave in April of 2013, had Ms. Eason said
17   anything critical or negative to you about the fact that
18   you had this shoulder condition?
19      A.  No.
13:30:51  20      Q.  Had Mr. Johnson said anything critical about
21   the fact that you had this shoulder condition?
22      A.  No, sir.
23      Q.  And UPS requested [sic] your request for leave
24   in April of 2013, didn't they?
13:31:03  25      A.  I'm sorry.  Say it again.

---

Page 96

1      Q.  Yeah.  You requested leave for your adhesive
2   capsulitis in April of 2013, and UPS approved that,
3   didn't they?
4      A.  They did.
13:31:13   5      Q.  Okay.  Approximately how long did you stay out
6   on leave?
7      A.  This is the last time I was out?
8      Q.  I believe so, yes, sir.
9      A.  I was out for approximately one year.  I was --
13:31:31  10   I requested a return to work in April.
11      Q.  April of 2014?
12      A.  Yes.
13      Q.  Yes, sir.  Would it be fair to say that you
14   went out on leave in April of 2013, stayed on leave for
13:31:45  15   about a year and tried to come back at least in April
16   of 2014?  Wouldn't it?
17      A.  No.  It -- It wasn't a calendar year.  It was a
18   calendar year that -- that it took for me to be
19   terminated, but I requested to come back to work three
13:31:59  20   months prior to my termination.
21      Q.  Okay.  Okay.  While you were out on leave, did
22   you develop a medical condition known as CRPS?
23      A.  Yes.
24      Q.  And to the best of your recollection, when did
13:32:15  25   the CRPS disorder first come about or first be

---

Page 97

1   diagnosed?
2      A.  I believe it was diagnosed about 2011.
3      Q.  So this was a condition you had that predated
4   your April 2013 --
13:32:27   5      A.  Yes.
6      Q.  -- period of leave?
7      A.  Correct.
8      Q.  Was there some relationship, to the best of
9   your understanding, between your CRPS and your adhesive
13:32:37  10   capsulitis?
11      A.  A relationship between my CRPS and adhesive
12   cap -- I'm sorry.  Say it again.
13      Q.  Yeah.  Did -- Did your adhesive capsulitis
14   cause your CRPS, or was there some relationship, or were
13:32:51  15   they two independent medical disorders?
16      A.  The -- The initial surgery for carpal tunnel
17   may have been what caused my CRPS.
18      Q.  But to the best of your understanding, there
19   wasn't necessarily a relationship between your shoulder
13:33:09  20   disorder and the CRPS itself?
21      A.  That's not necessarily true.  The CRPS is a
22   disease of inflammation and pain.  So it does spread, so
23   it -- and it has spread to both extremities -- upper
24   extremities.
13:33:35  25      Q.  Do you still suffer from CRPS today?

---

25  (Pages 94 to 97)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 98

1   A.  Yes.
2   Q.  So you've had that condition for at least
3   approximately the last six years; is that right?
4   A.  Yes.
13:33:47   5   Q.  While you were out on leave for 9 to
6   12 months -- and I understand you requested to come back
7   at some point.
8   A.  Uh-huh.
9   Q.  But while you were out on leave for -- in 2013,
13:33:59   10   2014, what type of treatments were you undergoing with
11   your medical providers?
12   A.  I was undergoing stellate ganglion blocks.
13   S-T-E-L-L-A-T-E.  Ganglion, G-A-N-G-L-I-O-N.
14   Q.  And what does that procedure --
13:34:21   15   A.  It's a --
16   Q.  -- do?
17   A.  It's a -- What it does, it's a -- an x-ray
18   guided injection into my -- the spine around -- in my
19   neck to anesthetize the nerves to reduce my pain
13:34:45   20   symptoms.
21   Q.  Did you have any other surgeries during the
22   years 2013 or 2014?
23   A.  Besi -- Aside from the two shoulder surgeries
24   and the carpal tunnel?
13:35:01   25   Q.  Well, you had the carpal tunnel prior to 2013,

Page 99

1   correct?
2   A.  Yes.
3   Q.  Okay.
4   A.  I had carpal tunnel, and I don't recall the
13:35:07   5   dates of the superseding procedures, but I also had
6   cubital tunnel release surgery of my right elbow.
7   Q.  Was that prior to 2013?
8   A.  Yes.
9   Q.  And was that one of those periods of leave that
13:35:21   10   you had in 2009, 2011 or 2012?
11   A.  Yes, sir.
12   Q.  Okay.  Let me ask you this way:  While you were
13   out on leave beginning in April of 2013, did you feel
14   that your medical treatments improved your physical
13:35:35   15   condition?
16   A.  The carpal tunnel release surgery did improve
17   the carpal tunnel issue.  The cubital tunnel also
18   improved that issue.  And the shoulder surgeries, it's a
19   yes, and that's a very complicated answer, because
13:36:11   20   complex regional pain syndrome is a complex disease.
21   There's no cure for it.
22          It's just treated with, well, the stellate
23   ganglion blocks.  A spinal cord stimulator was another
24   procedure I had for it.  That was unsuccessful.  And
13:36:35   25   then Ketamine infusions -- Ketamine infusions were the

Page 100

1   next step for treatment.
2   Q.  Let me ask it this way, I guess:  You went out
3   on leave in April of 2013 because you felt you needed
4   time off before you could perform your job at UPS.  Is
13:36:51   5   that a fair statement?
6   A.  I -- I needed -- Time off would have been nice,
7   additional -- some additional time off, or return to
8   work at re -- reduced hours.
9   Q.  You requested return back to work sometime in
13:37:13   10   early February 2014; is that correct?  Give or take.
11   A.  Give or take, yeah.
12   Q.  Yeah.  I'm not going to hold you to that --
13   A.  Okay.
14   Q.  -- right now.
13:37:21   15   A.  Thank you.
16   Q.  But -- But sometime in early 2014 --
17   A.  Uh-huh.
18   Q.  -- you requested to return to work; is that
19   correct?
13:37:27   20   A.  Yes, sir.
21   Q.  Okay.  Did you feel more capable of performing
22   your position with UPS in early 2014 than you had when
23   you went out on leave in April of 2013?
24   A.  Did I feel more capable?
13:37:37   25   Q.  Yes, sir.

Page 101

1   A.  I can't say there was -- there was -- I was
2   undergoing treatment from my pain management doctor in
3   2014, and the treatment -- his specialty in pain
4   management is backs.  And then he recommended I go to
13:38:01   5   another pain manage doctor -- management doctor that
6   specialized in more -- or in other chronic pain issues
7   like CRPS.
8   Q.  And who is your pain specialist?
9   A.  The first one or second one?
13:38:17   10   Q.  First one.
11   A.  Dr. Raul Martinez.
12   Q.  Okay.  And who was your second pain specialist?
13   A.  Dr. Donald Bacon.
14   Q.  Do you continue to see Dr. Bacon today?
13:38:31   15   A.  Yes.
16   Q.  Do you remember approximately when it was that
17   you stopped seeing Dr. Martinez and began seeing
18   Dr. Bacon?
19   A.  2014 --
13:38:37   20   Q.  Was there --
21   A.  -- I believe, yeah.
22   Q.  Was there any particular reason that you
23   stopped seeing Dr. Martinez?
24   A.  Yes.  As I just stated, it's because Dr. Bacon
13:38:49   25   treated complex regional pain syndrome more so than

26  (Pages 98 to 101)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 102

1    Dr. Martinez. Dr. Martinez was more -- he treated more
2    patients with back pain.
3         Q. Did -- Did you -- You didn't have any doubts
4    about the quality of treatment Dr. Martinez was giving
13:39:07  5    you?
6         A. No.
7         Q. Okay. Did you find Dr. Martinez to be a
8    competent doctor in his care for you?
9         A. Yes.
13:39:13 10    Q. Did you feel like he had your best interests at
11    heart?
12        A. Yes.
13        Q. Did you ever feel like he misrepresented your
14    physical condition in any way, to the best of your
13:39:21 15    knowledge?
16        A. No.
17            (Exhibit 3 marked.)
18        Q. (By Mr. Barbour) I'm going to hand you what
19    I've marked as Exhibit 3 to your deposition,
13:39:33 20    Mr. Gonzalez.
21        A. Sir, is it okay to take a bathroom break --
22        Q. Please. Absolutely.
23        A. -- right at this time?
24        Q. This is a good time.
13:39:39 25    A. It's a good time? Okay. Thank you.

## Page 103

1            THE VIDEOGRAPHER: The time is 1:39 p.m.,
2    and we are off the record.
3            (Off the record.)
4            THE VIDEOGRAPHER: The time is 1:44 p.m.,
13:44:37  5    and we are on the record.
6         Q. (By Mr. Barbour) Mr. Gonzalez, are you ready to
7    proceed, sir?
8         A. Yes, sir.
9         Q. Any answers at this time that you would like to
13:44:43 10    change?
11        A. No, sir.
12        Q. Okay. Before our break, I had handed you what
13    I had marked as Exhibit 3 to our deposition. Do you
14    have that document?
13:44:51 15    A. Yes, sir.
16        Q. Does this appear to be a document completed by
17    Dr. Scott Sledge?
18        A. Yes.
19        Q. And have you seen this document prior to today?
13:45:01 20    Do you know?
21        A. No. I don't recall it, no.
22        Q. Does this appear to be a document that
23    Dr. Sledge had completed in relationship to some claims
24    made on your behalf with Aetna?
13:45:13 25    A. Yes.

## Page 104

1         Q. And do you -- apart from this form, do you
2    generally remember Dr. Sledge submitting forms in
3    relationship to your long-term disability claim with
4    Aetna?
13:45:25  5    A. Yes.
6         Q. Does this particular form appear to be signed
7    by Dr. Sledge on October 22nd of 2013?
8         A. Yes, it does.
9         Q. Okay. And when I look up into the body of the
13:45:37 10    document, does it indicate -- going about three-fourths
11    of the way down, do you see the line that says, "Total
12    number of hours patient capable of working per day"?
13            And I can direct you to it, if you would
14    like me to, sir.
13:45:53 15    A. Yes.
16        Q. I apologize. I'm looking -- Thank you.
17        A. Oh, okay.
18        Q. Yeah. I'm right there.
19        A. "Patient capable of working" -- Yes. Okay.
13:46:01 20    "None."
21        Q. Okay. Yeah.
22        A. "Read above." Uh-huh.
23        Q. And my question: As I see it, does appear that
24    Dr. Sledge has written that, as of October 22nd, 2013,
13:46:09 25    you were not capable of working any hours during the

## Page 105

1    day. Is that correct?
2         A. Yes.
3         Q. Is it --
4         A. Yes.
13:46:13  5    Q. I didn't mean to cut you off, Mr. Gonzalez. I
6    apologize.
7         A. Yes.
8         Q. Does that generally match your recollection as
9    to your work abilities as of October 22nd, 2013?
13:46:29 10    A. I -- I don't recall what my abilities were at
11    that time.
12        Q. Okay. As you sit here today, do you know one
13    way or not -- whether or not you were, in fact, capable
14    of working any hours during the day as of October 22nd,
13:46:47 15    2013?
16        A. Any hours I -- I was capable of working?
17        Q. Yes, sir.
18        A. It -- I -- I'm -- I'm sure I could have worked
19    some hours. I -- I really don't recall specifically --
13:47:03 20    Q. Okay.
21        A. -- on this document or -- or my condition at
22    the time. I know it was -- Let's see. That's 2013.
23            Yeah. I just don't -- I don't have a
24    recollection of it.
13:47:21 25    Q. And I -- And I -- I understand and appreciate

27  (Pages 102 to 105)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 106

1    that you don't recall this specific document.

2            And so setting aside this document --

3      A.  Uh-huh.

4      Q.  -- October 22nd, 2013 would have been somewhere

13:47:33   5    right around one half of the way through your yearlong

6    period of leave from working with UPS.

7      A.  Okay.

8      Q.  Is that correct?

9      A.  That -- Yes.  Okay.  I appreciate the schedule

13:47:43  10   time frame.

11     Q.  Sure.  Just to the best of your recollection,

12   setting this document aside, do you believe you would

13   have been capable of working for UPS or anyone else as

14   of October 2013?

13:47:55  15     A.  I -- I may have been able to, and it may have

16   been difficult to.  It's still difficult for me to -- to

17   say absolutely, yes, I -- I could have done the job.

18     Q.  So you think you could have but possibly with

19   some great difficulty.  Is that what you're saying?

13:48:21  20     A.  Well, I didn't say "great difficulty," but I --

21   I may have had difficulties.

22     Q.  What kind of difficulties do you think you

23   would have had performing any work as of October of

24   2013?

13:48:35  25     A.  Well, I -- I was recovering from surgery and

## Page 107

1    complications with complex regional pain syndrome.

2      Q.  And you didn't try to return to work in October

3    of 2013, correct?

4      A.  No.

13:48:51   5     Q.  And as you sit here today, do you have any

6    specific recollection of it was that it wasn't the time

7    that you tried to return to work?

8      A.  No.

9      Q.  Okay.

13:49:03  10           (Exhibit 4 marked.)

11     Q.  (By Mr. Barbour) I'm going to hand you what

12   I've marked as Exhibit 4 to your deposition,

13   Mr. Gonzalez.

14           And, again, my question is -- my first

13:49:19  15   question would be:  Have you seen this document prior to

16   today?

17     A.  It -- It does look familiar, but -- yes.

18     Q.  Okay.  And you say it looks familiar.  I -- I

19   assume that means that you believe you -- you may have

13:49:57  20   seen this document prior to today.

21     A.  Yeah.  Yes, I may have.  I've seen numerous

22   Aetna documents because of the requirements.  This one

23   is evidently sent directly to my doctor.

24     Q.  Okay.  When -- When I look at the back -- the

13:50:17  25   second page of this document, the numbers are somewhat

## Page 108

1    confusing, but I believe that it's RG 1699 in the bottom

2    right-hand corner.

3            Do you see the page I'm looking at?

4      A.  Is it -- Is it this one?

13:50:37   5     Q.  Yes.  It's the one that I think has

6    Dr. Martinez's signature at the very bottom.

7      A.  Yes.  Okay.

8      Q.  Okay.  Dr. Martinez was -- was your first hand

9    specialist; is that correct?

13:50:45  10     A.  Yes.

11     Q.  And it appears that this document was -- was

12   completed by Dr. Martinez on February 19th of 2014; is

13   that correct?

14     A.  Yes.

13:50:53  15     Q.  Okay.  Do you recall a specific appointment

16   with Dr. Martinez in February of 2014?

17     A.  No.

18     Q.  When I look at the first page of that

19   Exhibit 4, Mr. Gonzalez, second half of the page is a

13:51:09  20   box.  Above it, it says, "3, impairing diagnosis and

21   treatment."  Do you see that?

22     A.  I do.

23     Q.  And when I drop down under F, it says,

24   "Medications, dose and frequency."  Is that correct?

13:51:19  25     A.  Yes.

## Page 109

1      Q.  And on that, it indicates that you were taking

2    Percocet as of that time; is that correct?

3      A.  Yes.

4      Q.  And I believe it indicates -- or how often --

13:51:31   5    Let me strike that.

6            Do you recall taking Percocet as of

7    February 2014?

8      A.  Yes.

9      Q.  Are you taking Percocet today?

13:51:39  10     A.  No.

11     Q.  When did you stop taking Percocet on a regular

12   basis?

13     A.  About -- Approximately four months ago.

14     Q.  Sometime in early 2017?

13:51:53  15     A.  Yes.

16     Q.  Okay.  But you do recall taking Percocet as of

17   February 2014?

18     A.  Yes.

19     Q.  Okay.  When I flip over to the second page of

13:52:03  20   Exhibit 4, the back of the document you're looking at

21   right there, about a third of the way down, do you see a

22   box that is numbered five and it says,

23   "abilities/limitations"?

24     A.  Yes.

13:52:21  25     Q.  Okay.  When I drop down, the fifth bullet point

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 110

1    down there says, "Able to do," question mark.
2         Am I correct that Dr. Martinez, on
3    Exhibit 4, has checked off that, as of the date of this
4    form, you had no ability to work?
13:52:39   5    **A. Yes.**
6    Q. And as of February 19th, 2014, Dr. Martinez
7    indicated that you had severe limitation of functional
8    capacity and you were incapable of minimal activity.
9    **A. Yes.**
13:52:55   10   Q. Now, at some point you tried to return to work
11   with UPS; is that right, Mr. Gonzalez?
12   **A. Yes, sir.**
13   Q. How did you go about notifying UPS that you
14   wanted to return to work?
13:53:15   15   **A. I believe I called Carmen Elizondo, and I**
16   **probably called the Human Resource Service Center.**
17   Q. And sometimes UPS-ers call that the HRSC, don't
18   they?
19   **A. Yes, sir.**
13:53:39   20   Q. I may call it that to save ourselves a little
21   bit of time --
22   **A. Yes.**
23   Q. -- here today.
24        So you notified somebody in HR, either in
13:53:45   25   San Antonio or the HRSC, that you wanted to try and come

---

Page 111

1    back to work?
2    **A. Yes.**
3    Q. Was there anything in particular that prompted
4    you to tell UPS that you wanted to try to come back to
13:53:55   5    work?
6    **A. I felt I was ready to go back to work. I had**
7    **the ability to go back.**
8    Q. Okay.
9    **A. I had been on Percocet before. When I was**
13:54:11   10   **telling you about the previous surgeries, that was the**
11   **pain management treatment I was on at the time.**
12   Q. When did you begin taking Percocet, to the best
13   of your recollection?
14   **A. Oh, two thousand -- maybe 2009. I mean, I**
13:54:29   15   **wasn't taking it all the time.**
16   Q. Was there ever a period of time where you took
17   Percocet every day?
18   **A. Yes.**
19   Q. And what time period would that have been
13:54:43   20   during?
21   **A. It would have been after one of the shoulder**
22   **surgeries. It may have been the -- I'm not sure which**
23   **shoulder surgery it was. I don't recall.**
24   Q. Do you know whether, in 2014, you were taking
13:54:57   25   Percocet on a daily basis?

---

Page 112

1    **A. I don't recall.**
2    Q. It's possible, but you don't recall?
3    **A. It's possible, but I don't recall.**
4    Q. When you requested to return to work with UPS,
13:55:09   5    did you feel like you were capable of performing the job
6    functions expected of you at that time?
7    **A. When I -- My first request to come back to work**
8    **in --**
9    Q. In 2014.
13:55:21   10   **A. Yes.**
11   Q. You felt like you could perform the job at that
12   time?
13   **A. Yes.**
14        **(Exhibit 5 marked.)**
13:55:33   15   Q. (By Mr. Barbour) I know there are accommodation
16   issues, and we'll discuss those in a second, but I want
17   to hand you what I've marked as Exhibit 5 to your
18   deposition.
19        And, again, my first question would be:
13:55:45   20   Do you recognize Exhibit 5?
21   **A. I am not sure.**
22   Q. Okay.
23   **A. I remember receiving a document requesting**
24   **medical information from a physician -- physician, but I**
13:56:15   25   **don't recall it being this one.**

---

Page 113

1    Q. Exhibit 5 appears to be sent by a Ms. Patricia
2    Lorio, doesn't it?
3    **A. Yes.**
4    Q. Do you recognize Ms. Lorio's name?
13:56:27   5    **A. I do.**
6    Q. Did you have conversations with Ms. Lorio
7    regarding your employment with UPS?
8    **A. I had it re -- regarding the accommodation**
9    **checklist.**
13:56:33   10   Q. Okay. Do you know what her position at UPS is?
11   **A. Yes.**
12   Q. And what's her position?
13   **A. It's an occupational health nurse --**
14   Q. Prior --
13:56:43   15   **A. -- supervisor. Sorry.**
16   Q. No, not at all.
17        Prior to return -- trying to return to
18   work in 2014, had you previously talked with Ms. Lorio?
19   **A. No.**
13:56:49   20   Q. So that would have been your first exposure to
21   her during your employment with UPS?
22   **A. Yes, sir.**
23   Q. Exhibit 5 at least indicates that on
24   February 3rd, 2014, you had requested a job-related
13:57:01   25   accommodation because of a medical condition, doesn't

---

29 (Pages 110 to 113)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                                RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 114

1  it?

2      **A.  Yes.**

3      Q.  Does that generally match your recollection as

4  to the course of events in your attempts to return to

13:57:13    5  work?

6      **A.  Please state that again.**

7      Q.  Yes.  Exhibit 5 indicates that you requested an

8  accommodation on February 3rd, 2014.

9          My question is:  Do you have any reason to

13:57:29   10  doubt that February 3rd, 2014 was the date you actually

11  made that request to return to work?

12      **A.  I don't recall.**

13      Q.  Does it generally match your recollection that

14  sometime in early 2014 was when you tried to first

13:57:43   15  return to work?

16      **A.  That is possibly correct.**

17      Q.  And so as of the date that you notified UPS

18  that you wanted to return to work, that's when you felt

19  like you could perform what you had called your sales

13:58:05   20  consultant role for the company; is that right?

21      **A.  Yes.**

22      Q.  And Exhibit 5 indicates that you felt like you

23  needed an accommodation to perform your role for UPS; is

24  that right?

13:58:21   25      **A.  Yes.**

## Page 115

1      Q.  At that time, did you have any idea what type

2  of accommodation would help you perform your job with

3  the company?

4      **A.  I re -- At that time, I -- I relied on the --**

13:58:35    5  **my -- my doctors' opinions on that.**

6      Q.  You would have needed to get their expertise in

7  terms of defining what you could and couldn't do at that

8  time.  Is that fair?

9      **A.  That -- That's fair.**

13:58:45   10      Q.  Okay.  Do you know whether, as of February

11  2014, you had any limitations on your cognitive ability?

12      **A.  I don't recall having cognitive issues.  I -- I**

13  **recall there being potential cognitive issues due to**

14  **medication side effects.**

13:59:05   15      Q.  And what kind of potential side effects do you

16  recall there being issues with?

17      **A.  It can make you sleepy, make you fatigued --**

18  **feel fatigued.  I don't recall any -- any other**

19  **specific --**

13:59:31   20      Q.  Okay.  Okay.

21      **A.  -- right now.**

22      Q.  You -- You don't recall actually suffering any

23  of those side effects?

24      **A.  No.**

13:59:37   25      Q.  You felt like you had your full cognitive

## Page 116

1  abilities throughout this time period?

2      **A.  Yes.**

3      Q.  Okay.

4      **A.  I -- I had conversations with human resources**

13:59:49    5  **and, of course, with Lenroe Hawthorne at the -- at the**

6  **checklist meeting, and Patricia.**

7      Q.  Okay.

8      **A.  Didn't have any problem driving there or having**

9  **a conversation with them.**

14:00:05   10      Q.  Okay.  Now, Exhibit 5 is dated February 10th,

11  2014, correct?

12      **A.  Yes.**

13      Q.  Okay.  And at that point, you and UPS were

14  already discussing --

14:00:13   15      **A.  Yes.**

16      Q.  -- whether you get --

17      **A.  My return.**

18      Q.  -- an accommodation and what it would be and so

19  forth; is that correct?

14:00:19   20      **A.  Yes.**

21      Q.  Okay.  Let's go back to Exhibit 4,

22  Mr. Gonzalez.

23          Exhibit 4 was dated February 19th of 2014,

24  wasn't it?

14:00:31   25      **A.  Yes.**

## Page 117

1      Q.  So Exhibit 4 actually was created by

2  Dr. Martinez nine days after Ms. Lorio's already

3  e-mailing you about your potential to return to work; is

4  that right?

14:00:45    5      **A.  Nine days after -- Yes.  Those dates, yes.**

6      Q.  And earlier, I think we agreed that on

7  Exhibit 4, Dr. Martinez said that as of February 19th,

8  2014, you had, quote, no ability to work, end quote.  Is

9  that right?

14:00:57   10      **A.  That's right.**

11      Q.  Okay.  And when I look at the first page of

12  Exhibit 4 -- There you go.  Previously we had looked

13  down at where, under Section 3F, Dr. Martinez indicated

14  that as of February 19th, 2014, you were taking

14:01:17   15  Percocet.  Is that right?

16      **A.  Yes.**

17      Q.  Okay.  Right below where Dr. Martinez has

18  written "Percocet," hasn't Dr. Martinez also written

19  that the impairment from your medication includes

14:01:31   20  mentation and ability to make decisions?

21      **A.  Yes.  That's what he wrote.**

22      Q.  Dr. Martinez is indicating that basically your

23  thinking ability is affected by the medications you're

24  taking, isn't he?

14:01:43   25          MR. CRANE:  Objection; form.

**30 (Pages 114 to 117)**

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 118

1          THE WITNESS:  I -- I'm not sure exactly
2    what Dr. Martinez is thinking when he wrote that.
3          Q.  (By Mr. Barbour) It doesn't appear to you that
4    Dr. Martinez is indicating that you have mentation
14:01:55    5    impairment as of February 19th, 2014?
6          MR. CRANE:  Objection; form.
7          THE WITNESS:  I don't understand the term
8    "mentation" or Dr. Martinez's definition of it.
9          Q.  (By Mr. Barbour) Do you have any understanding
14:02:09   10    as to what the word "mentation" means?
11         **A.  Not for -- for certain, no.**
12         Q.  Do you recall a meeting with Dr. Martinez just
13    one month later, in March of 2014?
14         **A.  Offhand, no.  I did meet with him, like,**
14:02:47   15    **monthly.  I --**
16         Q.  Well, it was approximately monthly that you
17    were meeting with him at that point?
18         **A.  Approximately.**
19         Q.  What other medications were you taking around
14:02:57   20    this period of time, to the best of your recollection?
21         **A.  Nefazodone, Silenor, clonazepam.  And as far as**
22    **I can recall, that's it.**
23         Q.  Okay.  Let me hand you what I'll mark as
24    Exhibit 6 to your deposition, Mr. Gonzalez.
14:03:29   25         (Exhibit 6 marked.)

## Page 119

1          Q.  (By Mr. Barbour) Exhibit 6 appears to be a
2    doctor's report from Dr. Martinez dated March 28th of
3    2014.  And I can help you through that, if you'd like
4    to.
14:03:51    5         **A.  I see it.  Thank you.**
6          Q.  You see it?  Does that --
7          **A.  Yes.**
8          Q.  Does that appear to be correct?
9          **A.  Yes.**
14:03:55   10         Q.  Is this a document that you recognize today?
11         **A.  I don't -- do not recall seeing this document.**
12         Q.  Okay.  Down towards the bottom, the document
13    reflects certain current medications that you were
14    taking.  Do you see that section?
14:04:09   15         **A.  I do.**
16         Q.  Okay.  Down there, Dr. Martinez appears to have
17    indicated that you were taking Flexeril, Percocet,
18    Lyrica, Silenor, Nefazodone, Viibryd and Klonopin as of
19    that time.  Does that appear to be correct?
14:04:25   20         **A.  Yes.**
21         Q.  And does that generally rec -- match your
22    recollection as to the medications that you were taking
23    at that time?
24         **A.  Yes.**
14:04:33   25         Q.  I -- I may have asked this already, and I

## Page 120

1    apologize if I did, Mr. Gonzalez, but is it your
2    testimony that you never suffered any impairments or
3    side effects from taking Percocet?
4          **A.  I -- I cannot say I have not had any side**
14:05:01    5    **effects from Percocet.**
6          Q.  What kind of side effects do you recall
7    suffering from taking Percocet?
8          **A.  Occasional drowsiness.  I -- I really -- I**
9    **don't recall very many side effects from the medication**
14:05:31   10    **right offhand.**
11         Q.  Okay.  What kind of medication was Flexeril?
12         **A.  Flexeril is a muscle -- a muscle relaxer.**
13         Q.  Did Flexeril ever cause you to have any
14    confusions or problem with your speech or vision?
14:05:45   15         **A.  No.**
16         Q.  Did you ever have any hallucinations or lack of
17    coordination because of taking Flexeril?
18         **A.  No, sir.**
19         Q.  How about Lyrica?  What kind of medication is
14:05:57   20    Lyrica?
21         **A.  Lyrica's a medication used to -- to help soothe**
22    **nerves.**
23         Q.  Is it a painkiller?
24         **A.  No.**
14:06:07   25         Q.  Did you ever suffer any cognitive side effects

## Page 121

1    from taking Lyrica?
2          **A.  No.  Well -- No, I did not.**
3          Q.  Lyrica never caused you loss of concentration?
4          **A.  No.**
14:06:25    5         Q.  Lyrica never caused you to suffer a loss of
6    focus?
7          **A.  No.**
8          Q.  And Lyrica never caused you to suffer a loss of
9    information retention?
14:06:35   10         **A.  No.**
11         Q.  What about Silenor?  What kind of medication is
12    that?
13         **A.  It's a sleeping medication to help sleep.**
14         Q.  Is it a nerve pain medication?
14:06:51   15         **A.  No.**
16         Q.  Is it an antidepressant?
17         **A.  No.**
18         Q.  Did you ever suffer any emotional or cognitive
19    impairments from taking Silenor?
14:07:03   20         **A.  No.**
21         Q.  What kind of medication is Nefazodone?
22         **A.  Nefazodone.**
23         Q.  Excuse me.  Yes.
24         **A.  It's okay.**
14:07:09   25         Q.  Okay.

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 122

1      A.  Nefazodone is a medication that -- that treats
2   depression and anxiety.
3      Q.  Did you have depression or anxiety issues as of
4   March 2014?
14:07:23   5      A.  Yes.  I had it --
6      Q.  What --
7      A.  -- much sooner than that.
8      Q.  I apologize.
9          How much sooner did you have depression
14:07:33  10   and anxiety issues, to the best of your recollection?
11      A.  I can say I've been on anxiety and depression
12   medication for at least 20 years.
13      Q.  It's a -- Your depression would predate the
14   termination of your employment with UPS --
14:07:51  15      A.  Yes.
16      Q.  -- at the very least; is that correct?
17      A.  That's correct.
18      Q.  Am I pronouncing "Viibryd" correctly?
19      A.  Yes.
14:07:59  20      Q.  Okay.  That's nice.
21          What kind of medication is Viibryd?
22      A.  It's the same as Nefazodone.  It's an
23   antianxiety, antidepressant.
24      Q.  You say it's the same.  Are they two
14:08:13  25   medications that treat the same condition?

Page 123

1      A.  Correct.
2      Q.  What about Klonopin?  What kind of medication
3   is that?
4      A.  Klonopin is pretty much the equivalent of
14:08:21   5   Flexeril.  It's a -- Like, it's really a competitor of
6   Flexeril.  So I -- I was not taking them both at the
7   same time.
8      Q.  You would have been taking one or the other?
9      A.  One or the other, yes, sir.
14:08:35  10          (Exhibit 7 marked.)
11      Q.  (By Mr. Barbour) I'll hand you what I've marked
12   as Exhibit 7 to your deposition.  And once again, I'll
13   ask you if you recognize this document, Mr. Gonzalez.
14      A.  Yes, sir, I do.
14:08:53  15      Q.  What is Exhibit 7?
16      A.  It's a function report that I submitted to
17   Social Security.
18      Q.  Is this written in your own handwriting?
19      A.  Yes, it is.
14:09:03  20      Q.  And it's several pages long, but when I go to
21   the very last page, 4357 in the lower right-hand corner,
22   is that your handwritten name --
23      A.  It is.
24      Q.  -- up there?
14:09:19  25      A.  Yes, sir.

Page 124

1      Q.  Does it appear that you completed this around
2   March 15th, 2014?
3      A.  Yes.
4      Q.  And you completed this in relationship to your
14:09:27   5   request for Social Security disability benefits; is that
6   right?
7      A.  Correct.
8      Q.  And you were doing your absolute best to be as
9   truthful and forthcoming with the Social Security
14:09:37  10   Administration as you could; is that right?
11      A.  Yes.
12      Q.  You wouldn't have written anything in here
13   that, to the best of your knowledge, wasn't accurate,
14   right?
14:09:45  15      A.  Correct.
16      Q.  Okay.  And when I look up on that very last
17   page under No. 22, see where it says, "Do you currently
18   take any medicines for your illnesses, injuries or
19   conditions?"
14:09:59  20      A.  Yes.
21      Q.  Below that, you've written out the names of six
22   different medications; is that right?
23      A.  Yes.
24      Q.  When I look down, you -- you've written out
14:10:07  25   Lyrica as one of the medications you're taking at that

Page 125

1   time; is that right?
2      A.  Yes.
3      Q.  And earlier you told me that you never suffered
4   a loss of concentration, focus or retention as a result
14:10:17   5   of taking Lyrica, didn't you?
6      A.  I -- I did say that, and I -- in addition to
7   that, I do not -- I -- I stopped taking Lyrica because
8   of the side effects within -- I'd have to guess, within
9   a couple of weeks.
14:10:37  10      Q.  Within a couple of weeks of when?
11      A.  Of it being prescribed and me taking it.
12      Q.  When did you first begin taking Lyrica?
13      A.  I don't recall the date, but it was -- it was
14   prescribed by Dr. Martinez.
14:10:49  15      Q.  You wouldn't have written Lyrica as one of the
16   medications you were currently taking as of March 15th,
17   2014 if you weren't --
18      A.  Correct.
19      Q.  -- taking it at that time, then?
14:11:01  20      A.  I am not -- Yes.  I have not taken Lyrica
21   since --
22      Q.  I understand.
23      A.  -- approximately that time.
24      Q.  And you told the Social Security Administration
14:11:09  25   that at that time you were taking Lyrica --

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

Page 126

1      A.  Yes.
2      Q.  -- and it did cause you a loss of
3   concentration, focus and retention; is that right?
4      A.  That's correct.
14:11:15    5      Q.  Okay.  And was that an accurate statement, that
6   it did cause --
7      A.  Yes.
8      Q.  -- you those side effects?
9      A.  Yes.
14:11:23   10      Q.  So your earlier testimony, that Lyrica never
11   caused you to suffer a loss of concentration, focus or
12   attention, would be incorrect, wouldn't it?
13      A.  It would be something I -- I did not recall
14   correctly.
14:11:35   15      Q.  And you don't recall the date on which you
16   stopped taking Lyrica?
17      A.  No.
18      Q.  And also on Exhibit 7 don't you indicate that
19   your Percocet caused you lightheadedness?
14:11:47   20      A.  Yes.
21      Q.  And your clonazepam -- Am I pronouncing that
22   correctly?
23      A.  Yes.  Pretty close.
24      Q.  Okay.
14:11:57   25      A.  That's close.  Yeah.  That's -- I'd say it the

Page 127

1   same way, "clonazepam."
2      Q.  Clonazepam.  You told the Social Security
3   administration that your clonazepam use caused you
4   fatigue and loss of coordination.  Don't you?
14:12:09    5      A.  Yes, I did state that.
6      Q.  And all those statements are accurate as to the
7   side effects of those various medications, aren't they?
8      A.  "Anxious, irritable"...
9          If I may have a moment to review this.
14:12:23   10      Q.  Please.
11      A.  It -- It looks like, as a -- and the name of
12   the medication and -- and the side effects I have --
13   That's correct.  Lyrica.  "Loss of concen" -- Okay.
14   "Fatigue and loss of coordination."  Yeah.
14:13:21   15          The only one that I may change a little
16   bit is the Silenor, the one in the middle.
17      Q.  Uh-huh.
18      A.  It says, "Moody, anxious, irritable."  Well,
19   Silenor is a sleep aid, so it doesn't make me moody,
14:13:39   20   anxious or irritable, but the -- some of those other
21   medications I take to -- to not be moody, anxious and
22   irritable.
23      Q.  So as you look at it here today, your testimony
24   is that the side effects of the Silenor might not be
14:13:55   25   accurately written; is that right?

Page 128

1      A.  It's -- Yeah.  It's -- The side effects are
2   stated in my list, but it's not correlated directly to
3   Silenor.
4      Q.  Okay.  Okay.  That -- That was a condition you
14:14:07    5   might have been experiencing but not necessarily as a
6   result of the Silenor?
7      A.  Yes.
8      Q.  Okay.  But otherwise, with regard to the
9   remainder of those medications, you've named the
14:14:17   10   medicines and then the side effects you actually did
11   have because you were taking those medicines as of
12   March 15th, 2014?
13      A.  Yes.
14      Q.  Okay.  I want to get back to your request for
14:14:27   15   accommodation, Mr. Gonzalez.
16          Ms. Lorio had given you some paperwork to
17   take to your doctor to help UPS process your request for
18   accommodation; is that right?
19      A.  Yes.
14:14:39   20      Q.  Do you recall that?
21      A.  Yes.
22      Q.  And I think you said that it was appropriate
23   for UPS to want to look through doctors' notes, try and
24   figure out --
14:14:47   25      A.  Yes.

Page 129

1      Q.  -- what you could and couldn't do; is that
2   right?
3      A.  Right.
4          (Exhibit 8 marked.)
14:14:53    5      Q.  (BY MR. BARBOUR) Okay.  I'll hand you what I've
6   marked as Exhibit 8 to your deposition, Mr. Gonzalez.
7   Do you recognize Exhibit 8?
8      A.  Yes.
9      Q.  And what is Exhibit 8?
14:15:11   10      A.  It's a request for medical information from
11   Mrs. Lorio.
12      Q.  Okay.  Did you provide this to one of your
13   doctors to have him or her complete it?
14      A.  Yes, I did.
14:15:23   15      Q.  Who did you provide it to?
16      A.  To Dr. Raul Martinez.
17      Q.  So when I look in the bottom right-hand corner
18   on Page 285, the very end --
19      A.  Yes.
14:15:33   20      Q.  -- that would be Dr. Martinez's signature; is
21   that right?
22      A.  Yes, it is.
23      Q.  Do you recall whether Dr. Martinez sent this
24   directly back to UPS or whether he gave it to you to
14:15:43   25   provide to UPS?

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                        RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 130

1      A.  I don't recall.
2      Q.  Did you review this at any point while your
3   request for accommodation with UPS was being considered?
4          And when I say "this," I mean Exhibit 8.
14:15:57  5      A.  Did I review it prior to or review it when?
6      Q.  Let me review -- Let me rephrase that.
7          UPS was considering your request for
8   accommodation; is that right?
9      A.  Yes.
14:16:05  10     Q.  Did you look at your doctor's notes during
11  those conversations to see what your doctor indicated
12  your restrictions were?
13     A.  Yes, I did.
14     Q.  Okay.  Did you think that Dr. Martinez had
14:16:15  15  incorrectly represented what you were capable of as of
16  that time?
17     A.  Do I think he incorrected -- incorrectly -- I
18  believe he wrote what he believed to be true --
19     Q.  Okay.
14:16:33  20     A.  -- of my condition.
21     Q.  And you never went to UPS and said,
22  "Dr. Martinez is wrong.  I" --
23     A.  No, I did not.
24     Q.  -- "actually can do some things."  Is that
14:16:41  25  right?

---

Page 131

1      A.  I -- Well, that's not necessarily true.  I -- I
2   did have a conversation with Lenroe Hawthorne at the
3   checklist meeting about the things that I could do.
4      Q.  Okay.  And we'll talk about the checklist
14:16:53  5   meeting in more detail --
6      A.  Okay.
7      Q.  -- but for right now...
8          During that checklist meeting, did you
9   think your doctor had misstated your physical or
14:17:01  10  cognitive impairments?
11     A.  No.
12     Q.  Okay.
13     A.  No.
14     Q.  When I look at Exhibit 8, under No. 1 on
14:17:13  15  Page 283, the second page of the document --
16     A.  Okay.
17     Q.  -- Dr. Martinez indicates that you are not able
18  to perform all of the functions of your position with
19  UPS; is that right?
14:17:25  20     A.  Yes.  That's -- That's correct.
21     Q.  And under No. 2, Dr. Martinez indicates the
22  essential job functions that you're unable to perform;
23  is that right?
24     A.  That's correct.
14:17:37  25     Q.  And in particular, he says you're unable to do

---

Page 132

1   continuous repetitive movements of your upper
2   extremities and you have decreased ability to make
3   decisions due to medication prescribed.
4      A.  That's correct.  That is what he wrote.
14:17:55  5      Q.  And just a second ago, when we looked at that
6   Social Security function report, you did indicate that
7   your Lyrica caused you to have loss of concentration,
8   focus and recollection; is that right?
9      A.  I -- I did state that, in addition to I stopped
14:18:09  10  taking it.
11     Q.  But you don't remember when you stopped taking
12  it, right?
13     A.  Right.
14     Q.  And under No. 3, Dr. Martinez writes, in part,
14:18:23  15  that you have de -- decreased ability of concentration,
16  on the second line, doesn't he?
17     A.  Yes, he did write that.
18     Q.  And earlier we discussed how the cognitive
19  ability to strategize and think and make decisions was
14:18:45  20  an essential function --
21     A.  Yes.
22     Q.  -- of the position you had with UPS; is that
23  right?
24     A.  Yes, sir, that's correct.
14:18:51  25     Q.  So when I look down below at No. 3A, at the

---

Page 133

1   bottom of Page 283, Mr. Gonzalez --
2      A.  Uh-huh.
3      Q.  -- the form asks Dr. Martinez, "For each
4   diagnosis or condition identified above, describe in
14:19:11  5   detail the extent of the restrictions and the known
6   expected duration of the restrictions."
7          Do you see where it asks that?
8      A.  I do.
9      Q.  Okay.  And then, when we go to Page 284, hasn't
14:19:23  10  Dr. Martinez written, "Patient is currently unable to
11  work for four hours or greater due to inability to do
12  repetitive motions"?
13     A.  Correct.
14     Q.  And then he says that your diminished sleep
14:19:37  15  cycles have increased your pain perceptions; is that
16  right?
17     A.  That's right.
18     Q.  And you continue on medication for pain; is
19  that also right?
14:19:45  20     A.  Yes.
21     Q.  Okay.  Dr. Martinez indicates that due to your
22  physical inability to do repetitive motions, you can't
23  work for more than four hours a day; is that right?
24     A.  He said for possible four hours a day, yes.
14:19:59  25     Q.  Okay.  I mean, I guess, on -- on particularly

---

34 (Pages 130 to 133)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                              RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 134

1    bad days, you may not be able to work for four hours a
2    day?
3        A.  I -- That's possible.
4        Q.  And on very good days, you --
14:20:07  5        A.  I could work more.
6        Q.  -- potentially could --
7        A.  Yeah.
8        Q.  -- physically work more than four hours, right?
9        A.  That was the plan, yes.
14:20:13  10        Q.  As you read No. 3A, does Mr. Martinez indicate
11    anything to UPS about how long you can or cannot, for
12    example, make decisions during a workday?
13        A.  No, he does not.  I don't -- I don't see where
14    he describes that or mentions that.
14:20:31  15        Q.  Under 3A, does Dr. Martinez provide UPS with
16    any information about how long you can concentrate
17    during a workday?
18        A.  No.
19        Q.  You would agree with me that as written on this
14:20:41  20    page, Dr. Martinez indicates that this four hours or
21    greater during a workday is targeted just at your
22    physical restrictions and inability to do repetitive
23    motions; is that right?
24        A.  Please repeat that.
14:20:55  25        Q.  Yeah.  Dr. Martinez indicates that you're

Page 135

1    unable to work four hours a day or greater, is that
2    right, under --
3        A.  Yes.
4        Q.  -- No. 3A?
14:21:05  5             But he says that that's due to your
6    inability to do repetitive motions.
7        A.  Yes.
8        Q.  He doesn't -- Dr. Martinez doesn't indicate,
9    under No. 3A, how long you can or cannot engage in
14:21:15  10    cognitive activities during an average workday.  Is that
11    fair?
12        A.  Yes.  He doesn't say anything about time
13    constraints for cognitive abilities.
14        Q.  Do you remember approximately when it was that
14:21:35  15    this list of medical information was provided to anybody
16    at UPS?
17        A.  It -- It should have been within a -- I
18    would -- I would estimate within a couple of weeks of
19    Dr. Martinez's receipt of it.
14:21:53  20        Q.  Okay.  At any point, did you feel like your --
21    the process in which UPS was talking to you about your
22    accommodation dragged on unduly long?
23        A.  Yes.
24        Q.  And why do you feel like it took too long?
14:22:05  25        A.  Well, for -- for one, Mr. -- Mr. -- Well, after

Page 136

1    speaking with HRSC, one of the service representatives
2    had told me that it can take at least a couple of weeks
3    before the OHS, occupational health --
4        Q.  Supervisor?
14:22:33  5        A.  -- nurse --
6        Q.  Yeah.
7        A.  -- supervisor, would process that paperwork.
8             So I remember that -- there being some
9    delays in doing that or -- and -- and I -- I don't
14:22:47  10    recall if it was in -- in coordinating the meeting there
11    was a delay of -- I can't say it was a delay or if it
12    was protocol.
13             There was a time period before the --
14    between the time I requested an accommodation and the
14:23:05  15    time there was a meeting, and then there was another
16    delay or another time period after the meeting.  So I
17    don't know if it's supposed to be done within, you know,
18    three to five days, a week or I -- None of that was told
19    to me or specified to me.  It just seemed to -- My
14:23:25  20    return-to-work date seemed to lapse.
21        Q.  Do you have any knowledge about what UPS was
22    considering internally, or do you know what discussions
23    were happening internally with regard to your request
24    during that time period?
14:23:39  25        A.  No, I do not.

Page 137

1        Q.  Did you --
2        A.  I thought that they were working on -- I'm
3    sorry.
4        Q.  No, you're fine.
14:23:45  5        A.  I thought they were working on my return to
6    work.
7        Q.  Okay.  Did you ever complain to anybody that
8    you felt like the process was dragging out or taking too
9    long?
14:23:53  10        A.  I did.
11        Q.  Who did you complain to?
12        A.  Mr. Lenroe Hawthorne.
13        Q.  Okay.  What was Mr. Hawthorne's -- Well, let me
14    ask you this:  Did you complain by e-mail or verbally
14:24:03  15    somehow?
16        A.  It was verbally.
17        Q.  Okay.  And do you recall approximately when in
18    this process you complained to Mr. Hawthorne that the
19    process was dragging out?
14:24:11  20        A.  It may have been around either Sep --
21    September, October.  It was -- Hang on a second.  It
22    was -- Give me a moment to think of the timeline.
23             I think I -- I -- I re -- I know it's in
24    the EEOC discrimination file of that date that I
14:24:41  25    mentioned, so it was around that time that I had

35  (Pages 134 to 137)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 138

1    mentioned I had spoke with Mr. Hawthorne --
2    Q.  Okay.
3    A.  -- and what he had told me.
4    Q.  And you had submitted a few forms to the EEOC,
14:24:53   5    or a few statements, in relationship to --
6    A.  Yes, I had.
7    Q.  -- to your charge of discrimination?
8    A.  Yes.
9    Q.  And it's your testimony that the date on which
14:24:59   10    you say you had the conversation with Mr. Hawthorne
11    about the process dragging out is somewhere in those
12    documents?
13    A.  Yes.  In those documents and -- Yes.  Correct.
14    Q.  Okay.
14:25:07   15    (Page 9 marked.)
16    Q.  (By Mr. Barbour) I'll show you what I've marked
17    as Exhibit 9 to your deposition, Mr. Gonzalez.
18    And do -- is this an e-mail you received
19    per Mr. Hawthorne?
14:25:41   20    A.  I -- I re -- Yes, it is.
21    Q.  And is this an e-mail you received in
22    relationship --
23    A.  I -- The reason I -- I'm sorry.  The reason I
24    hesitated is because I believe I also received a copy in
14:25:57   25    an overnight letter from UPS.

---

Page 139

1    Q.  Okay.  You may have received it in two
2    different ways --
3    A.  Yes.
4    Q.  -- is that correct?
14:26:05   5    A.  Yes.
6    Q.  Okay.  And Mr. Gonzalez is giving you some
7    documents that need to be completed so that UPS can
8    fully consider your request for accommodation; is that
9    right?
14:26:13   10    A.  Correct.
11    Q.  And that is sent to you on April 9th, I believe
12    it is, two thousand -- April 7th, 2014?
13    A.  April 7th.
14    Q.  And the e-mail address that it goes to,
14:26:31   15    rong@live.com, is that your personal e-mail address?
16    A.  Yes, sir.
17    Q.  Do you have that e-mail address today?
18    A.  I do.
19    (Exhibit 10 marked.)
14:26:43   20    Q.  (By Mr. Barbour) And I'll hand you Exhibit 10,
21    Mr. Gonzalez.  Do you recognize Exhibit 10?
22    A.  Yes, sir.
23    Q.  What is Exhibit 10?
24    A.  It's the accomodation checklist.
14:27:19   25    Q.  The first two pages of Exhibit 10 are actually

---

Page 140

1    in your own handwriting, aren't they?
2    A.  Yes, they are.
3    Q.  And at the bottom of Page 293, that's your
4    signature; is that right?
14:27:29   5    A.  That's correct.
6    Q.  And this is dated April 9th, 2014, isn't it?
7    A.  Yes, sir.
8    Q.  So this would be two days after Mr. Hawthorne
9    sent you the e-mail attaching the blank checklist,
14:27:39   10    right?
11    A.  Yes.
12    Q.  Okay.  Did you feel like Mr. Hawthorne provided
13    you with adequate time to complete the ADA checklist?
14    A.  Yes.
14:27:49   15    Q.  When I look at the first page of Exhibit 10,
16    No. 1 asks you what your current job at UPS is, doesn't
17    it?
18    A.  Yes.
19    Q.  And under No. 1, is that your handwriting where
14:28:03   20    it says, "Specialist, enterprise account representative,
21    the UPS Stores"?
22    A.  Yes.
23    Q.  Earlier we had some discussion about what your
24    job title was --
14:28:13   25    A.  Uh-huh.

---

Page 141

1    Q.  -- as of the time you went out on leave in
2    April of 2013, and you had described yourself as a
3    franchise sales consultant.
4    Do you recall that testimony?
14:28:21   5    A.  Yes.
6    Q.  Okay.  And you had said that you thought that
7    an enterprise account representative was a salaried
8    position that you had never held with the company.  And
9    I'm just asking if you recall that that was your
14:28:33   10    testimony at that time.
11    A.  I recall, yes.
12    Q.  Okay.  Does Exhibit 10 refresh your
13    recollection as to what your job title with UPS would
14    have been as of 2013 and 2014?
14:28:41   15    A.  What -- What it tells me and reminds me of is
16    what I testified earlier, that an enterprise account
17    representative is an inside sales rep that has accounts
18    that have sales volume of $50,000 or more a year of
19    revenue.
14:29:07   20    The franchise sales consultant, which is
21    also a specialist, was a new position created by UPS for
22    the UPS Stores.
23    Q.  Okay.  I guess my question, Mr. Gonzalez, is:
24    If you believe and believed, as of 2014, that your title
14:29:25   25    was franchise sales consultant --

---

36  (Pages 138 to 141)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 142

1    A.  Uh-huh.
2    Q.  -- why didn't you write that under No. 1?
3    A.  Probably because the information I was
4    receiving from UPS was giving me that title of
14:29:39  5    enterprise account representative and not franchise
6    sales consultant.
7    Q.  So UPS might have still had you classified
8    under this enterprise account representative job title?
9    A.  More -- More than likely, yes.
14:29:51  10    Q.  Okay.  And I'm really not trying to split
11    hairs.  I'm just trying to get some common
12    understanding --
13    A.  No.  I --
14    Q.  -- as to what your --
14:29:53  15    A.  I understand, and it's --
16    Q.  -- job title was at that time.
17    A.  And it's kind -- And I'm sorry to interrupt,
18    but it is --
19    Q.  You're fine.
14:29:59  20    A.  -- it is a little confusing.  I know UPS would
21    be able to, I would think, confirm what I'm saying is
22    accurate.
23    Q.  Okay.  Regardless of what your job title was --
24    You remember we had a brief protracted discussion
14:30:13  25    earlier about what your job responsibilities were?

Page 143

1    A.  Uh-huh.
2    Q.  You remember that con -- discussion?
3    A.  Yes.
4    Q.  Regardless of what your job title was, that
14:30:19  5    doesn't change what your responsibilities were at that
6    time; is that right?
7    A.  That is right.
8    Q.  Okay.  Now, Pages 292 and 293 of Exhibit 10 are
9    written in your handwriting; is that right?
14:30:29  10    A.  Yes, sir.
11    Q.  And you did your best to be accurate in
12    responding to these questions; is that right?
13    A.  Yes, I did.
14    Q.  And you knew that UPS would re -- rely in part
14:30:41  15    on your responses in deciding whether or not you were
16    eligible for a reasonable accommodation; is that
17    correct?
18    A.  Yes, I -- I hope so.
19    Q.  I'm looking under No. 2, Mr. Gonzalez.
14:30:53  20    A.  No. 2.  Okay.
21    Q.  And No. 2 asks you to identify all the medical
22    conditions you believe affect your ability to perform
23    the essential functions of your current job; is that
24    correct?
14:31:05  25    A.  Yes.

Page 144

1    Q.  And -- And there's -- there's a -- there's a
2    lengthy answer there.  In particular, I'm looking at the
3    third line that begins with "pain medication."
4    Do you see where I'm at?
14:31:15  5    A.  I do.
6    Q.  Did you write, in response to No. 2, "Pain
7    medication side effects affect retention, focus,
8    concentration and the ability to make decisions"?
9    A.  I did.
14:31:25  10    Q.  And did you write that depression, anxiety and
11    insomnia also have an impact?
12    A.  I did.
13    Q.  Okay.  And did that accurately represent your
14    medical restrictions, at least as to your cognitive
14:31:39  15    impairments, as of April 9th, 2014?
16    A.  Yes.  At that time, that's -- that's -- that is
17    what I wrote down, and that's per what my -- my
18    physicians also had stated.
19    Q.  And No. 3 asks you to describe the
14:32:05  20    accommodations you believe would permit you to perform
21    the essential functions of your job; is that right?
22    A.  Yes.
23    Q.  And you've got a long answer here.  You can
24    either read that or tell me, I guess.  What -- What
14:32:15  25    accommodations did you request from UPS?

Page 145

1    A.  You want me to just read it?
2    Q.  Sure.
3    A.  "Ergonomic workstation, repetitive" -- "reduced
4    repetitive tasks, interrupt tasks with other duties,
14:32:31  5    allow work from home, part-time work, allow phone calls
6    during work hours to doctors and others for support,
7    allow time off for medical treatment, allow more
8    frequent breaks, reduce physical exertion, allow a
9    self-paced workload, work independently or in a" -- "in
14:32:55  10    a small group and an environment that is less noisy" --
11    or "not noisy, one to two more breaks in the morning and
12    afternoon to take medication and relieve any stress on
13    my body."
14    Q.  In terms of the request for part-time work, to
14:33:15  15    the best of your recollection, does UPS have a permanent
16    part-time ISR position?
17    A.  A permanent -- To the -- I -- To the best of my
18    recollection -- Part-time?
19    Q.  Yes, sir.
14:33:27  20    A.  UPS -- At my location --
21    Q.  Yes.
22    A.  -- or in the district?
23    Q.  Well, let's -- let's start with your location.
24    A.  Okay.  At my location, there's -- I know
14:33:41  25    there's part-time jobs or work that I've done, but as

37  (Pages 142 to 145)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 146

1    far as permanent part-time as an ISR, I am not sure.
2        Q.   Okay.  And I guess my question would be:
3    Can -- Can you name one employee who's worked a
4    permanent part-time ISR schedule?
14:34:01  5        A.   I cannot name one employee.  I -- I can
6    still -- I can say that I had worked, while I was in
7    growth group, for another supervisor in a part --
8    part-time role.
9        Q.   Okay.  We'll get to that in one second.
14:34:19 10        You know anybody who's worked a permanent
11   part-time schedule in an account representative --
12   enterprise account representative position at UPS?
13        A.   No, not to my knowledge.
14        Q.   Do you know anybody who worked a permanent
14:34:33 15   part-time schedule in the franchise sales consultant
16   position?
17        A.   Not to my knowledge.
18        Q.   You said you worked a part-time schedule in the
19   growth group; is that right?
14:34:43 20        A.   Yes.
21        Q.   Okay.  When did you work a part-time schedule
22   in the growth group?
23        A.   There is -- Whenever there is a -- When I
24   worked for Grace Eason, other supervisors needed help in
14:34:59 25   their group, and they asked me to go work temporarily or

Page 147

1    part-time, fill in for an employee that was out.
2        Q.   An employee who was out on vacation or leave,
3    for example?
4        A.   Yes.
14:35:15  5        Q.   Okay.
6        A.   So that was -- that was one case.
7        Q.   But when you were filling in for that employee
8    temporarily, you still would have been working in that
9    role for eight hours a day; is that right?
14:35:29 10        A.   No.  I had worked in that role -- It was not a
11   full day.  It may have been a couple of hours; may have
12   been a few hours.
13        Q.   Okay.  So when you worked in growth group, you
14   say you had a part-time position filling in for folks
14:35:45 15   who are out on vacation or leave.  Any other time you
16   worked a part-time --
17        A.   No.
18        Q.   -- schedule at UPS?
19        A.   No.
14:35:51 20        Q.   Okay.  As of April 2014, do you know whether
21   there were any vacancies for ISR positions in the growth
22   group in San Antonio?
23        A.   I would assume, yes.
24        Q.   Why would you assume that?
14:36:15 25        A.   Because they are constantly -- Well, I say

Page 148

1    "constantly."  The time I had been there, they had
2    always been hiring.
3        Q.   Always hiring?
4        A.   ISRs.
14:36:25  5        Q.   Okay.  So you would assume that there would be
6    an opening in the growth group.
7        I guess my question is:  Can you state
8    with certainty here today that there was a vacancy
9    existing in the growth group in April of 2014?
14:36:43 10        A.   With nearly 100 percent certainty, yes.
11        Q.   And what's that based on?
12        A.   Based on my past experience of working for UPS
13   and there being a growth group.
14        Q.   Based on the fact that UPS -- I think was your
14:36:57 15   words -- was almost always hiring ISRs?
16        A.   Yes.
17        Q.   Okay.  So it's based on the assumption that
18   that was --
19        A.   That the --
14:37:05 20        Q.   -- more or less what was always happening?
21        A.   It's -- It's based on the attrition that I
22   noticed that they were always -- that they were --
23   always had a group of new recruits and that there was
24   often -- very often advertising for ISRs.
14:37:19 25        Q.   Okay.  As of April 2014, you had been out on

Page 149

1    leave for a year, hadn't you?
2        A.   Yes, sir.
3        Q.   You hadn't even set foot inside the Summit
4    facility during that year, had you?
14:37:31  5        A.   During that year -- With the exception to the
6    checklist?
7        Q.   Yes.
8        A.   Not that I recall, no.
9        Q.   Okay.  So you don't have any personal knowledge
14:37:41 10   as to whether new people were being brought on board or
11   people were leaving during that year from April of 2013
12   to April of 2014, do you?
13        A.   I -- I -- Based on the record, I would say
14   they -- they do, but I don't have any factual knowledge,
14:37:57 15   but I'm sure that could be found out.
16        Q.   Okay.  Your testimony that there probably was a
17   vacancy in the growth group was based on what you
18   observed prior to April of 2013?
19        A.   Yes.  My experience prior to that time, yes.
14:38:13 20   Correct.
21        Q.   Were there any other part-time positions in the
22   San Antonio UPS operations that you felt you could
23   perform as of April 2014?
24        A.   None that I'm aware of.  I -- UPS does a lot of
14:38:39 25   hiring from -- in -- internally that -- so I don't have

38 (Pages 146 to 149)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 150

1    access to -- to all of the -- all the postings.
2        Q.  And I understand that.  All I'm asking you is
3    what your personal knowledge is as you sit here today.
4        A.  Uh-huh.
14:38:59  5        Q.  I know UPS obviously has the inside sales
6    facility that you worked at.  Is that right?
7        A.  Yes, sir.
8        Q.  And that is a separate building way across town
9    from where the actual small package center was; is that
14:39:11  10   correct?
11       A.  From -- Yeah.  From the major distribution
12   center --
13       Q.  Right.
14       A.  -- yes.
14:39:13  15       Q.  Okay.  Due to the physical nature of work
16   there --
17       A.  Uh-huh.
18       Q.  -- you probably wouldn't have been able to do
19   many of the jobs at the small package facility on
14:39:21  20   account of your lifting restrictions.  Is that fair?
21       A.  Yes.
22       Q.  Okay.  And as -- just as you sit here today,
23   you don't have any personal knowledge as to any other
24   vacant positions in U -- within UPS that you would have
14:39:33  25   been able to perform in April of 2014?

## Page 151

1        A.  I know there's administrative jobs at UPS at
2    Summit Parkway that some people did, but I don't know
3    the job titles.
4        Q.  I understand that.
14:39:53  5            Do you know whether the -- any of those
6    administrative jobs were vacant as of April 2014?
7        A.  No, I do not.
8        Q.  Now, you told me earlier that at the time you
9    went out on leave in April 2013 you had approximately
14:40:13  10   1,200 to 1,500 UPS or UPS Store-equivalent customers
11   assigned to you.  Is that right?
12       A.  Yes.  Roughly, yes.  It was subject to change.
13       Q.  And I'm sure it did.  I'm sure it did.
14            But somewhere within that range was how
14:40:25  15   many customers were assigned to you?
16       A.  Yes.
17       Q.  Is that fair?
18       A.  Uh-huh.
19       Q.  And you said that other than periods when
14:40:31  20   people would go out on leave or go on vacation, people
21   in your position didn't cover other people's accounts
22   and there wasn't fluidity as to those assignments; is
23   that correct?
24       A.  That they did not cover other people's
14:40:45  25   accounts?

## Page 152

1        Q.  Yes, sir.
2        A.  I -- I could tell you the times when people did
3    cover people's account -- accounts is when somebody was
4    out on -- for whatever issue, or vacation; other perhaps
14:40:59  5    would cover the phones.
6        Q.  Yes, sir.  And I -- I --
7        A.  Yeah.  I --
8        Q.  Well, I --
9        A.  So I'm not sure if that was the same question.
14:41:05  10   I'm sorry.
11       Q.  No, no, no.  I -- I think -- I think we're on
12   the same page, but let's make it clear.
13       A.  Okay.
14       Q.  When -- When folks would go out on leave or
14:41:11  15   vacation, we wouldn't just ignore the 1,200 to 1,500
16   clients --
17       A.  No.  No.  Yes.
18       Q.  -- that were assigned to them, right?
19       A.  That's correct.
14:41:17  20       Q.  Somebody would step in and cover for it while
21   that person was out on leave, right?
22       A.  Yes.
23       Q.  But just on a day-to-day basis, you wouldn't,
24   for example, be expected to cover a few hundred of the
14:41:27  25   customers assigned to somebody else who was working that

## Page 153

1    day?
2        A.  No.
3        Q.  Okay.  Your customers were your customers, and
4    other people in your position had their customers; is
14:41:35  5    that correct?
6        A.  That's correct.
7        Q.  Okay.  You said there were only six hundred --
8    or six other people -- Did you say there were six other
9    people in your position in April of 2013 or only six
14:41:47  10   total?
11       A.  I believe it was six total.
12       Q.  Okay.  So you were one of those six?
13       A.  Yes.
14       Q.  Okay.  Now, did you also ask UPS for the
14:41:53  15   ability to work part time in the position you held as of
16   April 2014?
17       A.  Did I ask them to work part time in the same
18   role?
19       Q.  Yes, sir.
14:42:03  20       A.  I didn't even specify what role.
21       Q.  Well, let's say that you -- Let me
22   strike that.
23            Do you think it would have been possible
24   to perform what you've called your franchise sales
14:42:17  25   consultant job working only four rather than eight hours

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 154

1  a day?

2  **A.  I would have preferred to work in the growth**

3  **group.**

4  Q.  Okay.  I understand that.

14:42:31   5  My question to you is:  Do you believe you

6  would have been able to perform the essential functions

7  of what you've called your functional sales consultant

8  job working only four hours a day?

9  **A.  Could I have done that job four -- Yes, I could**

14:42:45  10  **have.**

11  Q.  Do you believe you could have serviced all

12  1,200 to 1,500 of your clients working only four hours a

13  day?

14  **A.  Not at the same metrics.**

14:42:55  15  Q.  You wouldn't have been able to keep up the same

16  metrics or same quality of service working a truncated

17  schedule?

18  **A.  The quality of service would have been there**

19  **for each cust -- for the customers I called on, but I**

14:43:09  20  **may not have been able to get to all customers.**

21  Q.  When you say you wouldn't have been able to get

22  to all customers, if a customer e-mails a complaint, for

23  example --

24  **A.  Uh-huh.**

14:43:17  25  Q.  -- and -- or a concern and you're working four

## Page 155

1  hours a day, you might not be able to get to that

2  concern within that truncated time schedule.  Is that

3  fair?

4  **A.  That's -- No, that's not necessarily true.**

14:43:27   5  Q.  Then walk me through it.  When -- When you say

6  you couldn't meet the same metrics, what -- what do you

7  mean by that?

8  **A.  Metrics of if there's a program going on that,**

9  **say, it's an international service pro -- promotion or**

14:43:45  10  **project that we're working on and we've got a certain**

11  **timeline to -- to call each franchisee and put it in**

12  **a -- you know, in -- in TEAMS as a completed task, it**

13  **would have taken me longer to -- to get through all the**

14  **accounts.**

14:44:05  15  **And when I say "quality of service," when**

16  **I -- I mentioned I wouldn't be able to give them -- I'd**

17  **be able to give each customer that I contacted a quality**

18  **of service, but I wouldn't be able to get to them all.**

19  **And then the other piece of it is, if I**

14:44:23  20  **receive an urgent phone call or urgent e-mail, that's**

21  **part of my time manage -- management function to**

22  **identify who those people are and address their concerns**

23  **first.  So it's a time management issue.**

24  Q.  So earlier you had said that you felt like you

14:44:47  25  could do your same position, what you called the

## Page 156

1  franchise sales consultant role --

2  **A.  Uh-huh.**

3  Q.  -- working four or eight hours a day, but you

4  do agree that you would have some time management issues

14:44:57   5  working that position only part-time; is that correct?

6  **A.  I would have some issues calling all the -- all**

7  **the customers in my account base as part of the metrics**

8  **that UPS provides for -- for each ISR in that role.**

9  Q.  And so in your opinion, would it probably have

14:45:19  10  been necessary to move some of your customers on to

11  other people in your position to make sure that

12  everybody was called, for example?

13  **A.  Yeah.  There -- There would have to be some --**

14  **I'm sure they'd have to shift possibly some accounts**

14:45:33  15  **to -- to split it up.**

16  Q.  So that would have increased the number -- Let

17  me strike that.

18  Moving you to a part-time role in your

19  franchise sales consultant position in your opinion

14:45:47  20  would have increased the number of customers assigned to

21  the other five people in your position; is that correct?

22  **A.  That's -- That's certainly possible, yes.**

23  Q.  Well, somebody would have needed to service --

24  **A.  Some -- Somebody --**

14:45:57  25  Q.  -- those clients, right?

## Page 157

1  **A.  Yeah.  The -- All the accounts need to be**

2  **services.**

3  Q.  And if you're only working four of eight hours

4  a day, that leaves half your workday that's got to be

14:46:07   5  done by somebody else, doesn't it?

6  **A.  I -- I would think so, yes.  Somebody else**

7  **would have to pick up the slack for that.**

8  MS. KILGORE:  I -- Excuse me.  I need to

9  take a break.

14:46:17  10  MR. BARBOUR:  Well, I suppose I said I'd

11  allow a break as long as there wasn't a question

12  pending, so that's fine.

13  THE VIDEOGRAPHER:  The time is 2:46 p.m.,

14  and we are off the record.

14:46:29  15  (Off the record.)

16  THE VIDEOGRAPHER:  The time is 2:56 p.m.,

17  and we are on the record.

18  Q.  (By Mr. Barbour) Mr. Gonzalez, are you ready to

19  proceed, sir?

14:56:19  20  **A.  Yes, sir.**

21  Q.  Earlier we were discussing a checklist meeting

22  with UPS.  Do you recall that conversation?

23  **A.  Yes.**

24  Q.  And do you recall physically attending a

14:56:29  25  meeting with Mr. Hawthorne to discuss your request for

**40  (Pages 154 to 157)**

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 158

1    accommodation?

2        A.  Yes.

3        Q.  And I think you specifically said that that

4    checklist meeting was the first time you had actually

14:56:41    5    been inside the Summit Parkway facility since you went

6    out on leave in April of 2013; is that right?

7        A.  Yes.

8        Q.  Was Ms. Patricia Lorio in attendance at that

9    checklist meeting?

14:56:57   10        A.  No.

11        Q.  Was she appearing telephonically --

12        A.  Yes.

13        Q.  -- at that meeting?  Okay.

14        A.  Yes.

14:57:01   15        Q.  To the best of your knowledge, was there

16    anybody else participating either in person or

17    telephonically at that meeting?

18        A.  No.

19        Q.  Okay.  Do you re -- have a pretty good

14:57:11   20    recollection of what was said at that checklist meeting?

21        A.  Yes, somewhat.

22        Q.  And if I told you that the meeting was held

23    sometime on or around April 10th, 2014, does that sound

24    right?

14:57:25   25        A.  It sounds right.

## Page 159

1        Q.  What do you recall Mr. Hawthorne telling you

2    about your request for accommodation at that meeting?

3        A.  He told me that what we're going to do is we're

4    going to have a conference call with the occupational

14:57:43    5    health nurse supervisor and go through the checklist.

6        Q.  Okay.  And did you, in fact, go through the

7    checklist?

8        A.  Yes, we did.

9        Q.  And earlier you had indicated that the

14:57:57   10    accommodation you were requesting was a transfer to a

11    part-time position.  Is that right?  Or one of the many

12    accommodations you were requesting was transfer to a

13    part-time position.

14        A.  Yes.  I requested to -- to start work at a

14:58:11   15    part-time position, return to work working part time.

16        Q.  Did Mr. Hawthorne indicate if UPS would approve

17    your request for a part-time position?

18        A.  He didn't indicate -- He -- I'm sorry.  Say

19    that again.  What...

14:58:33   20        Q.  Yeah.  Did Mr. Hawthorne indicate whether UPS

21    would approve your request to move to a part-time

22    position?

23        A.  He did not say that, no.

24        Q.  Did he indicate that UPS would deny your

14:58:41   25    request for a part-time position?

## Page 160

1        A.  He said he didn't think the legal department

2    would approve it or go for it.

3        Q.  And what do you specifically recall him saying

4    about the fact that the legal department wouldn't go for

14:58:53    5    it?

6        A.  He said because they wouldn't know what to pay

7    me and they hadn't done it for anybody else; if he did

8    it for me, they'd have to do it for everybody else.

9    That's -- Yeah.

14:59:11   10        Q.  And I want to make sure I understand.

11            Is that as close as you can recall?  Are

12    you paraphrasing what he said, or are you attempting to

13    say as specifically as you can what Mr. Hawthorne told

14    you?

14:59:23   15        A.  I -- I'm -- I'm trying to recall exactly what

16    he told me in that -- after the checklist meeting.

17        Q.  Okay.

18        A.  And he said yes, definitely, he said he

19    would -- they would have to figure out how much to pay

14:59:41   20    me and, if they did that for me, they'd have to do it

21    for everybody else.  He wasn't sure if the legal

22    department would go for it.

23            And I'm not -- that's pretty -- it's not

24    verbatim, but it's the -- that's the gist of the

14:59:57   25    statements.

## Page 161

1        Q.  Okay.  Do you recall, whether being paraphrased

2    or specifically, him saying anything else to you with

3    regard to your request for part-time work at that

4    checklist meeting?

15:00:11    5        A.  No.

6        Q.  And do you have Exhibit 10 in front of you,

7    Mr. Gonzalez?

8        A.  I do, yes, sir.

9        Q.  Okay.  I'm looking down under No. 3.  And we've

15:00:19   10    spent a fair bit of time here today discussing cognitive

11    impairments that you might have had as of April 2014.

12        A.  Uh-huh.

13        Q.  You recall that testimony, right?

14        A.  I do.

15:00:27   15        Q.  Under No. 3, you request an ergonomic

16    workstation; is that right?

17        A.  Yes.

18        Q.  You would agree with me that an ergonomic

19    workstation wouldn't accommodate any cognitive

15:00:39   20    impairments you had in April of 2014, would it?

21        A.  I -- I agree.

22        Q.  Okay.  And you also asked to reduce repetitive

23    tasks, don't you?

24        A.  Yes, I did state re -- reduce repetitive tasks.

15:00:57   25        Q.  Okay.  And that reduction of repetitive tasks

Hoffman Reporting _ Video Service                              210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 162

1   is really addressed to your physical impairments, is it
2   not?
3       A.  Yes.
4       Q.  Yeah.  Reducing your -- your repetitive tasks
15:01:07  5   itself wouldn't accommodate the cognitive impairments
6   that you might have had as of April 2014, would it?
7       A.  The repetitive tasks and the cognitive are,
8   yeah, two separate things.
9       Q.  Do you recall Ms. Lorio saying anything during
15:01:33  10  the April 10th, 2014 checklist meeting?
11      A.  I -- I did ask her a question.
12      Q.  What question did you ask her?
13      A.  I asked her if she was familiar with my
14  condition.
15:01:45  15      Q.  And what condition?  Because it sounds like you
16  might have had more than one at that time.
17      A.  No.  I specifically asked her if she was
18  familiar with RSD.
19      Q.  And what is is -- All right.  Can you tell me what
15:01:59  20  RSD stands for?
21      A.  It's reflex sympathetic dystrophy.
22      Q.  And is RSD related to CRPS?
23      A.  Yes, it is.
24      Q.  And you asked Ms. Lorio if she was familiar
15:02:13  25  with RSD --

## Page 163

1       A.  Yes.
2       Q.  -- is that correct?
3       A.  I -- Yes.  And I -- I did spell it out.
4       Q.  And why did you ask her if she was familiar
15:02:21  5   with your RSD?
6       A.  Because she's a nurse and I -- I wanted to make
7   sure she was familiar with my condition.
8       Q.  And what did she tell you?
9       A.  No, she does not know -- was not aware of it.
15:02:33  10      Q.  Did that bother you in any way that she wasn't
11  familiar with RSD?
12      A.  Yes.
13      Q.  Why is that?
14      A.  She wouldn't have a clear understanding of my
15:02:47  15  condition.
16      Q.  Okay.  Do you know whether she did any research
17  on her own after that checklist meeting to learn more
18  about what RSD was?
19      A.  Possibly.
15:02:57  20      Q.  You just don't know, is that right --
21      A.  I do know.
22      Q.  -- what she --
23      A.  Well, I -- I --
24      Q.  -- what -- what she -- what she -- what she
15:03:03  25  did?

## Page 164

1       A.  I can make a good assumption.
2       Q.  What would your assumption be?
3       A.  No.
4       Q.  Why would you assume that she didn't do any
15:03:11  5   research about your condition?
6       A.  Due to recent findings.
7       Q.  And what would those findings be?
8       A.  A deposition.
9       Q.  Her deposition that was held a few days ago?
15:03:29  10      A.  Yes.
11      Q.  Okay.  So that -- So that's based on testimony
12  that she offered?
13      A.  Yes.
14      Q.  Okay.  And you were in attendance in that
15:03:35  15  deposition?
16      A.  Correct.
17      Q.  Earlier you told me that you felt that
18  Dr. Martinez's note did spell out what your physical
19  restrictions were, though; is that right?
15:03:43  20      A.  Yes.
21      Q.  Okay.  Earlier we had discussed this, quote,
22  unquote, no-restrictions practice or policy that
23  Ms. Elizondo had told you about previously; is that
24  right?
15:03:55  25      A.  Yes, sir.

## Page 165

1       Q.  All right.  It's fair to say that neither
2   Mr. Hawthorne nor Ms. Lorio ever told you that you
3   couldn't come back to work unless you had, quote, no
4   restrictions, unquote; is that right?
15:04:07  5       A.  I do not recall either one of them saying that,
6   no.
7       Q.  And neither one of them told you that you could
8   only come back if you were without restrictions --
9       A.  This is during --
15:04:17  10      Q.  -- period?
11      A.  -- during this accommodation checklist meeting
12  you're talking about?
13      Q.  Sure.
14      A.  No.  There was not any -- any discussion other
15:04:25  15  than the questions on the checklist meeting.
16      Q.  Okay.  Now, you specified checklist meeting
17  there.
18          Did -- Did Mr. Hawthorne or Ms. Lorio at
19  any other time tell you that you couldn't come back if
15:04:37  20  you had restrictions?
21      A.  No, they did not.
22      Q.  And, in fact, the whole point of the checklist
23  meeting was to look at what your restrictions were,
24  wasn't it?
15:04:51  25      A.  My understanding of the checklist was to see if

Hoffman Reporting _ Video Service                          210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D. GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 166

1    an accommodation could be made based on my -- the -- the
2    information on the checklist that --
3        Q.  And accommodation of the restrictions that your
4    doctor had said you were under.  Is that fair?
15:05:05  5    A.  Correct.  Yes, that's fair.
6        Q.  So the fact that the checklist meeting was held
7    seems to suggest that UPS would consider at least
8    returning you to work with restrictions, wouldn't it?
9        A.  I -- I would say that's fair if Ms. Lorio had
15:05:19  10    an understanding of my condition.
11        Q.  You feel like the fact that Ms. Lorio -- Well,
12    explain that to me.
13            Why do you feel like Ms. Lorio saying she
14    wasn't familiar with your condition --
15:05:37  15    A.  Well --
16        Q.  -- indicates that you had no chance of
17    returning to work, if that's your testimony?
18        A.  That is my testimony.  That's part of it.
19    It -- If she doesn't understand the treatment or the --
15:05:49  20    yeah, the treatment of my condition, how can I expect
21    her to know what's -- what are possible accommodations?
22        Q.  Okay.  Dr. Martinez's note in February of 2014
23    earlier you said accurately represented your physical
24    and cognitive restrictions as of that time; is that
15:06:11  25    right?

Page 167

1        A.  Yes.
2        Q.  Okay.  You provided that to UPS, didn't you?
3        A.  Yes.
4        Q.  And then this checklist meeting was held with
15:06:21  5    Ms. Lorio and with Mr. Hawthorne to evaluate whether
6    those restrictions prescribed by Dr. Martinez --
7        A.  Uh-huh.
8        Q.  -- could be accommodated in your sales
9    consultant role.  Is that a fair statement?
15:06:31  10    A.  That is a fair statement, and -- and -- and
11    what's also fair is she had a copy of my -- my health
12    records and she still didn't know anything about my
13    condition.
14        Q.  Okay.  But she had a copy of those records,
15:06:47  15    right?
16        A.  As far as I know, yes.
17        Q.  As far as you know.  I -- I under --
18            To the best of your knowledge, she was
19    looking at your health records --
15:06:53  20    A.  Yes, sir.
21        Q.  -- is that right?
22        A.  Yes.
23        Q.  And those records spelled out what you could
24    and couldn't do?
15:06:57  25    A.  They spelled out my medical condition.

Page 168

1        Q.  Including what your restrictions were.
2        A.  Including my RSD, or reflex sympathetic
3    dystrophy, complex regional pain syndrome and the
4    treatment.
15:07:09  5            So, yeah, it's -- it's -- it's unsettling
6    to know that an occupational nurse that is reviewing an
7    accommodation request did not know about my medical
8    condition.
9        Q.  Well, she knew that -- I mean, did she ever
15:07:27  10    tell you, "I don't know what your restrictions are,
11    Mr. Gonzalez"?
12        A.  No.  She had -- She had the checklist, but she
13    didn't have any knowledge of my con-- medical
14    condition.
15:07:37  15    Q.  And you said she had your medical file also, to
16    the best of your knowledge --
17        A.  To the best of my --
18        Q.  -- is that --
19        A.  -- knowledge, she had...
15:07:43  20    Q.  And the records that you had provided spelled
21    out what you could and could not do on a daily basis,
22    didn't they?
23        A.  Yes, they did.
24            (Exhibit 11 marked.)
15:08:01  25    Q.  (By Mr. Barbour) Okay.  I'll hand you what I've

Page 169

1    marked as Exhibit 11 to your deposition, Mr. Gonzalez.
2        A.  Okay.
3        Q.  Do you recognize this document?
4        A.  Yes, sir.
15:08:23  5    Q.  And what is Exhibit 11?
6        A.  It's an e-mail letter to me addressing the
7    denial of my request to return to work, stating they're
8    unaware of any available position at this time and that
9    me -- that are capable of performing the essential --
15:08:49  10            You want me to just read it, or...
11        Q.  No.  I'm just asking you just generally what
12    you understand Exhibit 11 to be.
13        A.  A termination letter.
14        Q.  Okay.  I mean, does Exhibit 11 indicate that
15:08:59  15    you had been terminated from employment?
16        A.  No, not this document.
17        Q.  Okay.  Does Exhibit 11 indicate that UPS has
18    decided that they're unable to grant your request for a
19    job-related accommodation?
15:09:11  20    A.  Yes.
21        Q.  This was sent to you on April 21st, 2014,
22    wasn't it?
23        A.  Correct.
24        Q.  And that would be approximately 11 days after
15:09:17  25    your checklist meeting with Mr. Hawthorne and Ms. Lorio,

43 (Pages 166 to 169)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 170

```
         1   wouldn't it?
         2       A.  Yes.
         3       Q.  Did you respond to any of UPS' communications
         4   indicating that your request for accommodation had been
15:09:39 5   denied?
         6       A.  Yes.  I re -- Prior to receiving this from
         7   Mr. Hawthorne, I received an e-mail from I believe it
         8   was HR, the service center, and it was stating very
         9   similar wording, that my request for accommodations --
15:10:15 10  that -- that -- pretty much the same letter, verbiage,
         11  the same meaning.
         12      Q.  Okay.
         13      A.  It was prior to the -- Lenroe's letter.
         14      Q.  And you were terminated from employment shortly
15:10:33 15  after receiving this April 21st e-mail; is that right?
         16      A.  Yes, sir.
         17      Q.  And would it be fair to say that your
         18  termination was sometime on or around May 1st of 2014?
         19      A.  Yes.
15:10:45 20      Q.  And as of May 1st, 2014, you had been on leave
         21  for over a year; is that right?
         22      A.  From the date of my surgery to this time, yes,
         23  that's right.
         24      Q.  And you're still suffering from your CRPS
15:11:03 25  today; is that correct?
```

## Page 171

```
         1       A.  Yes.
         2       Q.  And so as of May 2014, there -- there was an
         3   indefinite period for which you would be subject to the
         4   restrictions associated with that condition, wasn't
15:11:15 5   there?
         6           Can I rephrase that?
         7       A.  "Indefinite"?
         8       Q.  Can I -- Can I rephrase that --
         9       A.  Yeah.
15:11:19 10      Q.  -- question for you?
         11      A.  Please.
         12      Q.  Okay.  As of May 1st, 2014, you couldn't tell
         13  UPS how long your restrictions would last, could you?
         14      A.  I couldn't tell them -- I couldn't tell them
15:11:33 15  that, no.  I was still under treatment and they were
         16  trying different treatments, and I still continue with
         17  treatment today.
         18      Q.  Do you think you could perform your prior
         19  position at UPS as you sit here today?
15:11:59 20      A.  Yes.
         21      Q.  Would you need an accommodation to perform the
         22  essential functions of that position?
         23      A.  Yes.
         24      Q.  What accommodation would you need today?
15:12:07 25      A.  I would need to have -- I may need to have more
```

## Page 172

```
         1   breaks.  I would need some time for treatment.
         2           There's -- There was time provided when I
         3   was working there -- there's three week -- I had been
         4   over there five years, so I had three weeks of vacation,
15:12:31 5   and then I also had five -- five days of discretionary
         6   days, and those discretionary days I could take a
         7   half -- half a day at a time.
         8           So that was used for cases like this where
         9   I can -- I had an -- an appointment or procedure or...
15:12:47 10      Q.  Sure.  Could you work a full eight-hours-a-day,
         11  40-hours-a-week position with UPS, in your opinion,
         12  today?
         13      A.  To -- I would prefer to have a ramp-up period
         14  to see how I do and have my doctors evaluate that as
15:13:07 15  well.
         16      Q.  So is that a you're -- you're not certain that
         17  you could perform a full-time position with UPS here
         18  today --
         19      A.  I -- I -- I --
15:13:15 20      Q.  -- but you think you might?
         21      A.  I -- I think I might.  I think it's possible.
         22      Q.  Have you applied for reemployment with UPS at
         23  any time over the last three years?
         24      A.  No.
15:13:25 25      Q.  Is there any particular reason you haven't
```

## Page 173

```
         1   reapplied with UPS?
         2       A.  Yes.
         3       Q.  Why is that?
         4       A.  It's their policy not to rehire.
15:13:35 5       Q.  It's UPS' policy not to rehire?
         6       A.  Yes.
         7       Q.  Who told you that?
         8       A.  The policy book.
         9       Q.  What does the policy book -- To the best of
15:13:45 10  your understanding, what does the policy book say about
         11  rehiring?
         12      A.  "We do not rehire terminated employees."  I
         13  think you sent me a copy of it, too, one of your
         14  exhibits.  I don't recall the number.
15:13:59 15      Q.  Other than what's in the policy book, did
         16  anybody at UPS tell you that you were ineligible for
         17  rehire?
         18      A.  Yes.  We learned that -- All the ISRs learned
         19  that in training.
15:14:11 20      Q.  Is this new-hire training?
         21      A.  Yes.  Because that was provided by
         22  Rick Montecinos, who was the HR manager at the time.
         23      Q.  And that training told you that if you were
         24  terminated, you were ineligible for rehire?
15:14:27 25      A.  Correct.
```

Hoffman Reporting _ Video Service                    210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 174

1    Q.  And would this be termination for cause, like
2  misconduct, or anyone who -- who was involuntarily
3  separated from the company?
4    **A.  I'm not 100 percent certain, but I just know,**
15:14:39  5  **if you did not have a job with UPS in any -- any**
6  **capacity in any -- you know, whether it's small package**
7  **or supply-chain solutions or cargo or UPS Capital, or**
8  **any division of UPS, you could not be rehired.**
9    Q.  You told me that's based on training from
15:15:05  10  Mr. Montecinos and the policy book.
11    Any other sources of information that told
12  you were ineligible for rehire?
13    **A.  Just what I saw in writing and what I learned**
14  **in training.**
15:15:17  15    Q.  Okay.  And is that the only reason that you
16  haven't reapplied for employment at UPS?
17    **A.  I would -- I would say yes.  That was -- It's**
18  **clear.**
19    Q.  Okay.  While you were out on leave in 2013 and
15:15:35  20  2014, you also applied for long-term disability benefits
21  with Aetna, didn't you?
22    **A.  Yes, sir.**
23    Q.  And, in fact, you were approved for those
24  benefits, right?
15:15:47  25    **A.  Correct.**

## Page 175

1    Q.  And if I told you that your approval for
2  long-term disability began sometime in October of 2013,
3  does that more or less sound right?
4    **A.  Yes, it does.**
15:15:55  5    Q.  And is that because, under UPS' disability
6  plan, you transitioned from short-term to long-term
7  disability payments once you were out of work for six
8  months or so?
9    **A.  That's correct, per the summary plan**
15:16:07  10  **description.**
11    Q.  At some point, Aetna terminated your disability
12  benefits, didn't they?
13    **A.  Yes, they did.**
14    Q.  You understand that Aetna is a company distinct
15:16:19  15  from UPS, right?
16    **A.  Yes.**
17    Q.  Okay.  So when Aetna canceled your benefits,
18  that wasn't a decision that was made by UPS itself?
19    **A.  That's correct.**
15:16:29  20    Q.  Okay.  And isn't it true that as a result of
21  the termination of your long-term disability benefits,
22  you've actually filed suit against Aetna?
23    **A.  That's correct.**
24    Q.  And that suit -- do you understand that that
15:16:45  25  suit remains pending today?

## Page 176

1    **A.  Yes.**
2    Q.  Do you believe you should be receiving
3  long-term disability benefits from Aetna as you sit here
4  today?
15:16:57  5    **A.  I have not been, but do I believe I...**
6    **Let me -- I'd like to think about that a**
7  **little bit.  The -- My condition has -- My health**
8  **condition has -- has changed, so I'm not 100 percent**
9  **certain on how to -- how to -- how to address that.**
15:17:45  10    Q.  You don't know whether Aetna should be paying
11  you long-term disability benefits here today?
12    **A.  Well, they haven't been paying me, so I haven't**
13  **really -- I mean, they stopped paying me after a certain**
14  **period of time.**
15:17:55  15    Q.  I understand that, but that's also not my
16  question, Mr. Gonzalez.
17    **A.  Okay.  Please repeat your question.**
18    Q.  My -- My question is:  As you sit here today,
19  in May of --
15:18:01  20    **A.  Uh-huh.**
21    Q.  -- 2017 --
22    **A.  Uh-huh.**
23    Q.  -- do you believe Aetna should be paying you
24  long-term disability benefits?
15:18:07  25    **A.  I would say no.**

## Page 177

1    Q.  And you understand that this lawsuit that
2  you're offering this deposition in is distinct from your
3  lawsuit against Aetna; is that right?
4    **A.  If I may have a moment, please?**
15:18:31  5    Q.  Are you asking for a break or just to think
6  about things for a second?
7    **A.  A -- A -- Well, a break would be good, if I**
8  **could take a break.**
9    Q.  Well, I have -- I've just got -- The question
15:18:39  10  that's pending is:  Do you understand that this lawsuit
11  is distinct and a separate lawsuit from the lawsuit that
12  you have pending against Aetna?
13    **A.  Yes, they are -- they are distinct.**
14    Q.  All right.  Well, if you need to take a break,
15:18:53  15  I suppose we can take a break, Mr. Gonzalez.
16    **A.  Okay.**
17    THE VIDEOGRAPHER:  The time is 3:18 p.m.,
18  and we are off the record.
19    (Off the record.)
15:27:49  20    THE VIDEOGRAPHER:  The time is 3:27 p.m.,
21  and we are on the record.
22    Q.  (By Mr. Barbour) Mr. Gonzalez, are you ready to
23  proceed, sir?
24    **A.  Yes.**
15:27:57  25    Q.  And any answers you want to change to your

Hoffman Reporting _ Video Service                            210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

## Page 178

1  deposition questions so far?

2  **A.  Not at this time, no.**

3  Q.  When we broke for a break, we were discussing

4  your lawsuit against Aetna in relationship to your

15:28:09  5  long-term disability benefits; is that correct?

6  **A.  Yes, sir.**

7  Q.  And we had mentioned that it was a separate

8  lawsuit and so forth.  You recall that, right?

9  **A.  Right.**

15:28:15  10  Q.  And though it's a separate lawsuit, do you

11  understand that your testimony here today could

12  potentially be admissible in that Aetna lawsuit?

13  **A.  Yes.**

14  **(Exhibit 12 marked.)**

15:28:29  15  Q.  (By Mr. Barbour) I want to hand you what I've

16  marked as Exhibit 12 to your deposition, Mr. Gonzalez.

17  And obviously I would ask you if you recognize the

18  document that I've handed you as Exhibit 12.

19  **A.  Yes, I do.**

15:28:55  20  Q.  And is Exhibit 12 what you might consider to be

21  the lawsuit that was filed on your behalf against Aetna?

22  **A.  Yes.**

23  Q.  And when I flip to the last page of Exhibit 12,

24  in the bottom right-hand corner, it's D-RG-4520.

15:29:13  25  **A.  Yes, sir.**

## Page 179

1  Q.  This is electronically signed by Mr. Jeffrey E.

2  Dahl; is that right?

3  **A.  Yes.**

4  Q.  And Mr. Dahl is another one of your attorneys;

15:29:23  5  is that right?

6  **A.  Yes.**

7  Q.  Okay.  And I -- at no point during our

8  discussion do I want you to tell me anything Mr. Dahl

9  has told you or what you've told Mr. Dahl.  Is that

15:29:31  10  fair?

11  **A.  Fair.**

12  Q.  Okay.  But Mr. Dahl is your attorney in

13  relationship to your lawsuit against Aetna; is that

14  right?

15:29:39  15  **A.  Yes.**

16  Q.  And you understand that this document, this

17  Exhibit 12, was filed on your behalf with the Federal

18  Court here in San Antonio; is that right?

19  **A.  Yes.**

15:29:49  20  Q.  I want to look at Page 2 of that complaint and

21  specifically Paragraph 4, Mr. Gonzalez.

22  Are you with me on Paragraph 4?

23  **A.  Yes, sir.**

24  Q.  Okay.  In Paragraph 4, under "statement of

15:30:15  25  facts," does this complaint tell the Court that

## Page 180

1  Gonzalez, you, was employed as an inside sales

2  representative for UPS?

3  **A.  Yes.**

4  Q.  Okay.  And I know we've had some protracted

15:30:27  5  discussion about what your actual job title was, but you

6  were some type of individual working in sales for UPS,

7  correct?

8  **A.  Yes, sir.**

9  Q.  Okay.  And then Paragraph 4 continues and says,

15:30:37  10  "In the spring of 2013, he began suffering severe pain

11  in his left shoulder."

12  And it says that, correct?

13  **A.  Yes, it does.**

14  Q.  Is that -- Is that an accurate statement of

15:30:45  15  your medical condition?

16  **A.  Yes.**

17  Q.  Okay.  And then does Paragraph 4 also tell the

18  Court that "In April 2013, he underwent left shoulder

19  surgery due to left shoulder synovitis, left shoulder

15:30:57  20  impingement and left shoulder AC joint degeneration"?

21  **A.  Yes.**

22  Q.  And was it accurate that in April of 2013 you

23  underwent that surgery?

24  **A.  Yes.**

15:31:07  25  Q.  And then does it also tell the Court that your

## Page 181

1  pain did not improve following that surgery?

2  **A.  Yes.**

3  Q.  And is that an accurate representation to the

4  Court?

15:31:15  5  **A.  Yes, at that time.**

6  Q.  Okay.  And -- And then did you also tell the

7  Federal Court here in San Antonio, in this Paragraph 4,

8  that "Postoperatively, he" -- that's you -- "suffered

9  from left shoulder recurrent adhesive capsulitis and

15:31:31  10  reflective sympathetic dyst" -- "dystrophy that

11  prevented him from returning to work for UPS"?

12  **A.  Yes.**

13  Q.  And when I go over to that next page, that

14  Paragraph 5, does Paragraph 5 tell the Court here that

15:31:49  15  "Because he" --

16  And, again, that's you, right --

17  **A.  Yes.**

18  Q.  -- Mr. Gonzalez, right?

19  **A.  Uh-huh.**

15:31:53  20  Q.  "Because Mr. Gonzalez was not able to return to

21  work, Gonzalez submitted a claim for short-term

22  disability benefits."

23  **A.  Yes.**

24  Q.  And in Paragraph 6, are you also telling the

15:32:09  25  Court that your RSD of your left upper extremity did not

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 182

1    improve?  I read that first sentence correct?
2       A.  Yes.
3       Q.  And then you also tell the Court that as a
4    result of that, Aetna approved your claim for long-term
15:32:23  5    disability benefits, finding you unable to work as of
6    October 21st, 2013, the day after short-term disability
7    benefits expired.
8       A.  Yes.
9       Q.  This complaint is generally describing how your
15:32:37  10   medical condition affected your ability to work; is that
11   right?
12      A.  Yes.  It talks about my medical condition.
13      Q.  Okay.  And -- And this complaint tells the
14   Court that because of your medical condition, you were
15:32:53  15   no longer able to perform the work expected of you with
16   UPS, doesn't it?
17      A.  Yeah.  Yeah.  And it does state...
18      Q.  When I go down to Paragraph 8, doesn't it
19   indicate that, though you went out on leave in April of
15:33:11  20   2013 and you tried to come back in April 2014, the first
21   sentence of Paragraph 8 is, "Gonzalez's condition did
22   not improve"?
23      A.  Yes, that is --
24      Q.  And is that an accurate statement to the
15:33:23  25   Federal Court here?

## Page 183

1       A.  Yes, it is.
2       Q.  That your condition did not improve following
3    the treatments?
4       A.  Following the treatments -- That's -- That's
15:33:33  5    not totally true.  My condition has improved due to some
6    treatment, but the treatment doesn't always last.
7       Q.  Okay.  Well, Paragraph 8 begins with the
8    sentence, "Gonzalez's condition did not improve," does
9    it not?
15:33:47  10      A.  Yes.
11      Q.  Okay.  When -- When you approved the filing of
12   this complaint, did -- did you believe that that was an
13   accurate statement?
14      A.  Yes.
15:33:55  15      Q.  And then you also tell the Court that "By the
16   summer of 2015, he" -- that's you -- "was suffering from
17   shoulder adhesive capsulitis, synovitis and complex
18   regional pain syndrome in both limbs that extended down
19   to his hands."
15:34:11  20      A.  Yes.
21      Q.  If you go to Paragraph 15 on Page 5,
22   Mr. Gonzalez --
23      A.  Okay.
24      Q.  -- Paragraph 15 ends with the sentence,
15:34:41  25   "Gonzalez remains disabled," does it not?

## Page 184

1       A.  Yes.
2       Q.  And when you say, "I remain disabled," do you
3    believe you're able to perform gainful work?
4            MR. CRANE:  Objection; foundation.
15:34:57  5       Q.  (By Mr. Barbour) Let me rephrase that.
6            Do you believe there are jobs that you're
7    able to perform, Mr. Gonzalez?
8       A.  Yes.
9       Q.  Okay.  For example, you said you felt like you
15:35:07  10   could perform the ISR job with UPS; is that right?
11      A.  Yes.
12      Q.  In fact, I think you said that you believe that
13   with time off for doctors' appointments and things like
14   that, you could return to work with UPS today if you
15:35:21  15   wanted to; is that correct?
16      A.  With -- With accommodations, yes.
17      Q.  And those accommodations would be time off for
18   medical appointments, right?
19      A.  That's one example.
15:35:29  20      Q.  Okay.  You don't feel like you would need a
21   part-time schedule to return to work; is that right?
22      A.  I don't recall saying that.
23      Q.  Well, do you feel like you would need a
24   part-time schedule to return to your sales consultant
15:35:41  25   role with UPS today?

## Page 185

1       A.  I -- I would prefer to return to work part-time
2    as a ramp-up period, is my preference.
3       Q.  I understand the ramp-up period.  Ramp-up
4    sounds like it would be a ramp-up to a full-time
15:35:59  5    position.
6       A.  Yes.
7       Q.  Is that fair?
8       A.  That's fair.
9       Q.  Okay.  And so ramping-up period aside, you feel
15:36:03  10   like, with an accommodation, you would eventually be
11   able to perform the full-time sales consultant role that
12   you previously had with UPS; is that correct?
13      A.  Yes.
14      Q.  Would you also be able to perform, for example,
15:36:15  15   the role you previously held with Klinger Specialties?
16      A.  Yes.  Apparent -- Yes.
17      Q.  All right.  Do you generally feel like you
18   would be able to perform most sales jobs as you sit here
19   today?
15:36:29  20      A.  There again, with accommodation.
21      Q.  And with accommodation being time off for
22   medical appointments.  And anything else?
23      A.  Breaks.  I mean, as I stated before, many of
24   the accommodation I've asked for -- asked of UPS.
15:36:47  25      Q.  Yeah.  Breaks, time off for medical

47 (Pages 182 to 185)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 186

1    appointments.  What other accommodation would you need
2    here today to perform most sales jobs that you're
3    familiar with?
4         MR. CRANE:  Here, let me get it.
15:37:03   5    THE WITNESS:  Can we refer back to what we
6    discussed earlier as far as the accommodations that I
7    had requested of UPS?
8    Q.  (By Mr. Barbour) Okay.  And I guess that's
9    really my question, is -- We're discussing a
15:37:21   10   hypothetical return of you to work with UPS --
11   A.  Uh-huh.
12   Q.  -- be it in your enterprise account
13   representative position, franchise sales consultant.
14   Whatever -- Whatever the -- the name of the position
15:37:31   15   is --
16   A.  Uh-huh.
17   Q.  -- that's what we're referring to.
18        Would the accommodations you need to
19   return to that job today be any different than the
15:37:37   20   accommodations that you needed back in April 2014 to go
21   back into that job?
22   A.  Would they be any different now?
23   Q.  Yes, sir.
24   A.  I would have to review with my -- my
15:37:55   25   physicians.

---

Page 187

1    Q.  So you don't know whether you would have --
2    need -- need different accommodations today?
3    A.  I -- I -- I can't say with complete certainty
4    at this time.  I would like to have the opportunity to
15:38:11   5    review it with my pain management doctor.
6    Q.  That was over three years ago now, right?
7    A.  I saw my pain management doctor last week.
8    Q.  Fair point.  Fair point.
9         The -- The checklist meeting you had at
15:38:23   10   UPS to discuss your request for accommodation was over
11   three years ago, right?
12   A.  Yes.
13   Q.  Have you discussed with your physi --
14   physicians during that three-plus years what
15:38:33   15   accommodations would be necessary for you to return to
16   work?
17   A.  No.
18        (Exhibit 13 marked.)
19   Q.  (By Mr. Barbour) I'm going to hand you what
15:38:53   20   I've marked as Exhibit 13 to your deposition,
21   Mr. Gonzalez.  I only have a couple questions.
22        The first is:  On the second page of
23   Exhibit 13, is that your signature at the bottom?
24   A.  Yes, it is.
15:39:31   25   Q.  And then is that your handwriting --

---

Page 188

1    A.  Yes.
2    Q.  -- throughout Exhibit 13?
3    A.  Yes, sir.
4         (Exhibit 14 marked.)
15:39:57   5    Q.  (By Mr. Barbour) I'll hand you Exhibit 14,
6    Mr. Gonzalez.  Do you recognize Exhibit 14?
7    A.  Yes.
8    Q.  Okay.  Is Exhibit 14 a letter from your other
9    attorney, your other counsel, Mr. Dahl, to Aetna in
15:40:45   10   relationship to your appeal of the denial of your
11   long-term disability benefits?
12   A.  Yes.
13   Q.  And this is dated Febru -- excuse me --
14   December 16th, 2016; is that right?
15:40:55   15   A.  Yes, sir.
16   Q.  Did you authorize Mr. Dahl to submit this to
17   Aetna on your behalf?
18   A.  Yes.
19   Q.  And did you understand Mr. Dahl was providing
15:41:11   20   Aetna with certain information, documents and other
21   items that -- that he felt supported your entitlement to
22   long-term disability benefits from Aetna?
23   A.  That's my understanding of why he was
24   representing me.
15:41:27   25   Q.  Okay.  I'm looking at Paragraph 7 on the bottom

---

Page 189

1    of the second page of Exhibit 14, Mr. Gonzalez.
2         Do you see that Paragraph 7 --
3    A.  I do.
4    Q.  -- beginning with "Activities of daily living"?
15:41:47   5    A.  Yes.
6    Q.  Okay.  Could -- Could you read that paragraph
7    into the record for me, Mr. Gonzalez?
8    A.  "Activities of daily" -- "daily living form
9    completed by Ronald Gonzalez, indicating that he suffers
15:41:59   10   from chronic and severe pain in his upper and lower
11   extremities and has to take opiate" -- "opioid
12   medications daily to help manage his pain, and due to
13   these conditions, he re" -- "remains unable to perform
14   the requirements of any occupation."
15:42:15   15   Q.  As of February -- excuse me -- December 16th,
16   2016, were you taking opioid medications on a daily
17   basis?
18   A.  Yes.
19   Q.  Okay.  Are you still taking opioid medications
15:42:29   20   on a daily basis today?
21   A.  Yes.
22   Q.  What specifically -- opioid painkillers are you
23   taking on a daily basis today?
24   A.  I am taking a generic for OxyContin, which is,
15:42:45   25   I guess, Percocet without the aspirin, and then morphine

---

48  (Pages 186 to 189)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 190

1    sulfate.
2        Q.  Do you know the dosage of the OxyContin you
3    take daily today?
4        A.  I believe it's 15.
15:43:01  5        Q.  15 milligrams?
6        A.  Yeah.
7        Q.  And how frequently on a daily basis do you take
8    OxyContin?
9        A.  It's as needed.
15:43:09  10        Q.  In the last 24 hours, how many times have you
11    taken OxyContin?
12        A.  Three times.
13        Q.  Is that more or less an average amount that --
14    that you would take in a given day?
15:43:19  15        A.  Yes.  Three as -- as needed.
16        Q.  But three is within the realm of average?
17        A.  Last -- Yes.
18        Q.  Okay.  What about morphine sulfate?  What's
19    your dosage on that?
15:43:31  20        A.  It's also as needed.
21        Q.  Do you know the -- the dosage, though?
22        A.  Oh, I'm sorry.  It's 30 milligram.
23        Q.  Okay.  How many times in the last 24 hours have
24    you taken morph -- morphine sulfate?
15:43:43  25        A.  Once.

---

Page 191

1        Q.  And is that more or less average in a given day
2    for you?
3        A.  As needed, one to two times.
4        Q.  Are you still taking Ketamine?
15:43:55  5        A.  The infusions, or the troch -- troches?
6        Q.  Are you still taking Ketamine in any form?
7        A.  Yes.
8        Q.  In what form are you taking it today?
9        A.  Tro -- In a troche.
15:44:09  10        Q.  And, again, because I'm not a medical
11    professional, can you tell me what a troche is?
12        A.  Troche is a sublingual medication.
13        Q.  So it's absolved -- absorbed directly
14    through --
15:44:21  15        A.  Yes.
16        Q.  -- the membranes in the mouth, I suppose?
17        A.  Yes, sir.
18        Q.  Okay.  How often, on an average day, do you
19    take Ketamine troches?
15:44:29  20        A.  Three to -- Three to five times.
21        Q.  Do you know the dosage of your Ketamine
22    troches?
23        A.  160 milligram.
24        Q.  When was the last time you had Ketamine
15:44:55  25    infusions, Mr. Gonzalez?

---

Page 192

1        A.  It's been close to a year.
2        Q.  Did you begin taking the Ketamine troches after
3    you discontinued the Ketamine infusions themselves?
4        A.  No.
15:45:07  5        Q.  Okay.  There was a time at which you were both
6    having infusions and taking the as-needed troches?
7        A.  Correct.
8        Q.  Do you know whether you were taking the
9    Ketamine -- Do you know whether you were taking Ketamine
15:45:21  10    in any form in April of 2014?
11        A.  In April 2014?
12        Q.  Yes, sir.
13        A.  It was after I started seeing -- after I
14    changed doctors from Dr. Martinez to Dr. Bacon.  So
15:45:39  15    at -- at -- some time after -- after that.
16        Q.  We could look at your medical forms, I guess,
17    right?
18        A.  Yes, sir.
19        Q.  And that's because Dr. Martinez, his associate
15:45:49  20    who administered the Ketamine infusions to you, left his
21    practice, right?
22        A.  That's correct.
23        Q.  Right.  And then that's why you had to
24    transition to a new pain management specialist who could
15:45:59  25    continue to give you the Ketamine?

---

Page 193

1        A.  Correct.
2        Q.  Now, going back to Exhibit 7 -- excuse me --
3    Exhibit 14, Mr. Dahl does write on your behalf that as
4    of December 16th, 2016, you remained unable to perform
15:46:13  5    the requirements of any occupation, doesn't he?
6        A.  I'm sorry.  Whereabouts are you on that page?
7        Q.  Yes, sir.  I'm at Paragraph 7 --
8        A.  Uh-huh.  Okay.
9        Q.  -- at the bottom of Page 2, Exhibit 14.
15:46:27  10        A.  Yes, he does.
11        Q.  Okay.  Is that an accurate statement that
12    Mr. Dahl is making on your behalf, that you are unable
13    to perform the requirements of any occupation?
14        A.  Not -- No, not at this time.
15:46:43  15        Q.  Was it accurate as of December 16th, 2016?
16        A.  I don't recall how I was feeling at that time,
17    but I -- I was -- I was just trying to get my -- my
18    benefits approved.
19        Q.  You wouldn't have authorized Mr. Dahl to submit
15:47:19  20    this on your behalf if it contained inaccurate
21    information, right?
22        A.  No, I would not.
23        Q.  So is it likely that that Paragraph 7 was
24    accurate at least as of December 16th, 2016?
15:47:33  25        A.  Yes.

---

49 (Pages 190 to 193)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 194

1    Q.  Okay.  Even if it's not accurate today, it was
2    accurate at that time; is that right?
3        A.  I -- I believe that to be correct, yes.
4            (Exhibit 15 marked.)
15:47:59    5    Q.  (By Mr. Barbour) I'll hand you what I'm marking
6    as Exhibit 15 to your deposition, Mr. Gonzalez.
7            Is Exhibit 15 a handwritten note from you?
8        A.  Yes, it is.
9        Q.  Is that your signature at the bottom?
15:48:19   10        A.  It is.
11        Q.  Okay.  And Exhibit 15 is dated February 11th,
12    2014, isn't it?
13        A.  Yes.
14        Q.  This was the day after you received
15:48:31   15    Mr. Hawthorne's e-mail asking you for medical
16    information in relationship to your request for
17    accommodation, isn't it?
18        A.  Yes, it would be.
19        Q.  Okay.  And, in fact, the subject line of this
15:48:43   20    note says, "Re:  Job-related accommodation forms (ADA),"
21    doesn't it?
22        A.  Yes.
23        Q.  So this -- this was probably written in
24    relationship to trying to get some information related
15:48:55   25    to that accommodation process.  Is that fair?

Page 195

1        A.  Yes.
2        Q.  Okay.  And it's addressed to the attention of
3    someone named Pam; is that right?
4        A.  Yes.
15:49:05    5    Q.  Who is Pam?
6        A.  She's a nurse practitioner for Dr. Martinez.
7        Q.  So she would have been a healthcare
8    professional in the office of your pain specialist at
9    that time; is that right?
15:49:15   10        A.  Yes.
11        Q.  Okay.  Do you see the paragraph at the very
12    bottom of this Exhibit 15 that begins with, "As you may
13    recall"?
14        A.  Uh-huh.  Yes.
15:49:25   15        Q.  And you tell Pam, "As you may recall, I am also
16    being treated by a psychiatrist for anxiety, depression
17    and sleep deprivation"?
18        A.  Yes.
19        Q.  Okay.  And that was an accurate statement; is
15:49:37   20    that right?
21        A.  At that time, yes, sir.
22        Q.  Okay.  And then you also tell Pam, "Therefore,
23    my thinking processes, due to pain and anxiety, are
24    slow, and I experience lack of focus, concentration and
15:49:49   25    memory loss."

Page 196

1        A.  Yes.
2        Q.  And was that also an accurate statement, that
3    due to your various conditions that you had a lack of
4    focus, concentration and memory loss?
15:50:01    5        A.  Yes.
6        Q.  Can you go back to Exhibit 7 for me,
7    Mr. Gonzalez?
8        A.  (Complying.)
9        Q.  You -- You were able to recognize Exhibit 7; is
15:50:47   10    that right?
11        A.  Yes, sir.
12        Q.  And this was a handwritten note you submitted
13    in relationship to your application for Social Security
14    disability benefits --
15:50:55   15        A.  Yes.
16        Q.  -- is that right?
17        A.  That's correct.
18        Q.  Okay.  And it was dated March 15th of 2014 on
19    the very back page, if you want to double-check me on
15:51:03   20    that.
21        A.  Okay.  Yes.
22        Q.  All right.  So you would have submitted this
23    right in the middle of UPS requesting or analyzing your
24    request for accommodation, wouldn't you?
15:51:15   25        A.  Yes.  It would have been -- Yes, that's

Page 197

1    correct.
2        Q.  And you told me before that you tried to be as
3    accurate and honest as possible with the Social --
4    Social Security Administration in completing this form;
15:51:31    5    is that correct?
6        A.  Yes.
7        Q.  Because you understood the Social Security
8    Administration would rely on your statements in
9    determining whether or not it was proper to approve or
15:51:39   10    deny your request for disability benefits?
11        A.  Yes.
12        Q.  Okay.  At the bottom of the first page of
13    Exhibit 7, Mr. Gonzalez, do you see the question that
14    begins with No. 5, "How do your illnesses, injuries or
15:51:57   15    conditions limit your ability to work?"
16        A.  Yes.
17        Q.  Okay.  And I'm skipping down.  Do you see a
18    sentence that begins -- about halfway down that begins
19    with, "My current work requires"?
15:52:09   20        A.  Yes.
21        Q.  Okay.  Please let me know if I misread this
22    sentence.
23            Do you say, "My current work requires
24    99 percent PC and phone work, sitting or standing in one
15:52:19   25    place and repetitive upper" -- "upper extremity use"?

50  (Pages 194 to 197)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 198

1    Is that correct?
2      A.  That is.
3      Q.  Okay.  And was that an accurate representation
4    of the current work that you were doing for UPS?
15:52:29  5      A.  Yes.
6      Q.  Do you also tell the Social Security
7    Administration, "This causes my current pain levels to
8    increase and limits my range of motion of each extremity
9    and emotionally impacts my ability to focus and
15:52:39 10    concentrate"?
11      A.  Yes.
12      Q.  Okay.  And was that an accurate statement?
13      A.  At that time, yes.
14      Q.  Okay.  As of March 15th, 2014, that was
15:52:49 15    accurate, wasn't it?
16      A.  Yes.
17      Q.  Okay.  And do you also tell the Social Security
18    Administration, "In my current role, I have over 1,500
19    accounts to manage and grow the business from year over
15:52:59 20    year"?
21      A.  Yes.
22      Q.  Okay.  And that was an accurate statement also,
23    correct?
24      A.  Yes.
15:53:03 25      Q.  Okay.  And then do you tell the Social Security

Page 199

1    Administration, "With the chronic pain of both
2    extremities and pain medication, I do not have the
3    physical and mental ability to perform this role"?
4      A.  Yes.
15:53:17  5      Q.  Okay.  And "this role" is the job that you then
6    held with UPS, isn't it?
7      A.  Yes.  It was at the time, yes.
8      Q.  Right.  And it's your testimony that that was
9    an accurate statement to the Social Security
15:53:29 10    Administration, was it not?
11      A.  Yes.
12      Q.  Okay.  And you had said that it was accurate at
13    that time.  Did it become inaccurate at some point that
14    you became able to perform or -- Let me strike that.
15:53:43 15          At some point, did you have the physical
16    and mental ability to perform that role with UPS?
17      A.  I had my good days and I had my bad days under
18    treatment, absolutely.
19      Q.  Okay.  Well, as of March 15th, 2014, you did
15:53:55 20    not have those abilities, did you?
21      A.  At the time I wrote this -- this document, I
22    did not.
23      Q.  Okay.  You don't tell the Social Sec -- Social
24    Security Administration that you can perform that role
15:54:11 25    for four of eight hours a day, do you?

Page 200

1      A.  I don't see where I said that.  Did I say --
2      Q.  No.
3      A.  -- four to eight hours a day?
4      Q.  That -- That -- That is my point.
15:54:21  5      A.  Oh.
6      Q.  You -- You don't tell them that you're able to
7    perform that role on a part-time basis --
8      A.  No.
9      Q.  -- do you?
15:54:27 10      A.  I don't -- I don't -- No, I did not say that --
11      Q.  Okay.
12      A.  -- or write that.
13      Q.  Can you go to the page that has "1482" in the
14    lower right-hand corner, Mr. Gonzalez?
15:54:43 15      A.  The same exhibit?
16      Q.  Same exhibit, yeah.  We're still on Exhibit 7.
17      A.  1482?
18      Q.  On the back.
19          MR. CRANE:  Yeah.  Oh, no.  I'm sorry.
15:54:49 20          MR. BARBOUR:  Yeah.  It's the...
21          MR. CRANE:  Sort of the back.
22          MR. BARBOUR:  It is confusing because they
23    were produced in reverse order, so...
24      Q.  (By Mr. Barbour)  Are you on the page that has
15:55:07 25    the numbers "1482" in the lower right-hand corner,

Page 201

1    Mr. Gonzalez?
2      A.  Yes, I am.
3      Q.  And do you see the No. 20, where it says,
4    "Check any of the following items that your illnesses,
15:55:17  5    injuries or conditions affect"?
6      A.  Yes, I do.
7      Q.  And you checked a variety of boxes here; is
8    that right?
9      A.  Yes.
15:55:23 10      Q.  Okay.  Is it fair that -- to say that you
11    checked the boxes next to "memory," "completing tasks,"
12    "concentration," "understanding," "following
13    instructions" and "getting along with others"?
14      A.  Yes.
15:55:35 15      Q.  So it would be accurate to say that, as of
16    March 15th, 2014, your illness, injury and condition
17    affected your ability to -- to engage in each of those
18    functions?  Did it not?
19      A.  That was -- Yes.  That's what I checked off.
15:55:49 20      Q.  Okay.  And then under No. 20A -- No. 20, you've
21    written some things in that paragraph that begins with
22    "I can only lift up to five pounds," didn't you?
23      A.  Yes.
24      Q.  The very last -- or two last sentences in that
15:56:05 25    paragraph read, "Memory and concentration, understanding

51  (Pages 198 to 201)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

Page 202

1    are difficult," don't they?  Doesn't that one sentence
2    read that?
3        A.  Yes.
4        Q.  Okay.  Are -- Are you with me, Mr. Gonzalez?
15:56:21    5        A.  I see -- In the body of that -- of No. 20?
6        Q.  Yes, sir.  And I'm looking at --
7        A.  In my handwriting?
8        Q.  Yes, sir.  Do you see the sentence that begins
9    with, "Memory and concentration"?
15:56:33   10        A.  Yes, I do.
11        Q.  And does that sentence read, "Memory and
12    concentration, understanding are difficult"?
13        A.  Yes.
14        Q.  And does the next sentence read, "Instructions
15:56:45   15    must be repeated or I must be reminded frequently"?
16        A.  Yes.
17        Q.  Earlier you said that you continued taking
18    Ketamine.
19            Refresh my recollection.  Was it your
15:57:35   20    testimony that you began taking Ketamine after you left
21    Dr. Martinez's practice?
22        A.  That's correct.
23        Q.  You did take Ketamine while under
24    Dr. Martinez's care, though, did you not?
15:57:49   25        A.  I -- I had an infusion.

Page 203

1        Q.  Right.  And there -- there's two different
2    ways -- at least two different ways we can take it, an
3    outright infusion --
4        A.  Uh-huh.
15:57:57    5        Q.  -- or kind of a PRN troche, I think is what --
6        A.  Correct.
7        Q.  -- you had described; is that right?
8        A.  That is correct, yes, sir.
9        Q.  Dr. Martinez had administered Ketamine
15:58:05   10    infusions to you, had he not?
11        A.  Yes.
12        Q.  And would it be fair to say that after you had
13    these Ketamine infusions you were substantially unable
14    to engage in day-to-day activities immediately
15:58:17   15    thereafter?
16        A.  I believe he -- the instructions on checkout
17    are for at least a day.
18        Q.  All right.  Would it be fair to say that you
19    were taking Ketamine infusions at least periodically up
15:58:33   20    through the date of your termination with UPS?
21        A.  Was I taking infusions since I left UPS up
22    until the time I said, about close to a year ago?  Is
23    that what your question is?
24        Q.  My -- My question is really just:  You -- You
15:58:53   25    were separated from UPS --

Page 204

1        A.  Uh-huh.
2        Q.  -- around May 1st, 2014, correct?
3        A.  Uh-huh.
4        Q.  Would it be fair to say that prior to May 1st,
15:59:01    5    2014, you were at least periodically taking Ketamine
6    infusions?
7        A.  Yes.
8        Q.  Okay.  Would you agree with me that -- that
9    Ketamine is a -- is very -- Well, let me strike that.
15:59:27   10            Do you know that Ketamine is used as a
11    horse sedative, Mr. Gonzalez?
12        A.  Yes.
13        Q.  Ketamine is a very strong drug, is it not, in
14    your experience?
15:59:37   15        A.  In my experience, yeah, it can be, yes.
16        Q.  Yeah.  Is it your testimony that -- that you
17    operate a vehicle even while you're taking Ketamine
18    troches during each day?
19        A.  That's correct.
15:59:51   20        Q.  It's your testimony that even though you're
21    taking these Ketamine troches on a daily basis, you
22    would still be able to perform your job with UPS?
23        A.  Yes.
24        Q.  Do you know a Dr. Jerome Fischer?
16:00:03   25        A.  Yes.

Page 205

1        Q.  Who's Dr. Fischer?
2        A.  He's a nephrologist.
3        Q.  Did you say nephrologist?
4        A.  Yeah.  He's a -- Well, it's a kidney doctor.
16:00:21    5        Q.  Okay.  Okay.  How long have you been seeing
6    Dr. Fischer, to the best of your recollection?
7        A.  I think I've only seen him twice.
8        Q.  Did you feel like Dr. Fischer provided adequate
9    treatment for you?
16:00:31   10        A.  Yes, as far as I know.
11        Q.  Okay.  Do you ever know of him to make
12    inaccurate statements regarding your medical condition?
13        A.  No.
14            (Exhibit 16 marked.)
16:00:53   15        Q.  (By Mr. Barbour) I'll hand you what I've marked
16    as Exhibit 16 to your deposition, Mr. Gonzalez.
17            And if you'll look at the back page of
18    Exhibit 16, second page, would you agree that this
19    appears to be a report of some type signed by Dr. Jerome
16:01:29   20    S. Fischer?
21        A.  Yes.
22        Q.  Okay.  And that is the Dr. Fischer that we just
23    referenced; is that correct?
24        A.  Yes.
16:01:35   25        Q.  Okay.  And if you look at Page 1 of Exhibit 16,

52 (Pages 202 to 205)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 206

1    this appears to be in relationship to an appointment you
2    had with Dr. Fischer on November 18th of 2014; is that
3    right?
4        A.  Yes.
16:01:45  5        Q.  Does that generally match your recollection
6    that you were visiting Dr. Fischer as of November 18th,
7    2014?
8        A.  Yes.
9        Q.  Okay.  And Dr. Fischer addresses this letter to
16:01:57  10   a Dr. Harr; is that right?
11       A.  Yes.
12       Q.  Who's Dr. Harr?
13       A.  She was my primary care physician at the time.
14       Q.  Do you have a new primary care physician today?
16:02:09  15       A.  I do.
16       Q.  Who is that?
17       A.  Dr. Manuel Naron, N-A-R-O-N.
18       Q.  Is there a particular reason you stopped seeing
19   Dr. Harr?
16:02:19  20       A.  He did not accept my -- She did not accept my
21   insurance any longer.
22       Q.  Okay.  So just insurance ran out and we had to
23   go somewhere else?
24       A.  Well, I -- Yes.
16:02:31  25       Q.  Okay.  I'm looking at that first paragraph that

---

Page 207

1    begins with "Mr. Gonzalez is a very pleasant 55-year-old
2    gentleman."  Do you see that?
3        A.  I do.
4        Q.  Okay.  And I agree with that statement.  I
16:02:45  5    would concur with that.
6            A couple of lines down, there's a sentence
7    that begins with, "He is on a..."  Do you see there?
8        A.  Yes.
9        Q.  Okay.  Does Dr. Fischer write, "He" -- that
16:02:55  10   being Mr. Gonzalez -- "is on a number of medications for
11   this, which is at least maintaining some stability,
12   though it makes him unable to function in the work
13   environment"?
14       A.  Yes.  I see that.
16:03:07  15       Q.  And this would have been just six months or so
16   after your separation from UPS; is that correct?
17       A.  Yes.
18           (Exhibit 17 marked.)
19       Q.  (By Mr. Barbour) I'll hand you what I've marked
16:03:49  20   as Exhibit 17, Mr. Gonzalez.
21           Is that your signature at the bottom of
22   the third page of Exhibit 17, Mr. Gonzalez?
23       A.  Yes.
24       Q.  And did you sign this document on or around
16:04:21  25   April 7th, 2015?

---

Page 208

1        A.  I did.
2        Q.  And did you read this document before signing
3    it, to the best of your recollection?
4        A.  To the best -- Yes.
16:04:31  5        Q.  Okay.  And do you see at the top of Page 3
6    where it has a section titled "Misrepresentation"?
7        A.  I do.
8        Q.  Okay.  And did you understand that paragraph to
9    mean that it could potentially be unlawful for you to
16:04:49  10   make misleading or incorrect statements in this document
11   that is Exhibit 17?
12       A.  Yes.
13       Q.  I want to go to the first page of Exhibit 3 --
14   excuse me -- Exhibit 17, Mr. Gonzalez, where it says,
16:05:03  15   "Work history."
16       A.  Okay.
17       Q.  Okay.  Do you see a section where you're
18   describing what we've called your franchise consultant
19   job with UPS?
16:05:17  20       A.  Yes.
21       Q.  And in this section -- And you completed this
22   less than a year after you had been separated from UPS;
23   is that correct?
24       A.  Yes, it is.
16:05:29  25       Q.  Do you see where it says, "Description of your

---

Page 209

1    job"?
2        A.  Yes.
3        Q.  Okay.  The -- My copy isn't so good here.
4    Could you tell me, what did you write into that box that
16:05:41  5    says, "Description of your job"?
6        A.  It says, "Eight-hour day."  Is that where you
7    see?
8        Q.  Yes.
9        A.  Can you read that?
16:05:51  10       Q.  Yeah.  If you could read that -- what -- what
11   you've written in that box, Mr. Gonzalez.
12       A.  "Eight-hour day in sitted position" -- or
13   "seated position, talking on phone, entering data on
14   computer" -- oh, "entering data in computer and taking
16:06:09  15   notes.
16           "Research comp" -- "competition strategies
17   and offerings and use product knowledge to generate
18   solutions and sales.  On phone two and a half to three
19   and a half hours a day.  Approximately 1,200 to"...
16:06:27  20           I'm not sure.
21       Q.  Does it say "Approximately 1,200" to some other
22   number of customers "in account base"?
23       A.  Yes.  Yes.  "Customers in account base."
24       Q.  And in the very next box, does this Aetna form
16:06:45  25   ask you to list those duties you now cannot perform?

---

53  (Pages 206 to 209)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

Page 210

1    **A.  Yes.**
2    Q.  Okay.  And what duties of your position with
3    UPS did you tell Aetna that you were unable to perform?
4    **A.  "Unable to continue" -- "do continuous**
16:07:01   5    **repetitive movements of upper extremities, decreased**
6    **ability to make decisions due to medication prescribed**
7    **and Ketamine infusion treatment."**
8    Q.  "With diminished sleep cycles and depression,"
9    right?
16:07:15   10    **A.  Yes.**
11    Q.  Just to complete the paragraph.
12    So as of April 7th, 2015, you were still
13    unable or you had decreased ability to make decisions;
14    is that correct?
16:07:27   15    **A.  That's -- That's what I stated.**
16    Q.  All right.  Well, was that an accurate
17    statement to Aetna?
18    **A.  At that time?**
19    Q.  Right.  As of April 7th, 2015, that still
16:07:35   20    accurate, that you had a decreased ability to make
21    decisions; is that right?
22    **A.  At times, yes.**
23    Q.  Yeah.  So as of April 7th, 2015, you still had
24    some cognitive restrictions that would have interfered
16:07:47   25    with your ability to perform your position with UPS; is

Page 211

1    that right?
2    **A.  I would say what -- what I put down in my**
3    **statement's accurate.**
4    Q.  Okay.  What's -- What's written right there is
16:07:59   5    accurate as of that date still.  Is that fair?
6    **A.  Fair.**
7    Q.  You said Dr. Na -- Naron is now your primary
8    care provider?
9    **A.  Yes.**
16:08:19   10    Q.  Did you ever ask Dr. Naron to provide you with
11    a letter in relationship to your appeal of the Aetna
12    long-term disability benefits?
13    **A.  Yes.**
14    Q.  Did Dr. Naron provide you with that letter?
16:08:35   15    **A.  Yes.**
16    Q.  Did you feel like the letter that Dr. Naron
17    gave you was an accurate representation of your
18    abilities?
19    **A.  He -- He was a new doctor, so I'm sure he -- he**
16:08:49   20    **wrote based on my history and the records he may have**
21    **had received from my previous primary to the best of his**
22    **ability.**
23    Q.  Okay.  And my question, I think, wasn't so much
24    what he had written but your impression of it.
16:09:03   25    Did -- Did you find the letter that he

Page 212

1    wrote on your account to be accurate?
2    **A.  Can -- Can I see the letter?**
3    Q.  Sure.
4    (Exhibit 18 marked.)
16:09:11   5    Q.  (By Mr. Barbour)  That's Exhibit 18,
6    Mr. Gonzalez.
7    And is Exhibit 18 that letter that
8    Dr. Naron gave you in relationship to your Aetna
9    long-term disability benefits?
16:09:31   10    **A.  Yes.**
11    Q.  He provided you with this letter at your
12    request; is that correct?
13    **A.  Yes, he did.**
14    Q.  Okay.  And this letter is dated May 11th, 2016;
16:09:41   15    is that correct?
16    **A.  Yes.**
17    Q.  So we would now be about two years following
18    separation of your employment with UPS.  Is that fair?
19    **A.  Yes.**
16:09:49   20    Q.  And in this, he indicates that you -- he's been
21    your doctor since November 2015; is that right?
22    **A.  Yes.**
23    Q.  Okay.  And two lines down, does he say, "His
24    conditions cause severe pain and limitations with
16:10:07   25    movement, not only in his shoulders, but also in his

Page 213

1    hands, wrists and elbows on both sides"?
2    **A.  Yes.**
3    Q.  Okay.  Was that an accurate statement of your
4    medical condition, to the best of your knowledge, as of
16:10:15   5    May 11th, 2016?
6    **A.  Yes.**
7    Q.  Then does Dr. Naron write, "He requires
8    multiple physician visits, and many of his medications
9    are sedating, which hinders his ability to find gainful
16:10:29   10    employment"?
11    **A.  Yes.**
12    Q.  Was that also an accurate statement of your
13    condition as of May 11th, 2016?
14    **A.  Yes.  The medications, it wasn't a -- some**
16:10:45   15    **medications were more sedating than others, and there**
16    **was times where some -- I wasn't feeling sedated at all.**
17    Q.  Okay.
18    **A.  I mean --**
19    Q.  But Dr -- But Dr. Naron does write that
16:10:57   20    because of the effects of your sedating medications, you
21    are unable to find gainful employment, doesn't he?
22    **A.  Yes, he did.**
23    (Exhibit 19 marked.)
24    Q.  (By Mr. Barbour)  And I'll hand you what I've
16:11:13   25    marked as Exhibit 19 to your deposition, Mr. Gonzalez.

54  (Pages 210 to 213)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

| Page 214 | Page 216 |
|---|---|

**Page 214**

1    THE VIDEOGRAPHER:  Excuse me.

2  Mr. Gonzalez, can you lift up your mic?

3    THE WITNESS:  Oh, sure.  That better?

4    THE VIDEOGRAPHER:  Thank you.

16:11:31  5    Q.  (By Mr. Barbour) Do you recognize the document

6  that I've marked as Exhibit 19 to your deposition,

7  Mr. Gonzalez?

8    A.  Yes.

9    Q.  Okay.  And is Exhibit 19 a note that Dr. Sledge

16:11:49  10  completed in relationship to your appeal of Aetna's

11  long-term disability benefits denial?

12    A.  Yes.

13    Q.  Did you review this before Dr. Sledge submitted

14  it to Aetna?

16:12:05  15    A.  I don't recall if I reviewed it before he did

16  **or not.**

17    Q.  Okay.  Under No. 3, on the first page of

18  Exhibit 19, do you see the sentence that begins with

19  "Based upon"?

16:12:17  20    A.  Okay.  Tell me again where you're looking.

21    Q.  Just No. 3.

22    A.  No. 3?

23    Q.  On the first page.

24    A.  Okay.

16:12:29  25    Q.  Yes, sir.

**Page 215**

1    A.  Yeah.  "Based upon conditions."  Uh-huh.

2    Q.  This forms asks Dr. Sledge, "Based upon the

3  conditions for which you treat Ron Gonzalez, is it" --

4    A.  Uh-huh.

16:12:37  5    Q.  -- "your opinion that he remains unable to

6  perform any full-time occupation?"

7    A.  Yes.

8    Q.  What box did Dr. Sledge check there?

9    A.  He checked the "yes" box.

16:12:45  10    Q.  Dr. Sledge indicates that it was his opinion

11  that you remained unable to perform any full-time

12  occupation; is that correct?

13    A.  Yes.

14    Q.  And this form is dated December 23rd, 2016; is

16:12:55  15  that correct?

16    A.  Yes, it appears to be December.

17    Q.  And on the back -- or excuse me -- Page 2 of

18  Exhibit 19, do you see the paragraph that's No. 6?

19    A.  I do.

16:13:09  20    Q.  And does No. 6 ask Dr. Sledge, "Will you expect

21  excessive absences and below-standard work from this

22  patient due to his impairments if he attempted full-time

23  work?"

24    A.  Yes, I see that.

16:13:23  25    Q.  Okay.  And what was Dr. Sledge's answer to that

**Page 216**

1  question?

2    A.  "Yes."

3    Q.  Did you also submit some documents to Aetna in

4  December of 2016 in relationship to your appeal of

16:13:39  5  their --

6    A.  I --

7    Q.  -- denial of long-term disability benefits?

8    A.  I may have.  I don't recall.

9    Q.  If you did submit documents to Aetna, would you

16:13:47  10  have been as accurate as possible in completing them?

11    A.  Yes.

12    Q.  You wouldn't have misled Aetna, right?

13    A.  Correct.

14    Q.  I'll hand you what I've marked as Exhibit 20 to

16:13:57  15  your deposition, Mr. Gonzalez.

16    (Exhibit 20 marked.)

17    Q.  (By Mr. Barbour) And if you'll go -- Well, do

18  you recognize this document, Mr. Gonzalez?

19    A.  Yes.

16:14:13  20    Q.  Okay.  Is this a form that you hand wrote and

21  then submitted to Aetna in relationship to your

22  long-term disability benefits?

23    A.  Yes.

24    Q.  Is that your signature at the very bottom of

16:14:25  25  Page 3?

**Page 217**

1    A.  Yes, it is.

2    Q.  And did you complete this form on or around

3  December 6th, 2016?

4    A.  Yes.

16:14:31  5    Q.  I'm looking at the -- the first page of

6  Exhibit -- I believe it's 20.  And do you see where

7  Aetna asks you to explain in your own words why you

8  remain unable to perform any full-time occupation?

9    A.  I do.

16:14:49  10    Q.  Okay.  And you responded to that, correct?

11    A.  Yes.

12    Q.  Right.  It -- It was your opinion that you were

13  unable to perform any full-time occupation as of

14  December 2016; is that correct?

16:14:59  15    A.  I'm looking to see where I stated that in that

16  paragraph.

17    Q.  Well, you answered the question, right?

18    A.  Yes, I answered the question.

19    Q.  The question seems to be based on the

16:15:11  20  assumption that you were incapable --

21    A.  Okay.  No.  I hadn't read the question.

22    Q.  Okay.

23    A.  I was looking at the body --

24    Q.  Okay.

16:15:17  25    A.  -- of my -- what I wrote.

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                         RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 218

1    Q.  Right.  Well, if I go four lines down, is that
2    your handwriting where you say, "I am unable to perform
3    any full-time occupation"?
4       A.  Yes.
16:15:27    5    Q.  And was that an accurate statement as of
6    December 2016?
7       A.  Yes, it was.
8       Q.  You were unable to perform any full-time
9    occupation at that time?
16:15:35   10    A.  That's what it -- That's what I wrote.
11    Q.  And that would include your former job with
12    UPS, wouldn't it?
13       A.  Yes.  It would in -- Well, because I requested
14    an accommodation of part-time or reduced hours.
16:15:49   15    Q.  That's a fair point.
16          This does say full-time, but it says you
17    would be un -- unable to perform any full-time
18    occupation as of December 6th, 2016, correct?
19       A.  Yes.
16:16:01   20    Q.  Do you see, a couple lines down, the sentence
21    that begins with "These medications"?
22       A.  I do.
23       Q.  Okay.  Does that sentence read, "These
24    medications and others I take for depression and anxiety
16:16:17   25    result in side effects that limit focus, concentration,

---

Page 219

1    mood, irritability, forgetfulness and others"?
2       A.  Yes.
3       Q.  So as of December 2016, you still had -- had
4    cognitive impairments as a result of the medications you
16:16:31    5    were taking, didn't you?
6       A.  I did have reactions to medications, yes.
7       Q.  All right.  Well, this -- that doesn't just
8    indicate reactions, right?  This is saying --
9       A.  Well --
16:16:39   10    Q.  -- that it results in --
11       A.  Side effects.
12       Q.  -- side effects, correct?
13       A.  Side effects, yes.
14       Q.  Okay.  Including a lack of focus,
16:16:45   15    concentration, forgetfulness and others, correct?
16       A.  Yes, I -- I did have side effects.
17       Q.  The next paragraph down asks you to list the
18    drugs that you take, correct?
19       A.  Yes.
16:16:55   20    Q.  And is that an accurate list of the medications
21    that you were taking in December of 2016?
22       A.  Yes.
23       Q.  Okay.  If you'll go to the last page, please,
24    Mr. Gonzalez.
16:17:17   25    A.  (Complying.)

---

Page 220

1    Q.  This paragraph asked you to identify other
2    issues, et cetera, that should be taken into account.
3    And do you see your response to that?
4       A.  I do.
16:17:27    5    Q.  Could you read the first sentence that you've
6    written under that paragraph?
7       A.  "The amount and strength of opioid and Ketamine
8    pain medication daily impair my abilities to
9    perform FT" -- full-time -- "employment."
16:17:41   10    Q.  Okay.  And was that an accurate statement as of
11    December 2016?
12       A.  Yes.
13       Q.  Okay.  That because of the medications you were
14    taking, you couldn't perform any full-time employment?
16:17:49   15    A.  That's my statement.
16       Q.  You said you own your home.  Is that correct,
17    Mr. Gonzalez?
18       A.  I do have a mortgage, yes.
19       Q.  Right.  And you've had -- How long have you
16:18:13   20    lived in that home?
21       A.  Approximately 13 years.
22       Q.  Okay.  Do you remember submitting a request to
23    the Bexar County Appraisal District for a disability
24    homestead exemption on that property at 9903 Carolwood?
16:18:25   25    A.  Yes.

---

Page 221

1    Q.  And do you remember asking Dr. Sledge to
2    complete some forms in relationship to your request for
3    a disability homestead exemption?
4       A.  No, but it's very possible.
16:18:41    5          (Exhibit 21 marked.)
6       Q.  (By Mr. Barbour) Okay.  Let me hand you what
7    I've marked as Exhibit 21 to your deposition,
8    Mr. Gonzalez.
9       A.  Sir, is it possible to take a break before
16:19:01   10    we --
11       Q.  Sure.
12       A.  Okay.
13          THE VIDEOGRAPHER:  The time is 4:19 p.m.,
14    and we are off the record.
16:19:09   15          (Off the record.)
16          THE VIDEOGRAPHER:  The time is 4:33 p.m.,
17    and we are on the record.
18       Q.  (By Mr. Barbour) Mr. Gonzalez, are you ready to
19    proceed, sir?
16:33:57   20    A.  Yes, sir.
21       Q.  Are there any answers that you want to change
22    at this time?
23       A.  Not at this time.
24       Q.  Prior to the break, I had handed you what I've
16:34:05   25    marked as Exhibit 21.  Do you have that document?

---

Hoffman Reporting _ Video Service                              210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                          RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 222

1      A.  I do.

2      Q.  And I don't recall your testimony.  Did you

3  indicate that you had or had not seen this document

4  previously?

16:34:13    5      A.  I have.

6      Q.  Okay.  And this was a document that Dr. Sledge

7  completed in relationship to your application for a

8  Texas disability homestead exemption; is that correct?

9      A.  Yes.

16:34:23   10      Q.  Do you know if your application for a homestead

11  disability exemption was approved by the Bexar County

12  Appraisal District?

13      A.  Yes, I do.

14      Q.  Okay.  You do know.  And it was approved, was

16:34:37   15  it not?

16      A.  It was, yes.

17      Q.  And you have the disability homestead exemption

18  until this day; is that correct?

19      A.  Yes.

16:34:43   20      Q.  You have not notified the Bexar County

21  Appraisal District that, in your opinion, you no longer

22  qualify for that exemption, have you?

23      A.  I have not.

24      Q.  Okay.  And I don't want to bore you with the

16:34:55   25  legal verbiage, but do you see the section beginning

## Page 223

1  with, "Physician, please provide the following

2  information," about halfway down that page?

3      A.  Yes.

4      Q.  And does Dr. Sledge indicate how long he had

16:35:07    5  treated you for your disabling condition?

6      A.  Yes.

7      Q.  And when does he indicate his care for you

8  began?

9      A.  March 12th, 2013.

16:35:17   10      Q.  Okay.  And does that more or less reflect your

11  recollection as to when Dr. Sledge began treating you?

12      A.  Yes.

13      Q.  In terms of your disabling condition, would

14  that be your CRPS?

16:35:29   15      A.  Yes.

16      Q.  Okay.  And that disabling condition is one you

17  still suffer from today; is that correct?

18      A.  Yes.

19      Q.  And was it your testimony that that's not a

16:35:39   20  condition that can be cured, but it's one that is

21  basically managed over a length of time?

22      A.  That's correct.  It is chronic and man --

23  man -- and managed.

24      Q.  Okay.  Under No. 2, Dr. Sledge indicates that

16:35:51   25  you last worked on April 18th, 2013; is that correct?

## Page 224

1      A.  Yes.

2      Q.  Okay.  And Dr. Sledge is asked when he expects

3  you to be able to return to work.  And what is his

4  answer to that question?

16:36:03    5      A.  It's "unknown."

6      Q.  And Dr. Sledge completed this document on

7  December 18th, 2013; is that correct?

8      A.  That's correct.

9      Q.  And you authorized him to submit this to the

16:36:13   10  Bexar County Appraisal District on your behalf, did you

11  not?

12      A.  Yes, I did.

13      Q.  Okay.  Now, you submitted a charge of

14  discrimination to the EEOC in relationship to your

16:36:29   15  termination of employment at UPS, didn't you?

16      A.  I did.

17      Q.  And did Mrs. Gonzalez work at the EEOC at that

18  time?

19      A.  No.

16:36:39   20      Q.  She did not.  Had she already separated from

21  the EEOC?

22      A.  She has never worked for the EEOC.

23      Q.  Is that correct?  Okay.  I apologize.

24      A.  That's okay.

16:36:57   25          (Exhibit 22 marked.)

## Page 225

1      Q.  (By Mr. Barbour) I'm going to hand you what

2  I've marked as Exhibit 22.  It's your charge of

3  discrimination, Mr. Gonzalez.

4          And do you recognize Exhibit 22 --

16:37:43    5      A.  22.

6      Q.  -- Mr. Gonzalez?

7      A.  Yes.  Yes, sir.

8      Q.  And is this the charge of discrimination that

9  you filed with the EEOC?

16:37:49   10      A.  It is.

11      Q.  And did you sign this document on or around

12  May 22nd, 2014?

13      A.  Yes, I did.

14      Q.  Okay.  Did you do your best to be as forthright

16:37:57   15  and honest as possible --

16      A.  Yes.

17      Q.  -- in completing this charge of discrimination?

18      A.  Yes.

19      Q.  And do you see the bottom left-hand corner

16:38:07   20  there's a signature?  Is there not?

21      A.  Yes, there is.

22      Q.  And that's your signature, isn't it?

23      A.  Yes.

24      Q.  And you understood you were signing that charge

16:38:15   25  of discrimination under penalty of perjury, didn't you?

57 (Pages 222 to 225)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 226

1   A.  Yes.
2       Q.  Now, in that charge of discrimination, you
3   complained that UPS had discriminated against you and
4   retaliated against you; is that correct?
16:38:29  5   A.  Yes.
6       Q.  Is that charge of discrimination the first time
7   that you had complained of discrimination or retaliation
8   by UPS?
9       A.  Yes.
16:38:47 10       (Exhibit 23 marked.)
11       Q.  (By Mr. Barbour) I'm handing you what I've
12   marked as Exhibit 23 to your deposition, Mr. Gonzalez.
13           And this is an amended charge of
14   discrimination that you've filed with the EEOC, is it
16:39:05 15   not?
16       A.  Yes, it is.
17       Q.  Okay.  And, again, that's your signature in the
18   lower left-hand corner, correct?
19       A.  Yes.  Correct.
16:39:11 20       Q.  And that's dated March 4th, 2015?
21       A.  Yes.
22       Q.  And there -- there's some handwritten notes
23   with what appears to be "RGs" next to them; is that
24   correct?
16:39:19 25       A.  Yes.

Page 227

1       Q.  Okay.  Are those notes that you personally
2   made?
3       A.  Yeah.  I -- Yes, I did.
4       Q.  All right.  Yeah.  So, for example, when it's
16:39:29  5   handwritten, "and I used Family Medical Act Leave,"
6   that --
7       A.  Yes.
8       Q.  -- that's your own handwriting, correct?
9       A.  Yes.
16:39:35 10       Q.  Okay.  Otherwise, does the content of your
11   amended charge of discrimination appear to be true and
12   correct to you?
13       A.  Yes.
14       Q.  And did you believe it to be true and correct
16:39:43 15   when you submitted it to the EEOC?
16       A.  Yes.
17       Q.  Do you recall earlier when we discussed a
18   memorandum or an e-mail you had submitted to the EEOC in
19   relationship to their investigation of your charge?
16:40:23 20       A.  Yes.
21       Q.  Okay.  Do you recall submitting a couple other
22   e-mails to the EEOC providing information that you
23   deemed relevant to their investigation?
24       A.  Yes.
16:40:09 25       (Exhibit 24 marked.)

Page 228

1       Q.  (By Mr. Barbour) Okay.  I'll hand you
2   Exhibit 24 to your deposition, Mr. Gonzalez.
3           Can you identify that document?
4       A.  Yes, I recognize it.
16:40:43  5       Q.  What is this document?
6       A.  It's an e-mail to Minerva Melendreras at the
7   EEOC.
8       Q.  Okay.  And did you send this e-mail on or
9   around March 4th, 2015?
16:40:59 10       A.  Yes.
11       Q.  And were you as honest and forthright as
12   possible when drafting this e-mail to Ms. Melendreras?
13       A.  Yes.
14       (Exhibit 25 marked.)
16:41:27 15       Q.  (By Mr. Barbour) Okay.  Finally, on this note,
16   I will hand you Exhibit 25, Mr. Gonzalez.
17           Do you recognize this document?
18       A.  Yes.
19       Q.  And is this also a memo that you submitted to
16:41:57 20   Ms. Melendreras, the EEOC investigator?
21       A.  Yes.
22       Q.  And did you submit this on or around July 17th,
23   2015?
24       A.  Yes, I did.
16:42:05 25       Q.  Did you personally write this letter?

Page 229

1       A.  Yes, I did.
2       Q.  Okay.  And were you as honest and forthright as
3   possible in drafting this July 17th memorandum to
4   Ms. Melendreras?
16:42:23  5       A.  Yes.
6       Q.  When I look at the third page of Exhibit 25,
7   Mr. Gonzalez, do you see a bolded paragraph that begins
8   with the number "4"?
9       A.  I do.
16:42:35 10       Q.  Okay.  No. 4 says, "I provided two comparators,
11   but UPS has not explained why these comparators received
12   accommodations and remained employed when I did not."
13   Is that correct?
14       A.  Yes.
16:42:47 15       Q.  What do you mean by that sentence?
16       A.  That there was two individuals that were often
17   out of work days to weeks at a time --
18       Q.  Who were the --
19       A.  -- and --
16:42:59 20       Q.  Oh.  Go ahead, Mr. Gonzalez.
21       A.  And they were able to return to work.
22       Q.  Okay.  Who were those two individuals?
23       A.  Randy Swearingen and Douglas Klinger.
24       Q.  Would that be Rodney Swearingen?
16:43:15 25       A.  Yes.  Rodney.  That's correct.  Rodney.

58 (Pages 226 to 229)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 230

1   Q.  Those -- Those are the two individuals you're
2   speaking of, correct?
3   A.  Yes.
4   Q.  Okay.  And your complaint was that they had
16:43:23  5   previously taken time off but were -- were allowed to
6   return to work whereas you took time off and UPS didn't
7   let you come back; is that correct?
8   A.  Correct.
9   Q.  It is correct that you had previously taken
16:43:35  10  time off yourself; is that right?
11  A.  Uh-huh.  Uh-huh.
12  Q.  In fact, isn't it accurate that in 2009, 2011
13  and 2012, you took medical leaves of -- leaves of
14  absence but were able to come back to work?
16:43:47  15  A.  Yes.
16  Q.  Okay.  What is Mr. Swearingen's race?
17  A.  White, as far as I know.
18  Q.  What's Mr. Klinger's race?
19  A.  Also white.
16:43:59  20  Q.  To the best of your knowledge, does
21  Mr. Swearingen have a disability?
22  A.  I know he has a chronic condition.  I don't
23  know about the disability.
24  Q.  What chronic condition do you know he has?
16:44:15  25  A.  I believe he's got a heart condition.

## Page 231

1   Q.  And what about Mr. Klinger?  Does -- Does he
2   have any disabilities or medical conditions, to the best
3   of your knowledge?
4   A.  He's got a medical condition.
16:44:25  5   Q.  What is his medical condition?
6   A.  I am not sure.
7   Q.  You have no personal knowledge as to that?
8   A.  No.
9   Q.  But you said you do know he has a medical
16:44:37  10  condition?
11  A.  Yeah.  I don't recall his condition.
12  Q.  Okay.  You don't know what it is?
13  A.  No.
14  Q.  Okay.
16:44:43  15  A.  I don't recall.
16  Q.  When did Mr. Swearingen take a leave and be
17  allowed to return to work?
18  A.  Throughout the period I worked as a franchise
19  sales consultant.
16:45:03  20  Q.  Do you recall the dates of that?
21  A.  The last year or so I was in that position.
22  Q.  Okay.  Sometime in 2012, 2013?
23  A.  Yes, sir.
24  Q.  Okay.  What about Mr. Klinger?  When did he
16:45:17  25  take leave?

## Page 232

1   A.  It was during that same time frame.  And
2   they -- I believe that they also took time prior to
3   that, but I don't have any dates.
4   Q.  Okay.  And how do you know that they took
16:45:31  5   leaves of absence?
6   A.  Because, as I mentioned, we -- we worked in the
7   same group in the same office.  There's a group of 12,
8   maybe 13 of us.
9   Q.  Okay.  So you just noticed that they weren't
16:45:43  10  there?
11  A.  Yes.
12  Q.  Did you ever discuss Mr. Swearingen's leaves
13  of -- leaves of absence with him?
14  A.  No.
16:45:49  15  Q.  Did you ever discuss Mr. Klinger's leaves of
16  absence with him?
17  A.  No.
18  Q.  Did you ever dis -- I take it you also never
19  discussed their medical conditions with either of them.
16:45:59  20  A.  Correct.  I did not.
21  Q.  Okay.  Do you know whether Mr. Swearingen ever
22  requested an accommodation -- a job-related
23  accommodation from UPS?
24  A.  I don't know for sure.
16:46:13  25  Q.  Do you know whether Mr. Klinger ever requested

## Page 233

1   a job-related accommodation from UPS?
2   A.  I do not.
3   Q.  So if they had, you wouldn't have any personal
4   knowledge as to what types of accommodations they had
16:46:25  5   requested, would you?
6   A.  No, I wouldn't.
7   Q.  Do you know whether Mr. Swearingen ever took a
8   leave of absence under the Family Medical Leave Act?
9   A.  I do not know.
16:46:35  10  Q.  Do you know whether Mr. Klinger ever took a
11  leave of absence under the Family Medical Leave Act?
12  A.  No, I do not know.
13  Q.  Did you ever see any paperwork that contained
14  Mr. Swearingen's medical restrictions?
16:46:47  15  A.  No.
16  Q.  Did you ever see any paperwork that contained
17  Mr. Klinger's medical restrictions?
18  A.  No.
19  Q.  Did any other UPS employees ever discuss with
16:46:55  20  you what Mr. Swearingen's medical restrictions were?
21  A.  No.
22  Q.  Did any other UPS employee ever discuss with
23  you what Mr. Klinger's medical restrictions were?
24  A.  No.
16:47:05  25  Q.  Did anyone at UPS ever tell you that either of

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 234

1    them had taken FMLA leave?

2       A.  No.

3       Q.  Okay.  Did anyone at UPS ever tell you that

4    they had been approved for or denied a reasonable

16:47:17  5    accommodation?

6       A.  No.  No.

7       Q.  Okay.  Do you know if either of them had

8    cognitive impairments at any point in time when they

9    attempted to return to work?

16:47:29 10       A.  Not knowing their condition other than Rodney's

11    heart condition, no.

12       Q.  You say that Rodney had a heart condition; is

13    that --

14       A.  I believe he had a heart condition.

16:47:43 15       Q.  Okay.  And what's that based on?  How -- How do

16    you think he had a heart condition?

17       A.  Just in conversation in the group, just

18    overhearing him talk about that and the other ISRs

19    talking about it.

16:47:55 20       Q.  So that would have been based on what

21    Mr. Swearingen himself told you or what other ISRs told

22    you?

23       A.  Well, he -- he didn't tell me directly.  It was

24    just -- We weren't having a conversation about it, but

16:48:07 25    it's what I made -- I overheard them talking about when

## Page 235

1    he was out, when he came back, why he was out.

2       Q.  No UPS management ever told you that

3    Mr. Swearingen had a heart condition, did they?

4       A.  No.

16:48:21  5       Q.  Do you know whether any of those individuals

6    were ever diagnosed as having restrictions in their

7    ability to make decisions?

8       A.  No.

9       Q.  Do you know whether Mr. Swearingen or

16:48:37 10    Mr. Klinger were ever diagnosed as having restrictions

11    in their ability to focus or concentrate?

12       A.  No.  I'm just not aware of their condition to

13    know that.

14       Q.  Okay.  All right.  As we've discussed at

16:49:07 15    length, you've sued UPS, correct?

16       A.  Yes.

17       Q.  Right.  And I'm sure you're seeking a variety

18    of types of damages, correct?

19       A.  Yes.

16:49:13 20       Q.  Okay.  And I don't want to discuss that on a

21    legal level with you, but I do have some questions for

22    you.

23       A.  Okay.

24       Q.  Do you know what -- what backpay is, or lost

16:49:25 25    wages?

## Page 236

1       A.  Yes.  I have an idea.

2       Q.  Okay.  And do you understand that you're

3    seeking lost wages from UPS in this case?

4       A.  Yes.

16:49:35  5       Q.  Okay.  And is it your testimony that -- that

6    you've been able to perform work, be it for UPS or

7    someone else, ever since the time that UPS terminated

8    your employment on or around May 1st of 2014?

9       A.  My way I feel is that I -- with an -- an

16:49:59 10    accommodation, when I first started looking for work,

11    when I felt I was able to return to work to UPS, that I

12    could have with a restriction -- or I'm sorry -- with an

13    accommodation.

14       Q.  Okay.  With an accommodation from UPS or from

16:50:11 15    any other employer, correct?

16       A.  Well, at the time, it was with UPS.  I wanted

17    my job back and benefits back.

18       Q.  Okay.  I think -- Correct me if I'm wrong, you

19    had testified earlier that you feel like your perform --

16:50:25 20    you're capable of performing most sales jobs today,

21    don't you?

22       A.  I do.  And I also mentioned, you know, I may

23    need accommodations after I spoke with my physicians.

24       Q.  Okay.  And whatever accommodations you received

16:50:39 25    or asked for would be negotiated, for lack of a better

## Page 237

1    word, with that potential employer, would it not?

2       A.  It -- It may.  It's very possible, yes.

3       Q.  And you indicated to me that you --

4       A.  Depends on -- I'm sorry.  Go ahead.

16:50:53  5       Q.  No.  Go ahead.  No.  Go ahead, please,

6    Mr. Gonzalez.

7       A.  I'm sorry to interrupt.

8           It -- It's -- It's contingent upon --

9    contingent upon the -- what my physicians are saying, as

16:51:03 10    well.

11       Q.  Okay.

12       A.  Yeah.

13       Q.  And -- And we've looked at a variety of

14    doctors' notes here today.

16:51:07 15       A.  We have.

16       Q.  And you would agree with me that we've looked

17    at many doctors' notes wherein your physicians indicate

18    that they don't think that you're capable of working; is

19    that correct?

16:51:19 20       A.  That is correct.

21       Q.  Okay.  You said you had worked in the sales

22    industry for 20 years; is that right?

23       A.  No.  That was your number.

24       Q.  Okay.  I rounded up potentially.

16:51:27 25       A.  Yeah.  It's closer to 30.

Hoffman Reporting _ Video Service                        210)  736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ

RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 238

1      Q.  Okay.  Okay.  I apologize.  I guess I rounded
2  down then.
3      A.  You rounded down.
4      Q.  Let's see.
5      A.  That's it.
16:51:31
6      Q.  You've got 30 years of experience in the sales
7  industry?
8      A.  Yes.
9      Q.  You told me that you enjoyed that type of work.
16:51:39 10      A.  Yes.
11      Q.  All right.  You told me that you felt like you
12  were good at that type of work.
13      A.  Yes.
14      Q.  Where have you applied for sales jobs in the
16:51:45 15  last three years, Mr. Gonzalez?
16      A.  I submitted a list of -- of employers to you.
17      Q.  Uh-huh.  I can -- And I can go through that
18  list --
19      A.  To all --
16:51:57 20      Q.  -- if you'd like to.
21      A.  Well, I -- I can name a sum of the ones that
22  I've applied to.
23          I've applied to Pearson.  I've applied to
24  USAA, Security Service Federal Credit Union, American
16:52:11 25  Express.  Those are some.

---

Page 239

1      Q.  Okay.  You applied to Security Service in
2  February of 2014; is that correct?
3      A.  That sounds -- sounds correct.  I don't recall
4  exactly.
16:52:23
5      Q.  Okay.  And I'll represent to you that in some
6  documents that your attorney and I exchanged, it
7  indicated --
8      A.  Okay.
9      Q.  -- that that was the date that you applied with
16:52:31 10  Security Service.
11          That was before you were separated from
12  employment with UPS, wasn't it?
13      A.  Before I was em -- Say that one more time.  I'm
14  sorry.
16:52:39 15      Q.  Yes, sir.  You applied for Security Service
16  sometime in February of 2014; is that right?
17      A.  Yes.  That sounds right.
18      Q.  Okay.
19      A.  Yes.
16:52:47 20      Q.  And you weren't terminated from UPS until
21  May of 2014; is that right?
22      A.  I -- I don't remember.
23      Q.  Okay.  Do you know when you applied to work for
24  USAA?
16:52:59 25      A.  It's within the past couple of years.

---

Page 240

1      Q.  Okay.  It wasn't in February of 2014?
2      A.  It may have been, sir.
3      Q.  Okay.  Did you retain any doc -- How did you
4  apply?  Through USAA's online portal?
16:53:15
5      A.  Yes.
6      Q.  Okay.  Did you retain any documents in
7  relationship to that application?
8      A.  I don't recall retaining any, no.
9      Q.  Okay.  Do you know whether you would have any
16:53:21 10  documents that show when you applied to work for USAA?
11      A.  I didn't retain any documents.  I don't know.
12      Q.  Okay.  What about Pearson?  Did you retain any
13  documents in relationship to your employment with
14  Pearson?
16:53:33 15      A.  No.
16      Q.  Okay.  You said you had applied for work at
17  Amex; is that correct?
18      A.  Yes.
19      Q.  Okay.  You had also applied for work with a
16:53:49 20  company named My Work Options?
21      A.  Correct.
22      Q.  Okay.  What type of work does My Work Options
23  do, to the best of your knowledge?
24      A.  It's at-home work.
16:54:01 25      Q.  Okay.  And you had applied for work with Amazon

---

Page 241

1  Flex?
2      A.  Yes.
3      Q.  Okay.  Is that some type of independent
4  delivery driver --
16:54:13
5      A.  Yes.
6      Q.  -- for Amazon?
7      A.  Correct.
8      Q.  And you had applied for work with Uber; is that
9  correct?
16:54:17 10      A.  Yes.
11      Q.  And none of these places hired you; is that
12  right?
13      A.  That's right.
14      Q.  Did any of these companies indicate why they
16:54:23 15  were not hiring you?
16      A.  No.
17      Q.  Did anyone indicate that they weren't hiring
18  you because of anything UPS had said or done?
19      A.  They did not indicate that, no.
16:54:33 20      Q.  Okay.  Other than the companies we've just
21  discussed, have you applied for work anywhere else in
22  the last three-plus years?
23      A.  Yes.
24      Q.  Where?
16:54:43 25      A.  I've applied for -- It's an on-site company

---

61 (Pages 238 to 241)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 242

1   called HVAC Agent.
2   Q.  HVAC Agent?
3   A.  I believe it's called HVAC Agent.
4   Q.  Okay.  What type of work did you apply for with
5   them?
6   A.  Heating, ventilating, air-conditioning sales.
7   Q.  Okay.  When approx -- Well, is that a
8   San Antonio company?
9   A.  No.  It's a -- It's kind -- It's kind of like
10  an Indeed or Monster.  It's an Internet-based --
11  Q.  Okay.
12  A.  -- for at -- HVAC jobs.
13  Q.  When did you submit that application?
14  A.  It's -- I'm going to have to guess.
15  Approximately a year --
16  Q.  Okay.
17  A.  -- year and a half.
18  Q.  Other than the companies we've discussed, are
19  there any other places or employers with whom you recall
20  submitting applications for employment since May 2014?
21  A.  Yes.  I recall applying through USA Jobs.
22  Q.  Okay.  I think we've discussed that.
23  A.  USA Jobs?  The government jobs that --
24  Q.  Oh, USA Jobs.  Okay.  I apologize.  I heard
25  "USAA."

---

Page 243

1   A.  Yeah.  USAA -- Yeah.
2   Q.  Got you.
3   A.  No.  It's very close to the same, yes.
4   Q.  Okay.  Any other companies you've applied for
5   work with since May 2014?
6   A.  There probably is.  I don't recall right now.
7   Q.  Did you keep a list of the places with whom
8   you've applied for work?
9   A.  The list that you have for sure, and I would
10  have to see if I can -- I'd have to look to see if I've
11  got, like, e-mail documents on the others.
12  Q.  Okay.  Have you searched your e-mail for
13  documents related to applications you've submitted for
14  employment?
15  A.  Have I searched my e-mails?  No.
16  Q.  Yes, sir.  Okay.
17  A.  No.
18  Q.  Have you searched your e-mails -- I'm talking
19  specifically about your rong@live.com e-mail address,
20  Mr. Gonzalez.
21      Have you searched that e-mail account for
22  e-mails you've sent to or received from U -- UPS
23  employees in relationship to your termination of
24  employment?
25  A.  To UPS employees?

---

Page 244

1   Q.  Yes.
2   A.  E-mails to them?  No.
3   Q.  Yes.
4       Have you searched for e-mails to or from
5   UPS employees in relationship to your request for
6   accommodation, in that e-mail account?
7   A.  No, not that I recall.  I mean, the only
8   correspondence I have during, you know, the request
9   for accommodation and checklist time.
10  Q.  Okay.  And I'm specif -- I'm -- I'm
11  specifically asking whether you've searched your e-mail
12  account for those types of e-mails.
13  A.  No.
14  Q.  Have you spoken with any UPS employees
15  regarding your claims in this lawsuit in the last year?
16  A.  No.
17  Q.  Have you spoken with any former UPS employees
18  regarding your claims in this lawsuit in the last year?
19  A.  No.
20  Q.  Have you spoken with any former or current UPS
21  employees at all in the last year?
22  A.  Spoken with, no.
23  Q.  Have you e-mailed with anyone?
24  A.  No.
25  Q.  Have you texted with anyone?

---

Page 245

1   A.  No.
2   Q.  Was there a reason you said "spoken with" other
3   than just saying you haven't communicated?
4   A.  Just seeing some things on Facebook.
5   Q.  Okay.  Okay.  So social media and things like
6   that?
7   A.  Yeah.
8   Q.  Have you sent any Facebook messages --
9   A.  No.
10  Q.  -- to UPS employees?
11  A.  No.
12  Q.  Okay.
13  A.  I just, you know --
14  Q.  I understand.
15  A.  -- can't help but be truthful.
16  Q.  Again, you know, I don't want to quiz you about
17  legal issues, Mr. Gonzalez, but in this lawsuit, are you
18  seeking any type of remedy from the Court for emotional
19  pain or suffering, or anything like that, that you
20  believe UPS has caused you?
21  A.  I am not familiar with what I would be --
22  how -- what I'd be remedied.
23  Q.  Okay.  Let me ask you this:  Do you believe
24  that UPS has caused you to suffer emotionally?
25  A.  Yes.

---

62 (Pages 242 to 245)

RONALD D.   GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 246

```
         1      Q.  Okay.  And what type of, for lack of a better
         2   word, mental anguish do you personally, just in your
         3   individual capacity --
         4      A.  Sure.  Sure.
16:58:47 5      Q.  -- believe UPS has caused you?
         6      A.  Well, once I lost my -- lost my job, I lost my
         7   benefits and I lost the -- the benefits package which I
         8   had, which were my health insurance for myself and my
         9   family.
16:59:03 10          And the health insurance I have now is
        11   not -- it's not a group plan, so it's not nearly as good
        12   and I don't receive the same treatment I used to.
        13      Q.  Okay.  I certainly don't want to belabor any
        14   personal issues, but there are some questions I have to
16:59:23 15   ask, Mr. Gonzalez.
        16          You indicated that you suffered from
        17   depression for 20-or-so years; is that correct?
        18      A.  Yes.
        19      Q.  So that depression would predate anything in
16:59:33 20   relationship to your employment with UPS; is that
        21   correct?
        22      A.  Correct.
        23      Q.  Okay.  Will you tell the ladies and gentlemen
        24   of the jury that your termination from UPS had any
16:59:41 25   impact on your marriage?
```

---

Page 247

```
         1      A.  Yes.
         2      Q.  And what type of impact would you contend that
         3   your termination from UPS had on your marriage?
         4      A.  Just lots of pressure on the relationship and
16:59:53 5   being a provider for my family -- for my wife and for my
         6   family financially, insurance coverage, bills, medical
         7   bills.
         8      Q.  Were -- were you and Mrs. Gonzalez going to any
         9   type of marital counseling or therapy prior to your
17:00:17 10   termination of employment at UPS?
        11      A.  I had been, yes.
        12      Q.  Okay.  You had.
        13      A.  Yeah.  No.  She has been, too, prior to.
        14      Q.  Okay.  So to the extent that there were any
17:00:25 15   types of those marital issues, they would at least, in
        16   part, predate anything UPS did that's a claim in this
        17   lawsuit?
        18      A.  I continued to go afterwards.
        19      Q.  So you go now.  But I -- I guess my point or my
17:00:43 20   question being:  You were seeking marital counseling
        21   before UPS denied your request for accommodation or
        22   terminated your employment; is that correct?
        23      A.  That also is correct.  There -- There's an
        24   escalation point.  I mean, part of the reasons we go
17:00:57 25   to -- some people go to therapy or to see a counselor
```

---

Page 248

```
         1   is due to life issues and conditions, things that
         2   happen --
         3      Q.  Okay.
         4      A.  -- and this is one.
17:01:07 5      Q.  And you would agree that your underlying
         6   medical condition, your CRPS or RSD, is not the work --
         7   not the result of a work-related accident that you
         8   suffered at UPS; is that correct?
         9      A.  In part.
17:01:23 10      Q.  In what part?
        11      A.  I -- When I first was diagnosed with carpal
        12   tunnel release -- or carpal tunnel, I was -- I had asked
        13   the HR -- I'm not sure her title -- Carmen Elizondo, I
        14   asked her if I should -- if I should go to -- through
17:01:51 15   workman's comp to get it -- believing that it was a work
        16   issue, if I should go through workman's comp to get it
        17   addressed, and she -- she recommended no.
        18      Q.  This would have been back when you were having
        19   your first carpal tunnel --
17:02:11 20      A.  Yes.
        21      Q.  -- surgery?
        22      A.  Correct.
        23      Q.  So in 2009 or so?
        24      A.  Yes.
17:02:15 25      Q.  And it's your testimony that you asked
```

---

Page 249

```
         1   Ms. Elizondo whether you should file a workers' comp
         2   claim?
         3      A.  Correct.
         4      Q.  Did you disagree with her that you should
17:02:25 5   not -- that in your opinion you should file a workers'
         6   comp claim?
         7      A.  I -- I wasn't being fairly -- Well, just being
         8   with UPS for that -- that period of time, at the time I
         9   wasn't so sure what I should do, so that's why I asked
17:02:43 10   HR.  That's why I asked her.
        11      Q.  And my question is:  Did you disagree with
        12   Ms. Gon -- Ms. Elizondo?
        13      A.  Well, I made the decision to -- based on what
        14   she told me, to get my own private doctor.
17:02:55 15      Q.  I still don't know that I know your answer to
        16   my question, Mr. Gonzalez.
        17      A.  All right.  Ask the --
        18      Q.  Did -- Did -- Did --
        19      A.  -- question again, and I'll answer it more
17:03:05 20   directly.
        21      Q.  Well, your -- your carpal tunnel back in 2009,
        22   did you believe --
        23      A.  Uh-huh.
        24      Q.  -- that was a work-related injury?
17:03:09 25      A.  I did.
```

---

63 (Pages 246 to 249)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D. GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 250

1    Q. Did you file a workers' comp claim?
2    A. No.
3    Q. Did you hire an attorney to seek out workers'
4    compensation benefits for you?
17:03:17    5    A. No, sir.
6    Q. You had previously been represented by an
7    employment attorney, hadn't you?
8    A. Yes.
9    Q. The folks who sued Oslin National on your
17:03:27    10    behalf?
11    A. Oslin Nation, yes.
12    Q. Oslin Nation. Excuse me.
13        All right. Mr. Gonzalez, have you
14    understood my questions today, sir?
17:03:37    15    A. Yes.
16    Q. Are there any answers that you want to change
17    at this time?
18    A. No, sir, not at this time.
19    Q. All right. Thank you for your time.
17:03:43    20        MR. BARBOUR: And I'll pass the witness.
21        THE WITNESS: Okay.
22            (5:03 p.m.)
23            EXAMINATION
24    BY MR. CRANE:
17:03:45    25    Q. I have a couple questions.

## Page 251

1        Now I'm showing you what's marked
2    Exhibit No. 24.
3    A. Okay.
4    Q. I'm Tom Crane. I represent the plaintiff.
17:04:11    5        You testified earlier, Mr. Gonzalez, that
6    this was an e-mail you sent to Ms. Melendreras at the
7    EEOC; is that correct?
8    A. Yes, sir.
9    Q. And it looks like, on the first -- I'm looking
17:04:21    10    at the first page. It says, "I know you told me one of
11    the managers had told you that if you did not come back
12    with a full clearance, they would not bring you back."
13    Do you see that first portion?
14    A. Yes.
17:04:29    15    Q. And then, it looks like, in response to that,
16    you mentioned that on April 17th Carmen Elizondo --
17    April 17th of 2013, Carmen Elizondo told you that to
18    come back to work you needed a doctor's note without
19    restrictions. Is that what you said?
17:04:43    20        MR. BARBOUR: Objection; leading.
21        THE WITNESS: Yes.
22    Q. (By Mr. Crane) Was that accurate at the time
23    you said that?
24    A. Yes.
17:04:47    25        MR. BARBOUR: Objection; leading.

## Page 252

1        THE WITNESS: That was accurate.
2    Q. (By Mr. Crane) Did you write this at a time
3    that you had a better memory of what Carmen had told
4    you?
17:04:53    5        MR. BARBOUR: Objection; leading.
6        THE WITNESS: Yes.
7    Q. (By Mr. Crane) And then, a little further down,
8    it says, "On April 10th, 2014, I was told by
9    Mr. Hawthorne that I needed to come back with a" -- "a
17:05:01    10    full" -- "a release with no restrictions."
11        Is that what you say?
12        MR. BARBOUR: Objection; leading.
13        THE WITNESS: Yes.
14    Q. (By Mr. Crane) Was that accurate at the time?
17:05:07    15    A. Yes, sir.
16    Q. Do you still believe that today?
17    A. I do.
18    Q. And if you'll look at the bottom of the page,
19    it -- apparently this is a question to you from
17:05:19    20    Ms. Melendreras. And she asks you what accommodation
21    you are seeking, and you say, "To work four hours a day,
22    five days per week, per my doctor's recommendations."
23    Is that what you say?
24    A. Yes, I do.
17:05:31    25    Q. Was that accurate at the time?

## Page 253

1    A. Yes.
2    Q. After you were fired, did you have bills to
3    pay?
4    A. Yes.
17:05:39    5        MR. BARBOUR: Objection; leading.
6    Q. (By Mr. Crane) Did -- Did the bills stop?
7    A. No.
8    Q. Did -- When people send you bills, do they
9    stop -- do they say, "If you're still working, you need
17:05:47    10    to pay this bill"?
11        MR. BARBOUR: Objection; leading.
12        THE WITNESS: I still have to pay.
13    Q. (By Mr. Crane) Did you have financial issues
14    after you were fired?
17:05:53    15    A. Yes.
16    Q. What did you do to help deal with those
17    financial issues?
18    A. I've had to take out loans and credit.
19    Q. Did you get an exemption from the Bexar
17:06:05    20    Appraisal District for your -- for homestead?
21    A. Yes.
22        MR. BARBOUR: Objection; leading.
23    Q. (By Mr. Crane) Did that help with some bills?
24    A. No.
17:06:13    25    Q. No?

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                              RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

Page 286

1    going.

2         Q.  Is -- You left the meeting in April of 2014,

3    and my understanding was UPS did not get back to you

4    with options or possibilities in how you could return to

17:53:21  5    work.  Is that right?

6         A.  That's correct.

7         Q.  Is there anything more you would have liked to

8    hear from UPS regarding an interactive discussion on how

9    to accommodate you?

17:53:31 10         MR. BARBOUR:  Objection; leading.

11         THE WITNESS:  Yes.  The -- The meeting

12    wasn't interactive, in my opinion.  It was just a

13    reading of the checklist.  There wasn't any proposals or

14    ideas offered at the time of the meeting.  It was

17:53:47 15    basically read it and -- and leave.

16         So the only accommodations that were

17    discussed were ones that I had made as far as potential

18    jobs that I could do with UPS that I had done before.

19         (Exhibit 28 marked.)

17:54:19 20         Q.  (By Mr. Crane) I'm showing you what's marked

21    Exhibit No. 28.  It's -- You see it has an exhibit

22    number in front of Exhibit No. 8, but I wanted to ask

23    you to look at the second page.

24         A.  Uh-huh.

17:54:35 25         Q.  This -- You've seen this before?  This was part

---

Page 287

1    of your EEOC file; is that correct?

2         A.  Yes.

3         Q.  And your understanding is this was UPS'

4    explanation to the EEOC regarding what your essential --

17:54:51  5    what your job description was.  Is that -- Is that your

6    understanding?

7         A.  Yes.

8         Q.  Is this an acc -- As far as you can tell,

9    reading through this, is this an accurate description of

17:55:01 10    the job you had as of April of 2013?

11         A.  No.

12         Q.  What -- What is not accurate about it?

13         A.  There's -- It doesn't really talk about what I

14    did as far as job responsibilities.  It's rather --

17:55:17 15    It -- The closest thing it says under "position" is

16    maybe -- Well, there's a lot of those that do not apply

17    to me.

18         Q.  Well, you're -- you're talking about

19    under the -- It lists several positions this covers.  It

17:55:33 20    doesn't list ISR or franchise sales consultant anywhere.

21    Is that what you're saying?

22         A.  That's correct.

23         Q.  Well, look further down on the "essential job

24    functions."  Does that ad -- adequately explain your

17:55:43 25    daily -- your day-to-day job as a franchise sales

---

Page 288

1    consultant?

2         A.  No.

3         Q.  What's -- Is something missing, or is there

4    something in there that shouldn't be?

17:55:55  5         A.  There's things that shouldn't be there that

6    don't apply.

7         Q.  Well, can you point out what's not accurate

8    about it?

9         A.  One example is "Ability to work varying shifts,

17:56:05 10    additional hours or overtime depending on service

11    needs."  That's, like, the third or fourth one down.

12    Another would be...

13         "Cognitive ability to follow

14    directions...perform...may be assigned..."

17:56:29 15         I think there was one that -- I'm trying

16    to find it.

17         Q.  I don't see anywhere on here that says you have

18    to be on the phone.  Do you see a requirement to make

19    phone calls?

17:56:39 20         A.  No.  There's nothing pertaining to -- to phone

21    or -- or PC, that I can see, or a business plan or

22    accounts or -- No.

23         "Bend" -- Let's see.  "Climb stairs and

24    walk intermittently throughout the workday" is not part

17:57:17 25    of the ISR position.

---

Page 289

1         Q.  Is there anything else?

2         A.  Well, there's -- Yeah.  I mean, there's

3    "handheld scanner."

4         Q.  You're saying that's not there?

17:57:43  5         A.  No, that is here.  I -- It's -- I don't --

6    didn't work -- I wasn't in -- I didn't work in services

7    or distribution, so that -- that was -- did not apply to

8    me at all.

9         Q.  Thank you, Mr. Gonzalez.

17:57:55 10         (5:58 p.m.)

11         EXAMINATION

12    BY MR. BARBOUR:

13         Q.  Mr. Gonzalez, I have just a few wrap-up

14    questions.  Let's stay on Exhibit 28, if you would, sir.

17:58:13 15         Are you familiar or have you -- Let me

16    strike that.

17         Have you previously reviewed any of UPS'

18    job models for the inside sales representative position?

19         A.  Ones that you've submitted or that have been

17:58:27 20    submitted by UPS or --

21         Q.  At all.  Are you familiar with such a document,

22    an ISR job model?

23         A.  Not until I saw it in an exhibit.

24         Q.  Okay.  When you were working with UPS, you

17:58:39 25    weren't familiar with that document?

---

Hoffman Reporting _ Video Service                              210) 736-3555

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 290

1          A.  No.
2          Q.  You don't know what information Mr. Hawthorne
3    or Ms. Lorio were looking at in terms of deciding
4    whether or not you could be reasonably accommodated; is
17:58:49  5    that right?
6          A.  Well, Ms. Lorio was on the phone remotely, so I
7    know -- I don't know, and then Mr. Hawthorne was in
8    front of me and he, I believe, had just a Legal Pad and
9    just the accommodation checklist.  That was all.
17:59:03 10    Q.  This was during the checklist meeting, right?
11         A.  Yes.  That's been our only meeting.
12         Q.  Right.  And after that meeting, they -- they
13    said that the company would need to consider your
14    request in more detail before making a decision as to
17:59:15 15    whether or not it could accommodate you; is that right?
16         A.  Yes.  They said they needed some time to
17    evaluate.
18         Q.  And you weren't privy to any of those
19    conversations or deliberations that happened after the
17:59:27 20    checklist meeting to determine whether or not you could
21    be reasonably accommodated?
22         A.  No.
23         Q.  Okay.  So you don't know what documents or
24    materials they were consulting or looking at in making
17:59:35 25    that decision, do you?

Page 291

1          A.  No.
2          Q.  Okay.  Did -- Did Mr. Hawthorne or Ms. Lorio
3    ever tell you that they were denying your request for
4    accommodation because of your inability to work varying
17:59:47  5    shifts, additional hours or overtime?
6          A.  No.  They didn't -- They didn't state anything.
7          Q.  Right.  So when I look at Exhibit 28, that line
8    on the "essential job functions" wasn't something the
9    company relied on in telling you that you were unable to
18:00:03 10    return to work, was it?
11         A.  This whole document?
12         Q.  Just that one line.
13         A.  That one line?  Repeat your question, please.
14         Q.  Yeah.  Mr. -- Neither Mr. Hawthorne nor
18:00:15 15    Ms. Lorio told you that you couldn't return to work
16    because of your inability to work varying shifts,
17    additional hours and/or overtime depending on service
18    needs, did they?
19         A.  No, they did not.
18:00:25 20    Q.  Okay.  I hate to go all the way back to the
21    beginning, but could you find Exhibit 1 for me,
22    Mr. Gonzalez?
23             MR. CRANE:  Let me -- Let me help you.
24         Q.  (By Mr. Barbour) And keep Exhibit No. 28 there,
18:00:39 25    please, also.

Page 292

1          Okay.  You have Exhibits 28 and Exhibit 1
2    in front of you; is that right?
3          A.  Yes.
4          Q.  On Exhibit 28, do you see the second-to-last
18:00:55  5    major bullet point that begins with "Demonstrate
6    cognitive ability to"?
7          A.  Yes.
8          Q.  And it lists out approximately eight or so
9    different essential functions and cognitive abilities
18:01:07 10    somebody has to do to perform the jobs listed above; is
11    that right?
12         A.  Yes.
13         Q.  Would you look at the second page of Exhibit 1,
14    Mr. Gonzalez?
18:01:13 15    A.  The one dated February 20th, 2015?
16         Q.  Yes, sir.  I'm looking at the page that's "929"
17    in the lower right-hand corner.
18         A.  929.  Okay.
19         Q.  Are you with me?
18:01:33 20    A.  Yes, sir.
21         Q.  And we discussed this previously, where you had
22    written -- written to the EEOC and listed what -- the
23    essential functions of your last position with UPS.
24             You recall that testimony, right?
18:01:41 25    A.  Yes.

Page 293

1          Q.  And specifically you testified about what you
2    had told the EEOC some of the cognitive abilities were
3    that were essential functions of that job.
4              Do you recall that testimony?
18:01:51  5    A.  Yes.
6          Q.  Okay.  It -- It would be fair to say that you
7    have literally typed out verbatim, on that bullet point
8    that begins with "Demonstrative [sic] cognitive
9    ability," the exact same job functions that are listed
18:02:07 10    at the bottom of Exhibit No. 28.  Haven't you?
11         A.  No, I did not do that.
12         Q.  Let's go line by line.  You see Exhibit 28
13    where it says, "Demonstrate cognitive ability to"?
14         A.  Yes, I do.
18:02:21 15    Q.  Okay.  Do you see where you've written,
16    "Demonstrate cognitive ability to," on Exhibit 1?
17         A.  Okay.  Give me a second.  Okay.
18         Q.  Am I correct that you -- on Exhibit 1 --
19         A.  "Concentrate" --
18:02:37 20    Q.  -- you typed out, "Demonstrate cognitive
21    ability to"?
22         A.  Yes.  I do see that.
23         Q.  Okay.  And then after that, you wrote, "Ability
24    to follow directions and routine."  Is that correct?
18:02:47 25    A.  Yes.

74  (Pages 290 to 293)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                            RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 294

1    Q.  And that is the very next line on Exhibit 28,
2   is it not?
3        A.  Tell me again which one you're reading.
4        Q.  If you --
18:02:59  5        A.  "Concentrate, memorize, recall, identify
6   legal"...
7        Q.  My question is:  Haven't you written out all of
8   those functions under "cognitive ability" from
9   Exhibit 28 on your submission to the EEOC that's
18:03:13 10  Exhibit 1?
11       A.  Yes, that is -- those are on there.
12       Q.  Okay.  And, in fact, on Exhibit 28, right above
13  the "cognitive abilities," it lists out, "work
14  cooperatively in a diverse environment," doesn't it?
18:03:29 15      A.  Yes.
16       Q.  You also wrote that to the EEOC on Exhibit 1 as
17  one of your essential functions; is that correct?
18       A.  Yes.
19       Q.  Okay.  And the "ability to communicate" is also
18:03:41 20  reflected on Exhibit 1 and Exhibit 28, is it not?
21       A.  Yes.
22       Q.  Okay.  "Performing simple office tasks" is also
23  reflected on Exhibit 1, your submission to the EEOC, and
24  Exhibit 28, isn't it?
18:03:57 25      A.  Yes.

Page 295

1        Q.  So you would agree that Exhibit 28 does reflect
2   many of your essential job functions of your last
3   position with UPS, doesn't it?
4        A.  It -- Yes, it does, in that -- that portion of
18:04:11  5   it.
6        Q.  You never asked UPS to provide you with -- with
7   any Dragon or other translating software for your use,
8   did you?
9        A.  No, I did not.
18:04:23 10      Q.  Okay.
11       A.  I asked for an accommodation or accommodations,
12  but not that one specifically.
13       Q.  That software, if it was given to you, would
14  have accommodated your sometimes inability to type,
18:04:35 15  wouldn't it?
16       A.  Yes.
17       Q.  That software would not have, for example,
18  accommodated your inability to make decisions, would it?
19       A.  We -- I don't know that.
18:04:45 20      Q.  You can't state for certainty today that it
21  would have accommodated that, could you?
22       A.  I believe it -- I might could have done the
23  job.
24       Q.  Do you -- And I'm asking about the software
18:04:55 25  specifically, that Dragon software we discussed.

Page 296

1        A.  I -- I have --
2        Q.  Would --
3        A.  -- no way of speculating or knowing how that
4   software would have impacted my day.  I feel it would
18:05:05  5   have helped.
6            My doctors have stated, if I can return to
7   work with some accommo -- accommodation or
8   accommodations, that probably would help.
9        Q.  It would have helped you get around the burden
18:05:19 10  of sometimes having to type?
11       A.  Yeah.  That particular accommodation would
12  have, yes.
13       Q.  Okay.  Is it your testimony that your sales
14  positions with UPS don't require you to make decisions?
18:05:31 15      A.  They -- As far as simple decisions of, you
16  know, if I need to go to the bathroom -- go to the
17  bathroom, I can do that.
18           Pick up the phone, work the TEAMS program,
19  look up -- go to the billing center, teach people how --
18:05:49 20  or set up programs like Quantum View Manage, things like
21  that, yes, I can still do all of those things.
22       Q.  Okay.  My -- My question, though, was:  Was it
23  your testimony earlier that you didn't have to make
24  decisions in your day-to-day work for UPS?
18:06:05 25      A.  I did say that, if it was in a managerial

Page 297

1   role --
2        Q.  Right.
3        A.  -- which I was not.
4        Q.  You had to decide what your clients' needs
18:06:15  5   were, didn't you?
6        A.  Yes.
7        Q.  You had to decide what UPS products and
8   services would be able to serve those clients' needs,
9   wouldn't you?
18:06:21 10      A.  Yes.
11       Q.  You would have to decide what type of sales
12  strategy to use in selling those customers those
13  products and solutions, wouldn't you?
14       A.  Yes.
18:06:31 15      Q.  You would have to decide, if a customer had a
16  concern, who the appropriate individual within the
17  company would be to direct that concern to, wouldn't
18  you?
19       A.  Yes.
18:06:41 20      Q.  And you would have to decide how to monitor
21  your customers' compliance with the agreements that they
22  had already entered into, wouldn't you?
23       A.  Yes.
24       Q.  And I'm sure that there's probably a myriad
18:06:53 25  other decisions that you may have to make in the

75 (Pages 294 to 297)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

Page 298

1    day-to-day work as a sales rep for UPS, isn't there?
2        A.  Sure.  It's -- It's -- I -- I would have to --
3    As I do know, I know how to operate the programs.
4        Q.  Okay.  On Exhibit 26, which was the
18:07:07  5    February 11th, 2014 letter to -- from Dr. Sledge -- I
6    really just have one question.  We -- We can wait for
7    it.
8            Do you know whether you submitted
9    Exhibit 26 to UPS at any point, Mr. Gonzalez?
18:07:37  10       A.  And tell me again what that exhibit was.
11       Q.  Let's pull it out.  Let's get the exhibit in
12   front of you.
13           MR. CRANE:  Almost there.
14           MR. BARBOUR:  There we go.
18:07:45  15       Q.  (By Mr. Barbour) All right.  You have
16   Exhibit 26 in front of you, right, Mr. Gonzalez?
17       A.  Yes.
18       Q.  And this is the February 11th, 2014 letter from
19   Dr. Sledge, correct?
18:07:51  20       A.  Yes.
21       Q.  This letter is not addressed to anyone in
22   particular, is it?
23       A.  No.
24       Q.  Okay.  Did you personally ever provide this
18:08:01  25   letter to anyone at UPS?

Page 299

1        A.  No, not that I recall.
2        Q.  Did Dr. Sledge ever tell you that he provided
3    the letter to anyone at UPS?
4        A.  Through Aetna, or...
18:08:15  5        Q.  Did Dr. Sledge ever tell you that he sent this
6    specific letter to anyone at UPS?
7        A.  No.
8        Q.  Okay.  And, in fact, Dr. Sledge wasn't the
9    doctor who signed your request for medical information
18:08:25  10   in relationship to your request for accommodation, was
11   he?
12       A.  Say that question again, please.
13       Q.  Dr. Martinez was the one who submitted your --
14       A.  Yes.
18:08:37  15       Q.  -- your medical information --
16       A.  Correct.
17       Q.  -- relative to your request for accommodation;
18   is that right?
19       A.  That's correct.
18:08:41  20       Q.  Okay.  It was not Dr. Sledge who provided that
21   information --
22       A.  No, it was not.
23       Q.  -- to UPS?
24           If we can find Exhibit 27 really quickly,
18:08:53  25   which is the letter from Dr. Emmett.  Here we go.

Page 300

1            You have Exhibit 27 --
2        A.  Yes.
3        Q.  -- is that right?
4        A.  Yes.
18:09:01  5        Q.  Degrees weren't required for promotion within
6    UPS as of 2014, were they?
7        A.  You had to be working -- You had to be either
8    enrolled in college in order to -- to advance, to be
9    promoted.
18:09:15  10       Q.  Okay.
11       A.  So you either had to have a degree or you had
12   to be in school.
13       Q.  Okay.  And you were in school; is that correct?
14       A.  Yes.
18:09:21  15       Q.  Okay.  This letter from Dr. Emmett that's dated
16   February 4th, 2014, you never provided this letter to
17   UPS, did you?
18       A.  I don't recall for sure or not if I did.
19       Q.  Okay.  You have no recollection of giving --
18:09:37  20       A.  I don't recollect, no.
21       Q.  Okay.  In fact, the letter is addressed to
22   Thomas Edison State College; is that right?
23       A.  Yes.
24       Q.  Okay.  And did Dr. Emmett ever tell you that he
18:09:47  25   had submitted Exhibit 27 to anyone at UPS?

Page 301

1        A.  No.
2        Q.  And this is written February 4th, 2014,
3    correct?
4        A.  Yes.
18:09:57  5        Q.  That would have been the very next day after
6    you requested a reasonable accommodation from UPS; is
7    that correct?
8        A.  Yeah.  I'm not looking at the checklist,
9    but that's the date you're talking about?
18:10:11  10       Q.  Well, earlier we had looked at an e-mail from
11   Ms. Lorio to you --
12       A.  Okay.
13       Q.  -- where she said, on February 3rd --
14       A.  Uh-huh.
18:10:19  15       Q.  -- 2014, you requested a job-related
16   accommodation.
17       A.  Okay.
18       Q.  Do you recall that e-mail?
19       A.  Yes.
18:10:23  20       Q.  If that's correct, this would have been the
21   very next day after you submitted that request to UPS,
22   wouldn't it?
23       A.  Yeah.  It's dated the very next day.
24       Q.  Okay.
18:10:31  25       A.  I mean, the doctor didn't do it the same day.

76  (Pages 298 to 301)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                                    RONALD GONZALEZ v. UNITED PARCEL SERVICE

---

### Page 302

1    He had some time to do --

2    Q.  Okay.

3    A.  -- to write the letter up.

4    Q.  And Mr. Crane had directed you to -- to the

18:10:39  5   second paragraph of the substance of -- of the letter

6    down below.

7         Could you read into the record the -- the

8    sentence that begins with "Patient is frequently,"

9    please?

18:10:49  10   A.  "Patient is frequently incapacitated by his

11   pain levels and, when taking medication to control said

12   pain, is unable to concentrate, attend and recall

13   significant material he may have read or heard.

14   This" --

18:11:03  15   Q.  And -- And you were taking medication -- pain

16   medication as of February 4th, 2014; is that right?

17   A.  Yes.

18   Q.  I think we discussed the Percocet you were

19   taking at that point, right?

18:11:13  20   A.  Yes.

21   Q.  And you were taking Lyrica, as well, at that

22   point, weren't you?

23   A.  Yes, I believe so.

24   Q.  And you told Mr. Crane earlier that

18:11:21  25   Dr. Emmett's letter accurately set forth your physical

---

### Page 303

1    condition and circumstances as of that date; is that

2    right?

3    A.  I believe that's correct, yes.

4    Q.  Okay.  Just a couple last questions.

18:11:33  5        You had mentioned some financial issues

6    you had following your termination of employment from

7    UPS.  Do you recall that testimony?

8    A.  Yes.

9    Q.  Okay.  Specifically you recalled some loans

18:11:43  10   that you had taken out following your termination; is

11   that correct?

12   A.  Yes.

13   Q.  When did you take these loans out?

14   A.  Over a year -- Well, somewhere -- loans -- I

18:11:59  15   mean, there was some loans -- personal loans, and

16   there's also credit cards.  So anywhere from a year, two

17   years, roughly.

18   Q.  For what purposes did you use these credit

19   cards and take out these personal loans?

18:12:13  20   A.  The most -- Much of it was for -- to pay bills

21   and to -- medical bills, and I also paid for some

22   infusions.

23   Q.  You were receiving Social Security disability

24   benefits throughout this period of time, correct?

18:12:33  25   A.  Yes.

---

### Page 304

1    Q.  You were receiving Aetna income-replacement

2    benefits; is that correct?

3    A.  For some time -- For some time, yes.

4    Q.  Right.  And that -- Aetna long-term disability

18:12:43  5    benefits, those were actually as a result of a

6    UPS-paid-for LTD policy, weren't they?

7    A.  UPS-paid-for?  I -- I'm not sure how that was

8    allocated as far as accounting's concerned.  I know I

9    had benefits I paid for.

18:12:59  10   Q.  Okay.  And -- But you continued to receive

11   income -- some income throughout much of this period of

12   time; is that correct?

13   A.  Yes.

14   Q.  And we discussed all the jobs that you had

18:13:09  15   applied for that you can recall applying for --

16   A.  Yes.  That I could recall, yes.

17   Q.  All right.  Earlier you had mentioned some

18   negative income you had as a result of payroll

19   deductions, or something along those lines; is that

18:13:23  20   correct?

21   A.  Yeah.  It was an offset.

22   Q.  All right.  It -- It was an offset against your

23   Aetna long-term disability payments --

24   A.  Correct.

18:13:31  25   Q.  -- wasn't it?

---

### Page 305

1         Right.  What happened was, Aetna continued

2    paying you beyond the two-year term of your plan; is

3    that right?

4    A.  No.

18:13:37  5    Q.  No?

6         How do you understand that Aetna ended up

7    debiting your long-term disability payments?

8    A.  The offset -- offset was created because I was

9    approved for Social Security benefits, and Social

18:13:51  10   Security provided a -- 12 or 18 months in backpay.

11        And per the summary plan, if I were to get

12   the -- I had to apply for Social Security or they would

13   calculate what my benefit would be, and I had to show

14   them the documentation that I had applied, and -- and if

18:14:13  15   I got approved, I had to show them the documentation

16   that I was approved.

17        And per the SPD, I had to pay back the --

18   any monies received from Social Security.

19   Q.  You paid that back to Aetna; is that correct?

18:14:25  20   A.  I did not.  I -- The money was used to pay

21   bills, so Aetna, based on the approved disability at the

22   time, started deducting what I owed them per month off

23   of the benefits they were paying.

24   Q.  Okay.  So Aetna deducted that from your Aetna

18:14:45  25   long-term disability payments?

---

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.   GONZALEZ                              RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 306

1      A.  Correct.

2      Q.  Right.  UPS never deducted anything from your

3   pay; is that correct --

4      A.  Right.

18:14:51   5      Q.  -- in relationship to that?

6      A.  That's correct.

7      Q.  Right.  All of this happened after you had

8   already been separated from employment with UPS?

9      A.  Yes.

18:14:59  10          MR. BARBOUR:  All right.  I'll pass the

11   witness.

12          MR. CRANE:  No other questions.  Thank

13   you.

14          THE VIDEOGRAPHER:  The time is 6:15 p.m.,

18:15:05  15   and this concludes today's deposition.

16          We are off the record.

17          (Deposition concluded.)

18

19

18:17:31  20

21

22

23

24

25

## Page 307

1           CHANGES AND SIGNATURE

2   RONALD D. GONZALEZ          MAY 24, 2017

3   PAGE LINE   CHANGE        REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

## Page 308

1          I, RONALD D. GONZALEZ, have read the

2   foregoing deposition and hereby affix my signature that

3   same is true and correct, except as noted above.

4

5          _____

6          RONALD D. GONZALEZ

7   THE STATE OF _____:

8   COUNTY OF _____:

9

10          Before me, _____, on this

11   day personally appeared RONALD D. GONZALEZ, known to me

12   (or proved to me under oath or through

13   _____) (description of identity card or

14   other document) to be the person whose name is

15   subscribed to the foregoing instrument and acknowledged

16   to me that they executed the same for the purposes and

17   consideration therein expressed.

18          Given under my hand and seal of office

19   this _____ day of _____, 2017.

20

21   _____

22   NOTARY PUBLIC IN AND FOR

THE STATE OF _____

23

24

25

## Page 309

1          IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

2               SAN ANTONIO DIVISION

3   RONALD GONZALEZ,        )

Plaintiff,      )

4                           )

VS.             )CIVIL ACTION: 5:15-CV-986 RCL

5                           )

UNITED PARCEL SERVICE,   )

6   Defendant.       )

7

8          REPORTER'S CERTIFICATION

9     DEPOSITION OF RONALD D. GONZALEZ

10               MAY 24, 2017

11

12          I, JULIE VERASTEGUI, a Certified Shorthand

13   Reporter in and for the State of Texas, do hereby

14   certify to the following:

15          That the witness, RONALD D. GONZALEZ, was duly

16   sworn by the officer and that the transcript of the oral

17   & video deposition is a true record of the testimony

18   given by the witness;

19          That the deposition transcript was submitted

20   on _____ to the witness, by and through his

21   attorney, THOMAS J. CRANE, for examination, signature

22   and return to me by _____.

23          That pursuant to information given to the

24   deposition officer at the time said testimony was taken,

25   the following includes counsel for all parties of

78 (Pages 306 to 309)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab

RONALD D.  GONZALEZ                              RONALD GONZALEZ v. UNITED PARCEL SERVICE

## Page 310

1    record:

2

3        THOMAS J. CRANE & SUSAN CONE KILGORE

4            Attorneys for the Plaintiff;

5        SHANNON B. SCHMOYER, CHRISTINE E. REINHARD

6            & JUSTIN BARBOUR

7            Attorneys for the Defendant.

8

9        I further certify that I am neither counsel

10   for, related to, nor employed by any of the parties or

11   attorneys in the action in which this proceeding was

12   taken, and further that I am not financially or

13   otherwise interested in the outcome of the action.

14        Further certification requirements will be

15   certified to after they have occurred.

16        Certified to by me this ___ day of

17   _____, 2017.

18

     _____

19        JULIE VERASTEGUI, CSR 7637

     Expiration Date: 12/31/18

20   Firm Registration No. 93

     Hoffman Reporting

21   206 East Locust Street

     San Antonio, Texas  78212

22   Telephone:  210.736.3555

     Fax:  210.736.6679

23

24

25

## Page 311

1        FURTHER CERTIFICATION

2

3        The original deposition was/was not

4    returned to the deposition officer on _____;

5        If returned, the attached Changes and

6    Signature page contains any changes and the reasons

7    therefor;

8        If returned, the original deposition was

9    delivered to JUSTIN BARBOUR, Custodial Attorney;

10       That $ _____ is the deposition

11   officer's charge to the DEFENDANT for preparing the

12   original deposition transcript and any copies of

13   exhibits;

14       That the deposition was delivered and that

15   a copy of this certificate was served on all parties

16   shown herein and filed with the Clerk.

17

18       Certified to by me this ___ day of

19   _____, 2017.

20

     _____

21        JULIE VERASTEGUI, CSR 7637

     Expiration Date: 12/31/18

22   Firm Registration No. 93

     Hoffman Reporting

23   206 East Locust Street

     San Antonio, Texas  78212

24   Telephone:  210.736.3555

     Fax:  210.736.6679

25

79 (Pages 310 to 311)

38e93dc4-3f15-4f66-9f17-ef24ba70f0ab