FILED

SEP 2 8 2018

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTIONIO DIVISION**

|                                    |     |
| ---------------------------------- | --- |
| RONALD GONZALEZ,                   | )   |
| *Plaintiff*,                       | )   |
|                                    | )   |
| **v.**                             | )   |
|                                    | )   |
| UNITED PARCEL SERV., INC.,         | )   |
| *Defendant*.                       | )   |
|                                    | )   |

Civil No. 5:15-CV-986-RCL

## MEMORANDUM OPINION

Before the Court is Defendant United Parcel Service, Inc. (Ohio)'s ("UPS") Motion for Summary Judgment (ECF No. 14), Plaintiff Ronald D. Gonzalez's ("Gonzalez") Response (ECF No. 19), Defendant's Reply (ECF No. 20), and Plaintiff's Sur-Reply (ECF No. 30). After reviewing the pleadings and the record in its entirety, the Court will **GRANT** UPS's Motion for Summary Judgment in part, **DISMISS** Gonzalez's Family Medical Leave Act ("FMLA") claims with prejudice, and **DENY** UPS's Motion for Summary Judgment in part as moot. The Court will **DENY** UPS's request for attorney's fees.

## BACKGROUND

This case arises under the anti-discrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. §§ 2000e *et seq.* and 42 U.S.C. §§ 12101 *et seq.*, respectively. Gonzalez also initially alleged that UPS violated the FMLA, 29 U.S.C. §§ 2601 *et seq.* Gonzalez withdrew his FMLA claim in his Response to UPS's Motion for Summary Judgment. *See* ECF No. 19-1, at 37.

In or about August 2007, Gonzalez assumed employment as an Inside Sales Representative ("ISR") at UPS's San Antonio facility. ECF No. 14-1, at 2 ¶ 1. At some point in or about 2009,

1

Gonzalez was diagnosed with Reflex Sympathetic Dystrophy, which caused him to experience chronic pain in his right hand. ECF No. 19-1, at 7 ¶ 2. During that year, he took a medical leave of absence for an unspecified duration. ECF No. 14-1, at 5 ¶ 9. When he returned to work, he had no cognitive restrictions. *Id.*

Gonzalez remained in his ISR role until or about June 2011, when he laterally transferred into an Enterprise Account Inside Sales Representative ("EAR") position. ECF No. 14-1, at 2 ¶ 1. The essential job functions of each role were practically identical. *See id.* at 3 ¶ 2; *see also* ECF No. 19-1, at 13. In his role as an ISR, Gonzalez worked in "growing the sales of UPS's products and services to independent, private businesses." *Id.* As an EAR, Gonzalez performed essentially the same job functions, but was assigned to larger accounts. *Id.* On or about October 27, 2011, Gonzalez took short-term disability leave through March 12, 2012. ECF No. 19-1, at 7 ¶ 2. After he returned to work, he had no cognitive restrictions. ECF No. 14-1, at 4 ¶ 9.

In or about April 2013, Gonzalez requested FMLA leave to care for a second condition related to his shoulder. *Id.* at 6 ¶ 10. On or about April 18, 2013, Gonzalez had surgery on his hand. ECF No. 19-1, at 7 ¶ 2. UPS granted Gonzalez's FMLA leave request, which guaranteed him certain substantive protections until July 2013. ECF No. 14-1, at 6 ¶ 10; ECF No. 19-1, at 7 ¶ 2. Gonzalez simultaneously applied for short-term disability benefits through UPS's sponsored provider in or about April 2013. ECF No. 14-1, at 6 ¶ 11.

In or about October 2013, Gonzalez applied for long-term disability benefits through UPS's sponsored provider. *Id.*; ECF No. 19-1, at 7 ¶ 2. On or about October 22, 2013, Gonzalez and a medical provider submitted to the long-term disability insurance provider that Gonzalez is and was completely unable to work in any capacity. ECF No. 14-1, at 6 ¶ 11.

In or about January 2014, UPS notified Gonzalez that he had been out of work since April 2013, and reminded him of UPS's reasonable accommodation policy. *Id.* at 8 ¶ 15; ECF No. 19-1, at 7 ¶ 3. On or about February 3, 2014, Gonzalez notified UPS of his intention to return to his position and requested an accommodation of his work-related restrictions. ECF No. 14-1, at 8 ¶ 15; ECF No. 19-1, at 8 ¶ 4. On or about February 21, 2014, UPS provided Gonzalez with a "Request for Medical Information" to be completed by his medical provider. ECF No. 14-1, at 8 ¶ 16. Gonzalez signed the release and returned it to UPS, who then sent it to Gonzalez's medical provider. ECF No. 19-1, at 8 ¶ 5.

At some time in or about March 2014, the medical provider returned the form to UPS. ECF No. 19-1, at 8 ¶ 5. Therein, the medical provider wrote, "[Gonzalez] is currently unable to work for 4 hours or greater due to [his] inability to do repetitive motions." ECF No. 14-6, at 4; ECF No. 19-6, at 1. The provider added that "[Gonzalez] [w]ould like to consider [returning to work] with accommodations after 3/15/14, possibly 4 hours a day, no lifting over 5 lbs. if available." *Id.* The medical provider also indicated that was "unable to do continuous, repetitive movements of [his] upper extremities" and that he had a "decreased ability to make decisions due to medications prescribed." ECF No. 14-6, at 3; ECF No. 19-5, at 23. Gonzalez admits that "[t]he medications prescribed to [him] do cause drowsiness." ECF No. 19-1, at 10 ¶ 13.

While receiving long-term disability benefits, in or about March 2014, Gonzalez applied for Social Security Disability Insurance ("SSDI") benefits. ECF No. 14-1, at 7 ¶ 13. In applying for those benefits, he submitted to the federal government, under penalty of perjury, that he was unable to make repeated use of his upper extremities and that his chronic pain "emotionally impact[ed] [his] ability to focus and concentrate." *Id.* He further submitted that "[w]ith the chronic pain of both extremities and pain medication, I do not have the physical and mental ability to

3

perform this role." *Id.* UPS was unaware that Gonzalez applied for SSDI benefits while on company-sponsored long-term disability leave. *Id.*

Gonzalez's application for SSDI benefits was approved and he received retroactive payments dating to October 2013. *Id.* at 7 ¶ 14. Gonzalez received monthly payments of $918 from the third-party long-term disability insurance provider, $2,050 from the Social Security Administration for his SSDI, and an additional $1,069 until his minor dependent child's eighteenth birthday. *Id.*

On or about April 10, 2014, Gonzalez met with UPS's Human Resources personnel to discuss Gonzalez's accommodation request. ECF No. 14-1, at 9 ¶ 17; ECF No. 19-1, at 8 ¶ 5. At that meeting, and in accord with the medical provider's statements, Gonzalez requested a part-time work schedule and an ergonomic work station. ECF No. 14-1, at 9 ¶ 17; ECF No. 14-1, at 9 ¶ 8. Gonzalez was unable to identify any accommodations that would address his significant cognitive impairments that precluded him from concentrating. ECF No. 14-1, 9 ¶ 17. Gonzalez admits that his medication regimen would change from time to time and that he "had some reactions to some medications," but that this was "just part of the treatment process." ECF No. 19-1, at 10 ¶ 9. The record is devoid of any indication that Gonzalez expressed concerns about discrimination during the April 10, 2014 meeting.

After the April 10, 2014 meeting, UPS concluded that it could not reasonably accommodate Gonzalez's request. ECF No. 14-1, at 9 ¶ 18. Human Resources personnel searched for vacant part-time positions that did not require sharp cognitive functioning at UPS, but no such positions were available. *Id.* at 9–10 ¶ 18. On or about April 21, 2014, UPS informed Gonzalez of its inability to accommodate his request. *Id.* at 10 ¶ 19. On or about May 1, 2014, UPS terminated Gonzalez's employment. *Id.*; ECF No. 19-1, at 10 ¶ 11.

On or about May 22, 2014, Gonzalez filed his Charge of Discrimination with the EEOC alleging discrimination under Title VII and the ADA. ECF No. 14-26 (EEOC Charge of Discrimination dated May 22, 2014). Gonzalez admits that this the first time he complained of any wrongful conduct by UPS. ECF No. 14-2 (Deposition of Ronald D. Gonzalez of May 24, 2017), at 50.

On or about March 4, 2015, Gonzalez amended his Charge of Discrimination to include allegations of retaliation under Title VII, the ADA, and the FMLA. ECF No. 14-27 (Amended EEOC Charge of Discrimination dated March 4, 2015).

On or about July 31, 2015, the EEOC issued its "Dismissal and Notice of Rights," wherein it was "unable to conclude that the information obtained" during the course of its investigation "establishe[d] violations of the statutes." ECF No. 14-28 (Dismissal and Notice of Rights dated July 31, 2015), at 2.

On or about November 10, 2015, Gonzalez filed the instant action. *See* ECF No. 1. On or about April 5, 2017, Gonzalez filed an action against Aetna Life Insurance Company, wherein he alleged, under oath and under penalty of perjury, *inter alia*, that at times relevant to the instant action against UPS beginning in or about April 2013, he "suffered from [physical ailments] that prevented him from returning to work for UPS." *Gonzalez v. Aetna Life Ins. Co.*, No. 5:17-CV-00266, Compl., Dkt. No. 1 ¶¶ 4–8 (W.D. Tex. filed Apr. 5, 2017).

## LEGAL STANDARD

A moving party is entitled to summary judgment upon showing that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Meadaa v. K.A.P. Enters., LLC*, 756 F.3d 875, 880 (5th Cir. 2014). A

dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 248 (1986).

Initially, the movant bears the burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets this burden, then the non-movant must come forth to "identify specific evidence in the summary judgment record demonstrating that there is a material fact issue concerning the essential elements of [his] case." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). If the record, as a whole, "could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Hillman v. Loga*, 697 F.3d 299, 202 (5th Cir. 2012) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

In deciding whether a fact issue has been created, when evaluating whether to grant a motion for summary judgment, the Court draws "all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Kevin M. Ehringer Enters. v. McData Servs. Corp.*, 646 F.3d 321, 326 (5th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). Critically, however, "'[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.'" *United States v. Renda Marine, Inc.*, 667 F.3d 651, 655 (5th Cir. 2012) (quoting *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003)). Further, "[m]ere conclusory allegations" are likewise insufficient to overcome a motion for summary judgment. *Akene v. Goodwill Indus. of Cent. Tex.*, 2018 WL 1128149, at *2 (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).

Accordingly, "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex Corp.*, 477 U.S. at 322.).

## DISCUSSION

### I.   Title VII Discrimination & Retaliation Claims

Gonzalez claims that UPS discriminated against him based on his disability status, in contravention of Title VII, when it altered the terms and conditions of the parties' employment relationship. Compl., ECF No. 1 at ¶¶ 13–14 (citing "Title VII," which is codified as amended at 42 U.S.C. §§ 2000e–2 *et seq.*). UPS admits that it terminated Gonzalez's employment on May 1, 2014. ECF No. 14-1, at 10 ¶ 19. It maintains, however, that Gonzalez fails to establish a *prima facie* case of Title VII or retaliation, for two reasons: (1) "he was not qualified for any position with UPS" and (2) he "did not engage in protected activity prior to his termination." Defendant's Motion for Summary Judgment, ECF No. 14, at 6.

Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1) (emphasis added). The statute further provides that it is "an unlawful employment practice for an employer to discriminate against *any of* [its] employees . . . . because he has opposed any practice made an unlawful employment practice, *or* because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" *Id.* § 2000e–3(a) (emphases added).

These provisions are not coterminous and the analysis of each claim is distinct. *See Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Indeed, the scope of Title VII's anti-retaliation provision is broader than the substantive discrimination provision. *See id.*

The Court finds that Gonzalez presents no cognizable claim under Title VII's anti-discrimination provision because even if, *arguendo*, UPS discriminated against him, Gonzalez has not established that UPS did so "because of" his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Gonzalez never identifies the alleged protected class to which he belongs in any of his pleadings, nor does he advance any factual or legal arguments explaining how UPS allegedly discriminated or retaliated against him because of his membership in that protected class. *See* ECF Nos. 1, 19-1, and 23-1.

Relatedly, the Court finds that Gonzalez does not establish a *prima facie* claim under Title VII's anti-retaliation provision because he fails to establish a causal connection between UPS's decision to terminate his employment and his protected activity.

Accordingly, the Court will **GRANT** UPS's Motion for Summary Judgment as to Gonzalez's Title VII claims.

       *a. Gonzalez does not establish a* prima facie *claim of Title VII discrimination.*

To establish a *prima facie* claim of unlawful discrimination under Title VII, a plaintiff bears the initial burden to produce facts which, if true, would permit a reasonable inference of discrimination. *See Reeves*, 530 U.S. at 142. The burden is one of production, not persuasion. *Id.* To establish this initial inference, a plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) other similarly-situated employees outside of his protected class were treated more favorably. *Bryan v. McKinsey & Co.*, 375 F.3d 358, 360 (5th Cir. 2004) (citing *Okoye v. Univ. of Tex. Hous.*

*Health Sci. Ctr.*, 245 F.3d 507, 512 (5th Cir. 2001)). Where, as here, a plaintiff's discrimination claim sounds in disparate treatment, he is further required to establish that (5) the similarly-situated employees were treated more favorably "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

Only if he meets this initial burden does the burden "then shift[] to the employer to articulate some legitimate, nondiscriminatory reason for the" employer's action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

A plaintiff's initial burden is "not onerous[,]" but he must "prove by a preponderance of the evidence" that an employer's alleged actions, if true, "give rise to an inference of discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (footnote omitted). At all times, "[t]he plaintiff retains the burden of persuasion." *Id.* at 256.

> i. Gonzalez does not allege, nor does the record provide any evidence, that he is a member of a Title VII protected class.

On this record, Gonzalez does not establish even the first prong of this familiar test: whether he is a member of a protected class. He does not identify his race, color, religion, or national origin in any of his pleadings. *See* ECF Nos. 1, 19-1, and 23-1. Nor does the factual record identify whether Gonzalez is a member of any of those protected groups. *See id.* Instead, Gonzalez spills great quantities of ink criticizing UPS for "fail[ing] to construe the facts and inferences in favor of [Gonzalez]," and yet entirely fails to give this Court the very facts it needs to ascertain whether Title VII is even applicable in this case. ECF No. 19-1, at 11. *See also id.* at 12–13; 24–26; ECF No. 23-1, at 2–3.[1]

---

[1] The Court does not understand plaintiff's counsel's preoccupation with his oft-repeated contention that defense counsel is "construing the available evidence *against* the Plaintiff." ECF. No. 30, at 2 (emphasis in original). Defense counsel is under a professional and ethical obligation to "act with competence, commitment, and dedication to the interest of [its] client and with zeal in advocacy upon the client's behalf." Tex. R. Prof. Resp. 1.01 cmt. 6. It is the

9

Indeed, while the Court must view all of the evidence in the light most favorable to Gonzalez at this stage, it can only do so if it has such evidence before it in the first instance. *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is precluded from making its own inferences where a party does not proffer the facts necessary to establish a presumption in the first instance and overtly fails to do so. *See, e.g., Price v. Fed. Express Corp.*, 283 F.3d 715, 724–25 (5th Cir. 2002) (affirming grant of summary judgment because of "fail[ure] to present evidence from which a factfinder could infer" any discrimination).

Accordingly, because Gonzalez fails even to articulate the Title VII "protected class" to which he belongs, the Court finds that he has not met his initial burden to establish a *prima facie* case of Title VII discrimination.

> ii. The Court cannot ascertain whether UPS treated other similarly-situated individuals more favorably because Gonzalez does not provide the Court with the alleged protected class to which he belongs.

Similarly, because Gonzalez does not allege that he is a member of a protected class, and because the record is devoid of any evidence from which the Court could reasonably infer such membership, he necessarily fails to establish that "he was treated less favorably because of his membership in that protected class than were other similarly situated employees who were not members of the protected class, *under nearly identical circumstances*." the final element of a *prima facie* Title VII discrimination claim. *Lee*, 574 F.3d at 259 (emphasis added); *accord McDonnell Douglas Corp.*, 411 U.S. at 802.

Even if, *arguendo*, the Court could infer that Gonzalez is a member of a racial or ethnic minority, he fails to identify any similarly-situated comparators outside of that racial or ethnic

---

Court, not the litigants, who is obligated by Rule 56 to "draw all reasonable inferences in favor of the nonmoving party" when determining whether to grant summary judgment. *Reeves*, 530 U.S. at 150 (citations omitted).

class whom UPS treated more favorably because of their non-membership in the protected class. *Cf. id.*, 574 F.3d at 261. The only evidence in the record that hints at disparate treatment is submitted by UPS. *See* Charge of Discrimination, ECF No. 14-26. Therein, Gonzalez alleged that "[t]wo Anglo Inside Sales Representatives were given reasonable accommodations for their disabilities and allowed to return to work." *Id.* at 2. *See also* ECF No. 14-2, at 60–61 (Gonzalez asserts a belief that two white individuals requested a reasonable accommodation and were granted that accommodation).

However, Gonzalez presents no specific evidence, and the record is devoid of any, to show that the employment actions taken against those "Anglo" comparators were "'under nearly identical circumstances.'" *Lee*, 574 F.3d at 260 (quoting *Little v. Rep. Ref. Co., Ltd.*, 924 F.2d 93, 97 (5th Cir. 1991)). To meet his burden, Gonzalez was required to produce some evidence that those "Anglo" employees "held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and ha[d] essentially comparable violation histories," and that their requests for accommodation were approved while his was not. *Id.* Indeed, "[u]nsubstantiated assertions . . . are not sufficient to defeat a motion for summary judgment." *Renda Marine, Inc.*, 667 F.3d at 655 (internal quotation omitted). Instead, in his deposition, Gonzalez denied that he had any personal knowledge of whether either of the two purported comparators requested or received a job-related accommodation from UPS. *See* ECF No. 14-2, at 61. The record contains no evidence that demonstrates that either of the two alleged comparators was "similarly-situated."

Accordingly, because Gonzalez fails to identify specific, relevant comparators outside of his racial or ethnic class whom UPS allegedly treated more favorably, the Court finds that Gonzalez failed to meet his initial burden under *McDonnell Douglas*. The Court thus need not,

and does not, evaluate whether UPS asserted a "legitimate, nondiscriminatory reason" for terminating Gonzalez for the purposes of his Title VII discrimination claim, because he does not clear the initial threshold burden under that provision.

      *b.*     *Gonzalez does not establish a* prima facie *claim of Title VII retaliation.*

As with a Title VII discrimination claim, to establish a *prima facie* claim of Title VII retaliation, a plaintiff bears the initial burden to produce facts which, if true, would permit a reasonable inference of unlawful retaliation. *Cf. Reeves*, 530 U.S. at 150–51. Such a showing requires a plaintiff to demonstrate that (1) he engaged in activity *protected by Title VII*; (2) the employer took an adverse action against him; and (3) a causal connection exists between the protected activity and the materially adverse action. *Aryain v. Wal-Mart Stores Tex., LP*, 534 F.3d 473, 484 (5th Cir. 2008) (emphasis added); *accord White*, 548 U.S. at 70–71.

Only after a plaintiff "makes a *prima facie* showing, the burden then shifts to the employer to articulate a legitimate, . . . nonretaliatory reason for its employment action." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (footnote omitted). As with a plaintiff's burden, an employer's burden "is only one of production, not persuasion, and involves no credibility assessment." *Id.* (citation omitted). The burden then shifts back to the plaintiff, who "bears the ultimate burden of proving that the employer's proffered reason is not true but instead is a pretext for the real . . . retaliatory purpose." *Id.* (citation omitted).

In this case, Gonzalez fails to establish that he engaged in any protected activity under Title VII, or that the materially adverse employment action (i.e., his termination) is causally connected to his protected activity.

As an initial matter, the parties appear to dispute whether Gonzalez engaged in protected activity within the meaning of Title VII. The anti-retaliation provision of Title VII prohibits employers from retaliating against their employees for engaging in either of two forms of protected activity. First, employers cannot retaliate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). Second, employers cannot retaliate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Id.*

Accordingly, to establish a *prima facie* claim of retaliation under Title VII, a plaintiff must demonstrate that he engaged in the kind of activity that Title VII itself protects. *See Aryain*, 534 F.3d at 484. Because Gonzalez fails to establish that his allegedly protected conduct falls within either of the two foregoing categories, he necessarily fails to establish a fundamental element of his anti-retaliation claim under Title VII.

For his part, Gonzalez appears to advance that he engaged in protected activity when he "exercise[d] . . . his right to oppose discriminatory conduct." Compl., ECF No. 1 ¶ 17. Specifically, he avers that at a meeting that "probably occurred on April 10, 2014," UPS management officials did not adequately ascertain whether he continued to be qualified for his position after returning from medical leave. ECF No. 19-1, at 8 ¶ 8. But in none of his submissions or pleadings does he allege that the management officials failed to accommodate his request specifically "because of" his race, color, religion, or national origin.

UPS responds that Gonzalez's "charge of discrimination, filed May 22, 2014," after his termination date, "was the first instance in which he complained of discrimination or retaliation in relationship to his employment with UPS[.]" ECF No. 14, at 7. The Charge of Discrimination,

submitted by UPS, minimally supports Gonzalez's claim. Therein, Gonzalez alleges that "[o]n or about February 21, 2014, [he] requested a reasonable accommodation for [his] disability that would have allowed [him] to return to work on March 15, 2014." ECF No. 14-26, at 2.

Without specifying a timeframe or supporting evidence, he states further that "[t]wo Anglo Inside Sales Representatives were given reasonable accommodations for their disabilities and allowed to return to work." *Id.* He then states he was "discharged" on or about May 1, 2014. *Id.*

Then, nearly one year later, Gonzalez amended his Charge of Discrimination and removed all allegations or inferences of racial discrimination. *See* ECF No. 14-27. Such unexplained factual inconsistencies, coupled with a dearth of relevant information about the comparators, are fatal to Gonzalez's Title VII retaliation claim. *See Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004) ("In order to withstand summary judgment, [the plaintiff] must offer evidence from which the jury may infer that retaliation, in whole or in part, motivated the adverse employment action.") (citations omitted). Gonzalez was thus required to provide evidence that he was treated differently from specific, relevant comparators. *See Allen v. Envirogreen Landscape Prof'ls., Inc.*, 721 Fed. App'x 322, 326 (5th Cir. 2017) (citing *Mota v. Univ. of Tex. Hous. Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001)).[2]

Gonzalez thus wholly fails to demonstrate that any retaliation "produce[d] an injury or harm" that is cognizable under Title VII. *White*, 548 U.S. at 67. Indeed, Title VII retaliation claims require a plaintiff to "show that a reasonable employee" would feel "'dissuaded from making or supporting a charge of discrimination.'" *Id.* at 68 (citing and adopting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). To defeat a motion for summary judgment, this showing requires a plaintiff to produce some evidence to indicate that other similarly situated

---

[2] Although *Allen* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4).

individuals outside a Title VII protected class engaged in similar conduct, but did not experience a materially adverse employment action. *Accord Lee*, 574 F.3d at 261. Gonzalez does not do so here.

Moreover, a Title VII retaliation claim is only viable if a plaintiff shows that he engaged in conduct protected by Title VII. *See* 42 U.S.C. § 2000e–3(a). Gonzalez argues that the "protected activity" here was his request for an accommodation, but then cites exclusively to cases decided under the ADA, not under Title VII. *See* ECF No. 19-1, at 16-17. Indeed, Gonzalez incorrectly states,

> [An employer's] [f]ailure to accommodate is a separate violation [of the *ADA*] for obvious reasons. In the typical *Title VII* case, the employer disputes that race or ethnic origin played a role [i]n the adverse decision. But, in disability cases involving a failure to accommodate, the employer often does not dispute that it failed to accommodate.

ECF No. 19-1, at 16 (emphases added) (collecting Title VII cases). Gonzalez's request for a reasonable accommodation is not protected activity within the meaning of Title VII, because disability status is not a protected class under Title VII. *See* 42 U.S.C. §§ 2000e–2(a)(1)-(2) (the only protected classes under Title VII are: "race, color, religion, sex, or national origin").[3] Thus, even if, *arguendo*, UPS terminated Gonzalez because he requested an accommodation for any disability, such conduct is not within the purview of Title VII.

ii.   Even if Gonzalez had demonstrated his membership in a protected class, he has not demonstrated that his membership in that class was the "but-for" cause of his termination.

Finally, to state a cognizable claim of retaliation in contravention of Title VII, a plaintiff must establish that "the desire to retaliate was *the* but-for cause of the challenged employment

---

[3] The Court also notes that "ethnic origin" is not a protected class under Title VII, as Gonzalez argues. *Compare* 42 U.S.C. § 2000e-2(a)(1)–(2) ("national origin" is a protected class) *with* ECF No. 19-1, at 16 (arguing that "typical" Title VII retaliation cases involve retaliation based on "ethnic origin.").

action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)) (emphasis added). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360.

Even if the Court could accept Gonzalez's bare allegation that "[t]wo Anglo Inside Sales Representatives were given reasonable accommodations for their disabilities and allowed to return to work," ECF No. 14-26, the record is entirely devoid of any evidence to suggest that UPS granted those accommodation requests *only because* of their race, and for no other reason. *See Nassar*, 557 U.S. at 352 (concluding that a "motivating-factor" analysis applies only to Title VII discrimination claims, and the more stringent "but-for" analysis applies to Title VII retaliation claims). Moreover, as discussed, Gonzalez never mentions the purported protected Title VII class in which he claims membership. And at this stage, "[m]ere conclusory allegations" are insufficient to defeat a motion for summary judgment. *Akene*, 2018 WL 1128149, at *2 (citation omitted).

For the foregoing reasons, the Court will **GRANT** UPS's Motion for Summary Judgment as to Gonzalez's Title VII discrimination and retaliation claims.

II.     ADA Discrimination & Retaliation Claims

Gonzalez next claims that UPS discriminated against him based on his disability status, in contravention of the ADA, when it altered the terms and conditions of the parties' employment relationship. Compl., ECF No. 1, at ¶¶ 13–14 (citing 42 U.S.C. §§ 12101 *et seq.*). UPS admits that it terminated Gonzalez's employment on May 1, 2014, but proffers that Gonzalez (1) was not qualified for his position; (2) that he "could not be reasonably accommodated in any existing position given his restrictions," (3) and that because "Gonzalez suffered from restrictions of an

open-ended and indefinite nature," UPS had a legitimate, non-discriminatory reason for terminating his employment. ECF No. 14, at 6–9.

The ADA prohibits any employer from "discriminat[ing] against a qualified individual on the basis of disability in regard to . . . discharge of employees, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a claim of ADA discrimination, a plaintiff must demonstrate that (1) he is a "'qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 442 (5th Cir. 2017) (quoting *Feist v. La. Dep't of Justice*, 730 F.3d 450, 452 (5th Cir. 2013)). Further, a plaintiff must show (4) "that he was subject to an adverse employment decision on account of his disability." *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999).

If a plaintiff makes such a showing with only circumstantial evidence, "a presumption of discrimination arises, and the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'" *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015) (quoting *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)). If the employer proffers such a reason, "[t]he burden shifts to the plaintiff to show the articulated reason is pretextual." *Id.* (citation omitted).

The Court finds that Gonzalez does not meet his initial burden to establish a *prima facie* claim of ADA discrimination because (1) he was not a "qualified individual" at the time of his discharge and (2) his requested accommodation was not "reasonable" within the meaning of the ADA. The Court further finds that Gonzalez does not meet his initial burden to establish a *prima facie* claim of ADA retaliation because (1) he did not engage in any ADA-protected conduct prior

to his termination and therefore (2) cannot establish a causal connection between any alleged protected conduct and his termination. Accordingly, the Court will **GRANT** UPS's Motion for Summary Judgment as to Gonzalez's ADA's discrimination and retaliation claims.

### a. *Gonzalez was not a qualified individual within the meaning of the ADA at the time of his termination.*

Only "qualified individuals" have cognizable causes of action under the ADA. *See* 42 U.S.C. § 12112(a). Such an individual is one "who, with or without reasonable accommodation, can perform the essential functions of the employment positon that such individual holds or desires." *Id.* § 12111(8). Accordingly, to avoid summary judgment, a plaintiff must establish either that "'(1) [he] could perform the essential functions of the job in spite of [his] disability'" or, in the alternative, "'(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job.'" *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (quoting *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (*per curiam*)).

The question here is not whether Gonzalez was *ever* qualified for his position, but rather whether he was qualified at the time of his termination. *See, e.g.*, *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017) (citations omitted). And while the Court draws all reasonable inferences in Gonzalez's favor at this stage, *see Reeves*, 530 U.S. at 150, the ADA requires it to consider "the employer's judgment as to what functions of a job are essential" to ascertain whether Gonzalez met his burden. 42 U.S.C. § 12111(8). And where, as here, an "employer has prepared a written description before advertising or interviewing applicants for the job," courts must consider such a writing as "evidence of the essential functions of the job." *Id.* Moreover, a job function is deemed "essential" if it bears "more than a marginal relationship" to

the employee's job. *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *modified on other grounds by Kapache v. City of San Antonio*, 304 F.3d 493 (5th Cir. 2002) (*per curiam*).

Because Gonzalez does not establish that he was a "qualified individual" who could perform the "essential functions" of his job at the time of his termination, his ADA discrimination claim cannot survive summary judgment.

> i.   Gonzalez could not perform the essential functions of his job, either with or without a reasonable accommodation.

The parties do not dispute that the ISR and EAR positions at UPS "were quite similar in their day-to-day essential functions." ECF No. 14-1, at 2 ¶ 2. Indeed, Gonzalez concedes that "[UPS] is correct that [Gonzalez's formal job title as ISR or EAR] would not otherwise be a distinction that matters [to the essential job function analysis]." ECF No. 19-1, at 12. He argues, however, that the distinction is relevant here because "it does illustrate the employer's refusal to draw available inferences in favor of [Gonzalez]." *Id.* It is not incumbent upon UPS to make Gonzalez's arguments for him. Gonzalez's pleadings are entirely devoid of any discussion or evidence of a meaningful difference between the essential job functions of the ISR and EAR roles.

Having conceded that the distinction is not one that matters, Gonzalez thus admits that the essential job functions detailed in UPS's Factual Background & Procedural History are not in dispute. *See* ECF No. 14-1 ¶¶ 2–8 (UPS's discussion of the essential job functions). *See also* ECF No. 14-5, at 7–8 (a "written description" that the Court must consider as evidence of the "essential functions of the job." *See* 42 U.S.C. § 12111(8)). Gonzalez does not dispute the authenticity or veracity of the job functions listed in either of UPS's submissions. Nor does Gonzalez ever dispute that any of the essential job functions detailed in UPS's submissions bore less than a "marginal relationship" to his roles as an ISR or EAR. *Cf. Chandler*, 2 F.3d at 1393.

Accordingly, at the time of his termination, Gonzalez would have been qualified for his position only if he could "engage in a host of complex, analytical, cognitive functions related to sales strategy, planning, and customer service activities," with or without a reasonable accommodation. ECF No. 14, at 7. *See also* ECF No. 14-5, at 7. The specific, enumerated job functions relevant here are the abilities: (1) to "[c]omplete the scheduled workday on a consistent basis[;]" (2) to "[g]rasp, lift (from floor to shoulder height), lower (from shoulder height to floor), push, pull, carry and manipulate equipment, packages or parts weighing up to 30 pounds[;]" (3) to "[p]erform office tasks using simple hand grasping, fine hand manipulation and reach associated with assigned tasks[;]" and (4) to "[d]emonstrate cognitive ability to concentrate[.]" ECF No. 14-5, at 7.

### A. Gonzalez could not perform the essential job functions without an accommodation.

Gonzalez appears to rest his argument on an alleged discrepancy that appears in the UPS Accommodation Checklist dated Apr. 10, 2014. *See* ECF Nos. 14-16, 19-5, & 19-6. He submits that "[i]n one section, the doctor states Mr. Gonzalez cannot work four hours. [In another section on the same page], [the medical provider] states [Gonzalez] *can* work four hours. [*sic*]" ECF No. 19-1, at 7 (emphasis added) (citing [ECF No. 19-6, at 1]).

The Court finds that there is no such inconsistency in the Accommodation Checklist. The first section asks the medical provider to "describe in detail the degree or extent of the job restrictions." ECF Nos. 14-16, at 3; 19-5, at 23. In response, the medical provider wrote, "[Gonzalez] is currently unable to work for *4 hours or greater* due to [his] inability to do *repetitive motions.*" ECF Nos. 14-16, at 4; 19-6 at 1 (emphases added). The second section asks the medical provider to "describe the activities that the employee can perform within the restriction." *Id.* In response, the medical provider wrote, "Would like to *consider* [returning to work] with

20

accommodations after 3/15/14, *possibly* 4 hours a day, no lifting over 5 lbs. if available." *Id.*
(emphases added). And, in that same document, the medical provider also wrote that Gonzalez
was "unable to do continuous, repetitive movements of [his] upper extremities" and that he had a
"decreased ability to make decisions due to medications prescribed." ECF Nos. 14-16, at 4; 19-5,
at 23.

Taking these statements together and in the proper context, there is no reasonable dispute
that Gonzalez's requested accommodation was twofold: (1) to work no more than 4 hours per day
(2) in a position that did not require him to lift more than five pounds. The medical provider did
not propose an accommodation for Gonzalez's inability to concentrate.[4] *See id.*

Thus, without a reasonable accommodation, Gonzalez concedes that he was unable (1) to
complete his scheduled workday on a consistent basis; (2) to manipulate anything weighing
between 5 and 30 pounds; or (3) demonstrate a cognitive ability to concentrate. *See* ECF No. 14-
5, at 7. Each of these functions was essential to the position he held at UPS. *See id.* Accordingly,
at the time of his termination, Gonzalez was medically incapable of performing his duties at UPS
and therefore was not a "qualified individual" under the ADA, unless some reasonable
accommodation existed that would have enabled him to perform each of these functions. *See, e.g.,*
*Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 480–81 (5th Cir. 2000).

---

[4] The Court also notes that Gonzalez did not submit the entirety of the medical provider's report. *Compare* ECF Nos.
19-5 and 19-6 (Gonzalez's submission, missing the last page and provider's signature) *with* ECF No. 14-16 (UPS's
submission of the same report). On the last page of that report, submitted by UPS, the medical provider expressly
states that Gonzales suffers from "decreased concentration and ability to make decisions." ECF No. 14-16, at 5. The
medical provider does not propose any accommodation that would ameliorate or mitigate these limitations, which
UPS alleges (and Gonzalez does not deny) are essential to his job functions.

B. Gonzalez could not perform the essential job
functions, even with a reasonable accommodation.

Gonzalez does not demonstrate he could have performed all of the essential functions of

his job *with* a reasonable accommodation. *See LHC Grp.*, 773 F.3d at 697. Indeed, the medical

provider's comments establish that a part-time schedule would accommodate Gonzalez's physical

requirements, but are silent as to any reasonable accommodation that would ameliorate his mental

health and other cognitive symptoms, each of which the provider attributed to Gonzalez's required

prescription medication regimen. *See* ECF Nos. 14-16, at 4; 19-5, at 23. This omission is fatal to

Gonzalez's contention that he is a "qualified individual," because one of the essential job functions

of Gonzalez's position was to "[d]emonstrate cognitive ability to concentrate[.]" ECF No. 14-5,

at 7.

Moreover, the medical provider indicated that Gonzalez's accommodation would require

that he lift "no more than 5 [pounds]." ECF Nos. 14-16, at 4; 19-6, at 1. Yet, one of the essential

job functions of his position was to "manipulate equipment, packages or parts weighing up to 30

pounds." ECF No. 14-5, at 7. Accordingly, the reasons underlying UPS's inability to reassign

Gonzalez to a part-time position are irrelevant: he would have been unqualified for any position

that required him to lift more than 5 pounds.

Gonzalez responds that he remained qualified through his termination date, relying on post-

dated medical reports to establish that he was qualified for his positon at the time of his termination.

ECF No. 19-1, at 9–10. Medical reports from August and September 2015, which post-date

Gonzalez's termination by more than one year, are not relevant to the inquiry of whether Gonzalez

was "qualified" for his position at the time of his termination. *Cf. Moss*, 851 F.3d at 418. The

only medical report in evidence that is germane to this inquiry is a document dated Feb. 19, 2014.

*See* ECF No. 14-12, at 5. Gonzalez represents that this document indicates that he "could work"

prior to his termination. ECF No. 19-1, at 14. But in that document, the medical provider indicates that while Gonzalez's condition was improving, he presented with a "continued decrease [in] range of motion" and that any estimated ability to return to work would be "on [a] limited basis." *Id.* Gonzalez points to no expert statement, and the court does not find any such document in the record, that provides an inference that he was able to complete each of his essential job functions as of May 1, 2014.

Accordingly, because Gonzalez fails to establish that he was a "qualified individual" with or without a disability at the time of his termination, he fails to establish the first element of a *prima facie* claim of disability-based discrimination under the ADA.

> ### b. Even if Gonzalez had been a qualified individual, the requested accommodation was not reasonable.

Even if Gonzalez were a "qualified individual" within the meaning of the ADA at the time of his termination, to establish a *prima facie* case under the ADA, he must demonstrate that UPS "failed to make reasonable accommodations for [his disability]." *Patton*, 874 F.3d at 442 (internal citation and quotation omitted). Gonzalez misses the mark when he argues that "[t]he failure to accommodate [a disability] is a violation of the ADA in itself." ECF No. 19-1, at 16. Not so. The ADA only requires employers to make *reasonable* accommodations. *See* 42 U.S.C. § 12112(b)(5)(A).

As relevant here, "reasonable accommodation" includes "job restricting, part-time or modified work schedules, [or] reassignment to a vacant position[.]" *Id.* § 12111(9)(B). Critically, however, "[r]easonable accommodation does not require an employer to wait indefinitely for the employee's medical conditions to be corrected." *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 760 (5th Cir. 1996) (citations omitted). Gonzalez concedes that UPS had no part-time sales

positions available at the time of his termination. *See* ECF No. 14-2, at 40. Therein, Gonzalez testified as follows:

> Q: Can you name one employee who's worked a permanent part-time ISR schedule?
> A: I cannot name one employee. . . .
> Q: [Do] [y]ou know anybody who's worked a permanent part-time schedule in an account representative-enterprise account representative position at UPS?
> A: No, not to my knowledge.
> Q: Do you know anybody who worked a permanent part-time schedule in the franchise sales consultant position?
> A: Not to my knowledge.

Accordingly, Gonzalez's request to work no more than four hours per day was not reasonable *per se*. Where, as here, an employer would be required to create a new position to accommodate an employee's disability, the request is not reasonable. *See Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997) ("For the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant.").

Moreover, Gonzalez bears the burden at this stage to "prov[e] that an available position exist[ed] that he was qualified for and could, with reasonable accommodations, perform." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007). He wholly fails to meet his burden. In the Accommodations Checklist dated Apr. 10, 2014, Gonzalez's medical provider offered the following requests for an accommodation: (1) to work no more than 4 hours per day, (2) without lifting more than 5 pounds, "*if available*." ECF Nos. 14-16, at 4; 19-6, at 1 (emphasis added). But the essential functions of his job were (1) to work up to 8 hours per day, (2) lifting up to 30 pounds. *See* ECF No. 14-5, at 7.

The medical provider also wrote that Gonzalez, even with *any* accommodation, would be "unable to do continuous, repetitive movements of [his] upper extremities" and that he had a "decreased ability to make decisions due to medications prescribed." ECF Nos. 14-16, at 3; 19-5,

at 23. The ability to use his upper extremities to lift packages and to employ his cognition to "concentrate" were also essential functions of his job. *See* ECF No. 14-5, at 7. Gonzalez's request, then, was not one of "accommodation" but of "reallocation." Such requests to reallocate "the essential functions of an employee's position to other employees is not a reasonable accommodation." *Ladson v. U.S.P.S.*, 2007 WL 1850422, at *7 (S.D. Tex. Jun. 26, 2007). Such accommodations are "unreasonable" as a matter of law. *Id.*

Gonzalez points to no other relevant, probative facts in the record to establish that his request to reallocate his workload to other UPS employees was reasonable. Accordingly, he fails to establish that his requested accommodation was reasonable within the meaning of the ADA.

> c. *UPS was not required to engage in the interactive process because the requested accommodations were unreasonable.*

Having established that Gonzalez's requests for accommodation were not reasonable, the Court turns to his argument that summary judgment is precluded because UPS failed to engage in the ADA's interactive process. *See* ECF. No. 19-1, at 20 ("The real problem is that [UPS] did not engage in an interactive discussion."). Gonzalez cites to an irrelevant, out-of-circuit authority for the proposition that employers are under an obligation to engage in an interactive process immediately upon discovery of an employee's disability. *Id.* at 23 (citing *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 742–43 (9th Cir. 2011)). This is entirely incorrect.

First, *Lucent* is a case about the California Fair Employment and Housing Act, a state law having nothing to do with the Americans with Disabilities Act. Second, the Ninth Circuit found that the "interactive process" in that state statute, like in the ADA, requires employers to respond to employees *only after* they submit a request for a reasonable accommodation. *Lucent*, 642 F.3d at 742 (collecting California state cases). The case thus stands for the unremarkable proposition that an employee must request a *reasonable* accommodation before an employer's obligation to

engage in the interactive process is triggered. *See id.* at 742–43. Taking Gonzalez's argument to its logical conclusion would require the Court to re-write the whole of ADA jurisprudence, to find that employers have an affirmative duty to scrutinize their employees' physical and mental abilities, and to offer to engage with any employee whom they believe may have a disability. Such scrutiny would doubtless be tantamount to discrimination under 42 U.S.C. § 12112(a).

In any event, that is not the law, and the Court declines Gonzalez's invitation to re-write it. We are concerned with the Fifth Circuit's interpretation of a federal statute, not with the Ninth Circuit's interpretation of a state statute. And in the Fifth Circuit, even where a genuine issue of material fact may exist as to whether an employer engaged in the interactive process, "its dereliction cannot be said to have *led* to a failure to reasonably accommodate" an employee where "there is no evidence that a reasonable accommodation was feasible." *Silva v. City of Hidalgo*, 575 Fed. App'x 419, 424 (5th Cir. 2014) (citation omitted) (emphasis in original).[5]

In *Silva*, the Fifth Circuit distinguished *Chevron Phillips*, explaining that *Chevron Phillips* does not "eradicate [the] causation requirement or relieve a plaintiff of [his] burden of showing that a vacant position existed which [he] was qualified to perform." *Id.* at 424 n.3 (citation omitted). Here, Gonzalez does not dispute that UPS lacked a vacant, part-time position for which he was qualified; in fact, he admits that no such position existed. *See* ECF No. 14-2, at 40.

Accordingly, because Gonzalez's request was unreasonable as a matter of law, UPS had no duty to engage in the interactive process. The Court thus need not, and does not, reach the issue of whether UPS engaged in the ADA-required interactive process, because Gonzalez entirely fails to establish that he was a qualified individual with a disability who requested a reasonable accommodation.

---

[5] Although *Silva* is not "controlling precedent," it "may be [cited as] persuasive authority." *Ballard v. Burton*, 444 F.3d 391, 401 n.7 (5th Cir. 2006) (citing 5th Cir. R. 47.5.4).

####### d. *Gonzalez does not establish a* prima facie *claim of unlawful retaliation under the ADA.*

For similar reasons, Gonzalez fails to establish a *prima facie* case of unlawful retaliation in contravence of the ADA. Under the ADA's anti-retaliation provision, it is unlawful for any person to "discriminate against *any individual* because such individual has opposed any act or practice [prohibited by the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a) (emphasis added). To establish a *prima facie* claim, a plaintiff must show that he "(1) engage[d] in an activity protected by the ADA, (2) [the employer took] an adverse employment action, and (3) a causal connection [exists] between the protected act and the adverse action." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999) (citation omitted).

The causation factor requires the employee to show that "but-for the protected activity, the adverse employment action would not have occurred." *Id.* A plaintiff "must reveal a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1122 (5th Cir. 1998) (citing *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (*en banc*)).

Gonzalez does not point to any specific facts that demonstrate that he engaged in any ADA-protected activity prior to his termination. Gonzalez concedes that the first time he ever challenged UPS's actions was in his May 22, 2014 EEOC Charge of Discrimination. *See* ECF No. 14-2, at 60. Such conduct is protected activity under the ADA, but it is irrelevant to the inquiry here because the activity post-dated Gonzalez's termination date of May 1, 2014.

Even if, *arguendo*, Gonzalez's February 3, 2014 request for an accommodation could be construed as ADA-protected activity, he fails to demonstrate that his request was "reasonable" and thus within the ambit of the ADA. *Accord Kaye v. Burlington N. & Santa Fe Ry. Co.*, 2018 WL 2446594, at *6 (N.D. Tex. May 31, 2018). And because Gonzalez does not advance any argument

as to the purported casual connection between his February 3, 2014 request and his termination on May 1, 2014, he does not meet his burden under *Seaman*.[6] Gonzalez simply fails to adduce any summary judgment evidence that his February 3, 2014 request for an accommodation was the "but-for" cause of his termination. *See Rhodes*, 75 F.3d at 993.

Accordingly, because Gonzalez fails to establish both (1) that he engaged in any ADA-protected activity prior to his termination and (2) that any such protected activity was the but-for cause of his subsequent termination, he fails to establish a *prima facie* claim of unlawful retaliation under the ADA.

For the foregoing reasons, the Court **GRANTS** UPS's Motion for Summary Judgment as to Gonzalez's ADA discrimination and retaliation claims.

### III. FMLA Claim

The Court does not address whether Gonzalez establishes a *prima facie* claim under the FMLA because he voluntarily withdrew the claim in his Response to UPS's Motion for Summary Judgment. *See* ECF No. 19-1, at 34 ("Plaintiff withdraws his claim based on the Family Medical Leave Act. The evidence developed during discovery appears to not support that claim [*sic*].").

To avoid dismissal of a claim with prejudice after a party moves for summary judgment, Federal Rule of Civil Procedure 41(a)(1)(ii) requires a plaintiff to file "a stipulation of dismissal signed by all parties who have appeared." Here, Gonzalez wholly failed to comply with this procedural requirement by submitting a one-sentence statement purporting to withdraw the FMLA

---

[6] The Court notes that the "causal connection" prong of an ADA retaliation claim requires more than a showing of temporal proximity between the alleged protected activity and the adverse action. While a plaintiff *may* show temporal proximity to establish a "causal connection," the Fifth Circuit has held that "a five month lapse is not close enough without other evidence of retaliation." *Feist*, 730 F.3d at 454 (citing *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 472 (5th Cir. 2002). Such "other evidence" may include, *inter alia*, "an employment record that does not support dismissal, or an employer's departure from typical policies and procedures." *Id.* at 454–55 (citing *Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1015, 1024 (5th Cir. 2011)). Gonzalez advances no arguments, and points to no other evidence, to establish this causal connection.

claim in his Response to UPS's Motion for Summary Judgment. *See* ECF No. 19-1, at 34.

Accordingly, pursuant to Rule 41(b)(2), the Court **DISMISSES** Gonzalez's FMLA claims with prejudice, and therefore **DENIES** UPS's Motion for Summary Judgment as to Gonzalez's FMLA claim as moot.

## IV.    UPS's Request for Attorney's Fees

In its Motion for Summary Judgment, UPS argues that it is entitled to recover its attorney's fees because, in its view, "it is abundantly clear that [Gonzalez] is and was unable to perform his former position with UPS" and that "[Gonzalez] continued to litigate this matter well beyond when such evidence and admissions became known and obvious, forcing [UPS] to incur substantial attorney's fees in defense of these groundless, frivolous, and unreasonable claims." ECF No. 14, at 17–18.

The Court finds that (1) Gonzalez's claims were not frivolous, unreasonable, groundless, or without foundation; (2) UPS's request for attorney's fees is statutorily precluded; and (3) UPS's request for attorney's fees is procedurally defective. Therefore, each party shall bear its own litigation expenses, in accordance with the American rule. Accordingly, UPS's request for attorney's fees is **DENIED**.

> a.   The Christiansburg Garment *Doctrine is inapplicable to the whole of Gonzalez's claims.*

Absent an explicit statutory provision to the contrary, civil litigants must bear the costs of their own attorney's fees in the United States. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). It is "inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation." *Id.* UPS nonetheless argues that it is entitled to "reasonable and necessary attorney's fees," and directs the Court to *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412 (1978) for such a proposition.

29

In *Christiansburg Garment*, the Supreme Court considered "what standard should inform a district court's discretion in deciding whether to award attorney's fees to a successful *defendant* in a Title VII action." *Christiansburg Garment*, 434 U.S. at 417 (emphasis in original). The case is thus limited to the Supreme Court's interpretation of the "Attorney's Fee" provision of Title VII. *See* 42 U.S.C. § 2000e-5(k) ("In any action or proceeding under [Title VII] the court, *in its discretion, may* allow the prevailing party, . . . a reasonable attorney's fee (including expert fees) as part of the costs.") (emphases added). The Supreme Court held that district courts may, in their discretion, "award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment*, 434 U.S. at 421. It then offered several words of caution:

> In applying these criteria, it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.

*Id.* at 421–22. Ultimately, the *Christiansburg Garment* Court affirmed the District Court's denial of defendant's request for attorney's fees, concluding that it had "exercised its discretion squarely within the permissible bounds of [42 U.S.C. § 2000e-5(k)]." *Id.* at 424.

Here, the Court finds that Gonzalez exercised a statutory right to bring a claim against UPS under Title VII alleging discrimination and retaliation. At any time, UPS could have mitigated its own costs and expenses by, *inter alia*, filing a dispositive motion under Rule 12 or offering to

settle the matter with Gonzalez. That Gonzalez fails to overcome UPS's motion for summary judgment does not necessarily presuppose that he had no reasonable ground for bringing suit in the first instance.

Accordingly, the *Christiansburg Garment* factors are inapplicable to Gonzalez's Title VII claims.

### b. UPS's request for attorney's fees is statutorily precluded.

Similarly, UPS is not entitled to attorney's fees under the fee-shifting provision of the ADA. That provision, like Title VII's, provides that a court may, in its discretion, award a prevailing party reasonable attorney's fees. *See* 42 U.S.C. § 12205. Because "the almost identical language" between these two statutes "indicates Congress's intent to enforce them similarly," the Fifth Circuit has adopted the *Christiansburg Garment* standard as a guidepost for courts to employ when exercising their discretion to award prevailing parties reasonable attorney's fees under the ADA. *No Barriers, Inc. v. Brinker Chili's Tex., Inc.*, 262 F.3d 496, 499 (5th Cir. 2001) (citing *Christiansburg Garment*, 434 U.S. at 422). Thus, a prevailing defendant is only entitled to reasonable attorney's fees if, in a court's judgment, the plaintiff's claim was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Christiansburg Garment*, 434 U.S. at 422.

As with Gonzalez's Title VII claims, the Court finds that Gonzalez exercised a statutory right to bring a claim under the ADA, when he was a person with a disability who was terminated from his employment. UPS urges that Gonzalez provided documents to "the [Social Security Administration], and other governmental entities reflecting that he has been wholly unable to perform any gainful activity for nearly a four-year period" in support of its contention that Gonzalez never had a meritorious ADA claim. ECF No. 14, at 17. UPS overstates the evidence.

Indeed, while the Court finds that Gonzalez was not a "qualified individual" for the full-time position from which UPS terminated him, this conclusion does not necessarily mean that Gonzalez was "wholly" unable to perform "any" gainful activity. The record is clear that Gonzalez was able to perform part-time work, but that UPS was unable, and had no obligation, to offer him a part-time position.

Nor is UPS entitled to attorney's fees under the FMLA. That statute, unlike Title VII and the ADA, does not contain a fee-shifting provision. While Title VII and the ADA permit courts to award attorney's fees to "prevailing parties," the FMLA limits such an award to prevailing *plaintiffs* only. *Compare* 42 U.S.C. § 2000e–5(k) and *id.* § 12205 ("[U]nder [Title VII or the ADA] the court . . . may allow the *prevailing party*, . . . a reasonable attorney's fee.") *with* 29 U.S.C. § 2617(a)(3) ("[I]n addition to any judgment awarded *to the plaintiff*," the court shall "allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to by paid *by the defendant*.") (emphases added).

Two key distinctions exist between the Title VII and ADA provisions and the FMLA provision. First, the plain language of the former provisions suggests that either party may be entitled to reasonable attorney's fees in certain circumstances. *Accord Chrisianburg Garment*, 434 U.S. at 422. The latter, however, contemplates an award only to a successful plaintiff. Second, while the award of attorney's fees to prevailing parties is discretionary under Title VII and the ADA, such an award to a prevailing plaintiff is mandatory under the FMLA.

These fundamental differences evince Congress's intent to permit only prevailing plaintiffs to recover attorney's fees in FMLA litigation. Thus, Federal Rule of Civil Procedure 54(d)(1) controls whether UPS is entitled to its attorney's fees for defending Gonzalez's FMLA claims.

And that Rule provides that where, as here, no federal statute, rule, or court order provides otherwise, prevailing parties are not entitled to recover attorney's fees.

Accordingly, UPS's request for attorney's fees is barred by statute and by the Rules of Civil Procedure.

### c.   UPS's request for attorney's fees is procedurally defective.

UPS requests attorney's fees as part of its Motion for Summary Judgment. *See* ECF No. 14, at 17–18.  This was wholly improper because UPS does not move for sanctions against Gonzalez's counsel under 28 U.S.C. § 1927; it only requests attorney's fees from Gonzalez himself. *See id.*

Federal Rule of Civil Procedure 54(d)(2)(A) expressly provides that any "claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as any element of damages." As the defendant, UPS cannot and does not cite to any provision of Title VII, the ADA, or FMLA that requires this Court to consider its claim for attorney's fees <u>before</u> the entry of a dispositive judgment, because it is not the party seeking damages.

Indeed, any such request must "specify the judgment" from which the moving party believes it is entitled to such fees. *See* Fed. R. Civ. P. 54(d)(2)(B)(ii).  Because the Court had not yet entered a final judgment in this matter, UPS's motion clearly did not comply with this procedural requirement.  UPS may have assumed it would prevail, but such assumptions are irrelevant and have proven presumptuous.  Furthermore, any such request must also "state the amount sought or provide a fair estimate of it[.]" *Id.* 54(d)(2)(B)(iii).  UPS's request is devoid of any figure certain, or estimation, of the fees to which it purports to be entitled.

33

For the foregoing reasons, the Court will **DENY** UPS's request for "reasonable and necessary attorney's fees" with prejudice.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** UPS's Motion for Summary Judgment as to Gonzalez's Title VII and ADA claims, **DISMISS** Gonzalez's FMLA claims with prejudice pursuant to Fed. R. Civ. P. 41(b)(2), **DENY** UPS's Motion for Summary Judgment as to Gonzalez's FMLA claims as moot, and **DENY** UPS's Request for Attorney's Fees.

A separate order shall issue this date.

SIGNED this 28th day of September, 2018.

ROYCE C. LAMBERTH
SENIOR UNITED STATES DISTRICT JUDGE